# Exhibit A

Steven I. Adler (N.J. Bar Id. No. 027881982)
Mohamed Nabulsi (N.J. Bar Id. No. 029032007)
MANDELBAUM SALSBURG, P.C.
3 Becker Farm Road
Roseland, NJ 07068
Ph.: 973-736-4600
Fax: 973-736-4670
Attorneys for Plaintiffs

|  |  |
|---|---|
| SALERNO MEDICAL ASSOCIATES, LLP, SENIOR HEALTHCARE OUTREACH PROGRAM, INC., and SM MEDICAL LLC, individually and on behalf of all others similarly situated, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  ESSEX COUNTY<br><br>Docket No. |
| Plaintiffs, | CIVIL ACTION |
| v. | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| RIVERSIDE MEDICAL GROUP, LLC, UNITED HEALTHCARE COMMUNITY PLAN, INC., OPTUM, INC., OPTUM CARE, INC., UNITEDHEALTH GROUP, INC., UNITEDHEALTHCARE INSURANCE COMPANY, and JOHNS DOE 1-20, |  |
| Defendants. |  |

Plaintiffs Salerno Medical Associates, LLP and Senior Healthcare Outreach Program, Inc. ("**SHOP**")(collectively "**SMA**"), with offices at 570 and 613 Park Avenue, East Orange, New Jersey and/or 346 Roseville Avenue, Newark, New Jersey; and SM Medical, LLC ("**SMM**"), with offices located at 135 Bloomfield Avenue, Bloomfield, New Jersey; individually and on behalf of all other medical groups in New Jersey similarly situated (the "**Medical Groups**"), by way of Complaint against Defendants Riverside Medical Group ("**RMG**"), Optum, Inc. and Optum Care, Inc.

(collectively "**Optum**"), UnitedHealth Group, Inc. ("**UHG**"), UnitedHealthcare Insurance Company ("**UHC**"), UnitedHealthcare Community Plan ("**UHCCP**" or the "**Plan**"), (UHG, UHC, UHCCP and Optum, collectively, "**United**"), and Johns Doe 1-20 (the "**John Does**"), allege and say as follows:

## INTRODUCTION

1.     This class action lawsuit is brought by SMA and SMM, New Jersey based medical groups practicing in this State, on behalf of themselves and all other similarly situated New Jersey Medical Groups who are not parties to any agreements with United concerning the New Jersey Medicare Advantage ("**MA**") Plan which contain an arbitration clause, and who learned from United beginning in or about mid 2019 that one or more of their healthcare providers ("**Providers**") who generate revenues from United for their Medical Groups were going to be deselected (removed) by United from the Plan without cause based upon its alleged "assessment" of the Plan's network. Specifically excluded from the class is RMG as well as any other medical group owned, in whole or in part, by United.

2.     As set forth below, in violation of the MA regulations (the "**Regulations**"), the Providers' due process rights and their right to fair hearings, these Medical Groups and their Providers were not given any reason why the Providers were not being renewed other than that they were deselected by United after it "assess[ed] our networks to help ensure they meet the needs of our members," and were not given the information required by the Regulations such that the Providers could take meaningful appeals.

3.      Various Providers in these Medical Groups have challenged their wrongful terminations in individual arbitration proceedings, but their Medical Groups, to the extent that they share in the revenues their Providers generate from participating in the Plan, have suffered their own, separate damages as a result of United's and the remaining Defendants' actions including, but not limited to, United writing to the Medical Groups' patients sometimes many months in advance that their Providers will no longer be participating in the Plan, providing those patients with the names, addresses and phone numbers of other Providers and Medical Groups to whom they should seek medical care all while knowing that United had not complied with the Regulations, misinforming patients that the Medical Groups were not accepting new patients, blocking Providers who were being nonrenewed from referring their patients to other Plan Providers in their Medical Groups, failing to timely re-list Providers in United's directories of approved Providers after being ordered to do so by the court in the Lawsuit (defined below) and by various emergency arbitrators, and otherwise unfairly competing and tortiously interfering with the contractual and/or business relationships the Medical Groups have with their Providers, other Providers outside their Medical Groups and patients.

4.      United deselected these Providers from the Plan not due to any issues or concerns involving the quality of medical care they or their Medical Groups provide but, upon information and belief, to maximize its profits by, among other things, directing these Medical Groups' patients to RMG, a large, United-owned multi-discipline medical group with headquarters in Secaucus, New Jersey.

5.     The John Does are defendants, whose identities are currently unknown, who conspired with United and/or RMG, inter alia, to and did tortiously interfere with the Medical Groups' contractual and/or business relationships with their Providers and patients as well as other Medical Groups and Providers, and otherwise engaged in unfair competition with the Medical Groups and/or were unjustly enriched by their actions.

## FIRST COUNT
### Identification of the Parties and Background

6.     RMG, an Optum company owned by United, is a large, multi-discipline medical practice (including adult  medicine, allergy and immunology, mental health, chiropractic, cardiology, ear, nose and throat, foot & ankle, gastroenterology, pain management, pediatric, physical therapy, optometry, pulmonology, rheumatology and sleep medicine), with 250 board-certified healthcare providers, over 250,000 patients and some 85 offices located throughout New Jersey.

7.     United, the largest healthcare company in the world, with 2019 revenues of over $198 billion and earnings of nearly $14 billion, is a Minnesota holding company that owns UHC and UHCCP.

8.     United's national network includes more than 700,000 physicians and healthcare professionals and over 5,300 hospitals, offering about 50 million people (slightly less than one in six Americans) access to healthcare services.

9.     UHG and/or UHC are Medicare Advantage ("**MA**") organizations ("**MAOs**") which means they are approved by the Government to offer MA Plans.

10.     To cover Medicare benefits, Medicare pays MAOs, such as United, a fixed monthly dollar amount based on the number of "lives governed" (the number of its insureds in an MA Plan) and the complexity of the cases, unlike traditional Medicare

where the Government directly pays Providers different amounts based upon the types of medical services rendered.

11.     Medicare has Part A that covers hospitalization, Part B that covers outpatient treatment, while MA Plans are known as Part C plans.

## The Plan

12.     The Plan, a subsidiary of UHC, is a dual complete medical plan that offers health insurance coverage for people in New Jersey entitled to Medicare and Medicaid. It also includes prescription drugs pursuant to Medicare Part D.  Customers entitled to Medicare and Medicaid who have limited income and resources may also be eligible to have their health plan premiums paid.

13.     The Plan has a Medicare contract with the federal government and a contract with New Jersey's Medicaid Program, and is available to anyone in New Jersey who has Medicare and Medicaid.

14.     The Plan serves State programs (Medicaid) that care for the economically disadvantaged, the medically underserved and people without the benefit of employer-funded health care coverage, in exchange for a fixed monthly premium per member from the State program.

15.     The Plan includes a network of Providers in New Jersey who deliver the benefits package approved by the Centers for Medicare & Medicaid Services ("**CMS**"), a federal agency within the United States Department of Health and Human Services ("**HHS**") that administers the Medicare Program and works in partnership with New Jersey to administer Medicaid and the Children's Health Insurance Program ("**CHIP**") (a program that provides health coverage for eligible children through Medicaid and

separate programs administered by New Jersey according to federal requirements). United does not have contracts with the Medical Groups which employ these Providers.

16.     CMS is the single largest payer for healthcare in the United States and nearly 90 million Americans rely on health care benefits through Medicare, Medicaid and CHIPS.

17.     The Medical Groups treat Dual Complete MA, Medicaid and CHIP New Jersey patients.

18.     The Plan is approved by CMS to ensure that all applicable requirements for patients are met, including access and availability to health care in their service areas, as well as quality and value of care.

19.     The Plan is not permitted to restrict enrollees' choice among Medical Groups' Providers that are lawfully authorized to provide services under the Plan and agree to accept the Plan's terms and conditions of payment.

20.     The Medical Groups' Providers all are "in-network" under the Plan.  This means that if a Provider is terminated or otherwise deselected from the Plan, that Medical Group's patients must find another Provider in the Plan or they can continue to be treated by that Medical Group's deselected Provider if they are prepared to pay for that care using their own funds or, if possible, follow that Medical Group's Provider to another insurance company.

21.     If a patient follows a terminated Medical Group's Provider to a different health plan that the Provider may participate in, the patient will likely be required to see different specialists covered by the new plan and be prescribed different medications depending upon which drugs are covered by the new plan. They are also likely to have

less over-the-counter medications and general healthcare supplies covered by the new health plan since United's Plan is better than most in this regard.

### RMG and its Relationship with United

22.     As noted above, RMG, a New Jersey entity, is one of the largest multi-practice medical groups in New Jersey, and it employs Providers approved by United under the Plan.

23.     RMG was purchased by Optum Care in or about 2016.

24.     Optum Care, a behemoth medical group with approximately 30,000 physicians, is owned by Optum, Inc.

25.     United created the Optum brand in or about 2011 as United's health services business.

### The Named Plaintiffs and the Medical Group Class

26.     The Medical Groups employ Providers in New Jersey who are medical doctors, doctors of osteopathy and/or nurse practitioners who are Medicaid and Medicare healthcare Providers under the Plan.

27.     There are hundreds, if not thousands, of New Jersey Medical Groups with Providers in the Plan, and they can only refer patients to specialists or other Providers who also are in-network in the Plan, whether in their Medical Groups or others.

28.     The Medical Groups either are paid directly by United with the Medical Groups paying their Providers a salary and/or based upon productivity, or the Providers are paid directly by United and their Medical Groups share in the revenues generated by their Providers who participate in the Plan.

29.     The Medical Groups are generally located in inner cities and provide needed medical care for the economically disadvantaged, medically underserved community and people without employer-funded health coverage, including children.

30.     SMA is a family-run, second generation, multi-discipline healthcare practice that has served East Orange and Newark, New Jersey, federally designated underserved areas, for over fifty (50) years, and has had a long-term business relationship with United.

31.     SMA has approximately fourteen (14) healthcare Providers who participate in the Plan and, over the years, SMA has received significant revenues from the work of their Providers in the Plan.

32.     SHOP is a New Jersey corporation affiliated with SMA that provides geriatric healthcare, ambulatory services and regularly scheduled visits to home and bed-bound patients, including high risk and psychiatric patients.

33.     SMA and SHOP have had long-term business relationships with their Providers, other Medical Groups and Providers in these other Medical Groups, as well as long-term physician-patient relationships with their patients.

34.     The geographic areas where SMA and SHOP provide medical services are so underserved that they currently have approximately 2,500 Medicare and Medicaid patients and treat eight (8) to ten (10) new Medicaid patients each day, making SMA and SHOP two of the largest primary care Medical Groups in Essex County, New Jersey.

35.     SMA and SHOP deliver the highest quality medical care and services and, in October 2014, United recognized SMA in a full-page Star-Ledger article as a top

healthcare metrics Provider for delivering consistent, innovative and pioneering healthcare outcomes.

36.    SMA recently had a twenty-eight percent (28%) increase in Medicaid patients under the Plan, and United rewarded it, based upon delivering great outcomes for its patients, by paying SMA a $130,000 bonus in early 2019.

37.    As set forth below, after SMA's owner, Alexander Salerno, M.D. ("**Dr. Salerno"**) rejected various overtures from RMG to purchase it, all of SMA's Providers received letters from United informing them that they would not have their contracts renewed to remain in the Plan.

38.    SMM has offices in Bloomfield, New Jersey and its Providers focus on delivering high-quality medical care for its patients who have similar demographics to the patients treated by SMA.  SMM also has had a long-term relationship with its Providers, its patients, other Medical Groups and their Providers as well as United.

### United Notifies Medical Group Providers They are Being Dropped From the Plan

39.    At various times Providers employed or retained by New Jersey Medical Groups received letters from United indicating that United was terminating them from the Plan.

40.    Subsequently, United withdrew those termination notices and sent new termination letters (the "**Termination Letters"**) to Medical Group Providers indicating that they would not remain in the Plan as Providers after the expiration of their agreements.

41.    The Termination Letters sent to Providers all state that:

> "[w]e (UHC) periodically assess our networks to help ensure
> they meet the needs of our members.  As a result, we sometimes
> have to make difficult decisions around care provider contracts.
> Unfortunately, we've decided not to renew your
> UnitedHealthcare Community Plan Agreement …"   A
> representative Termination Letter is annexed hereto and made a
> part hereof as Exhibit "A".

42.    The "Appeal Process" information sheets (the "**Appeal Information Sheets**") prepared by United that accompanied the Termination Letters confirm that United was terminating these Providers "without cause".  A copy of a representative Appeal Information Sheet is annexed hereto and made a part hereof as Exhibit "B".

43.    An MAO, such as United, by law must provide its participating Providers who are being terminated with reasonable procedures that include, among other things, the following:

> "A process for appealing adverse participation procedures,
> including the right of physicians to present information and
> their views on the decision" 42 C.F.R. §422.202(a)(4).

44.    Moreover, in the case of an MAO's suspension, termination or non-renewal of a Provider, the process must conform to the Regulations in 42 C.F.R. §422.202(d), which require, among other things, the following:

A.    written notice to the physician concerning the reasons for the action including, if relevant, the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MAO, and notice of the affected physician's right to appeal the action and the process and timing for requesting a hearing;

B.    that a majority of the hearing panel members are peers of the affected physician; and

C.    written notice to licensing or disciplinary bodies or to other appropriate authorities of the suspension or termination of a physician's contract because of deficiencies in the quality of care (emphasis added).

45.     The Termination Letters undeniably failed to comply with the Regulations because, inter alia, they indicated that United periodically "assesses its networks to help ensure they meet the needs of its members", yet they failed to inform Providers of the standards and profiling data used to evaluate them and failed to advise them of the numbers and mix of physicians needed by the Plan.

**United Notified Patients that Medical Group Providers Were Being Dropped from the Plan, Interfered with Patients Trying to Utilize Other Providers in The Same Medical Groups and Provided Them With False Information**

46.     Notwithstanding United's utter failure to comply with the Regulations, as confirmed by the Permanent Arbitrator in the Salerno Arbitration, discussed below, United notified Medical Groups' patients that their Providers were being terminated from the Plan and, in some cases, did so months in advance of the nonrenewal dates. Moreover, United would not allow patients to transfer from Providers who were being terminated to other Providers in the same Medical Group and otherwise interfered with the Medical Groups' relationship with their Providers, their Patients, other Medical Groups and Providers outside of their Medical Groups.

47.     No reasons were given for United's decision to drop certain Providers other than to state, as set forth above, that it resulted from United's assessment of its network to meet the needs of its members.

48.     United's notices mailed to patients in New Jersey resulted in patient confusion, as they were unaware of why their Providers were being dropped from the Plan and, upon information and belief, many patients wrongfully but reasonably believed that their Providers must have provided poor medical services to them and their patients or else they would not be dropped from the Plan by United.

49.     Moreover, as to certain Providers, United indicated in its on-line Provider directories that these Providers were "Not Accepting Patients," which was false.

50.     By, among other things, mailing those letters when it knew and clearly should have known it had no right to terminate the Medical Groups' Providers in the manner it did, and doing so months in advance, United, inter alia, tortiously interfered with the Medical Groups' contractual and business relations and prospective economic advantage with their Providers and patients as well as with other Medical Groups and Providers in other Medical Groups to whom they make and receive referrals .

**The Lawsuit and a Final AAA Award Conclusively Determine that United Failed to Comply with the Regulations, Forcing It to Reinstate Most of the Plaintiffs in the Lawsuit**

51.     In September 2019, Dr. Salerno individually and on behalf of SMA and SHOP, as well as various other Medical Groups, on behalf of themselves and their Providers, challenged the deselection of the Providers in a lawsuit filed in the United States District Court for the District of New Jersey (the "**Lawsuit**").

52.      On or about October 4, 2019, the Judge in the Lawsuit, the Hon. Kevin McNulty, U.S.D.J., temporarily enjoined and restrained United from removing any of those Providers from the Plan, ordered United to keep plaintiffs in the on-line directories maintained by United and afforded plaintiffs time to seek further relief in arbitration.

53.     Thereafter, despite the Regulations and/or Medicare's Guidance obligating United to update their directories in real-time, United delayed reinstating plaintiffs in the directories for weeks, resulting in plaintiffs' counsel threatening to bring contempt proceedings against United.

54. Subsequently, numerous Providers including, but not limited to, Dr. Salerno, Dr. Ramez Samuel ("**Dr. Samuel**") of SMM and Dr. Inas Wassef ("**Dr. Wassef**"), owner of a pediatric clinic in Jersey City and Bayonne, challenged their deselection from the Plan in individual arbitration proceedings before the American Arbitration Association ("**AAA**").

55. Dr. Wassef, in particular, received termination letters from United in or about 2018 and 2019, and United thereafter wrote to her patients and steered them to RMG which had opened pediatric offices within a very short distance from her offices in Jersey City and Bayonne.

56. Drs. Salerno, Samuel and Wassef all obtained termporary restraining orders from emergency arbitrators, allowing them to remain in the Plan, and various other Providers also obtained injunctive relief from different emergency arbitrators.

57. As noted above, in the arbitration proceeding brought by Dr. Salerno (the "**Salerno Arbitration**"), Dr. Salerno obtained a preliminary injunction before an emergency arbitrator, precluding United from removing him from the Plan or its directories until such time as a final arbitration hearing could be held.

58. Thereafter, a permanent arbitrator (the "**Permanent Arbitrator**") was appointed in the Salerno Arbitration, the parties exchanged certain written discovery and the matter went to a final hearing on February 18, 2020 at which there was testimony taken from various witnesses, including two United employees, all of whom were subjected to cross-examination followed, by lengthy closing arguments and numerous factual and legal questions from the Permanent Arbitrator.

59. On or about March 24, 2020, the Permanent Arbitrator issued a lengthy and well-reasoned decision and final Award (the "**Final Award**") in the Salerno Arbitration, holding, <u>inter alia</u>, that United breached Dr. Salerno's contract and the

Regulations.  A copy of the Final Award is annexed hereto and incorporated herein by

reference as Exhibit "C".

60.    In particular, the Permanent Arbitrator held that

> [t]he MA Regulations cannot reasonably be interpreted to permit the Respondents' [United's] termination of Claimant's [Dr. Salerno's] contract in the manner it occurred here. Respondents' interpretation of the MA Regulations is not supported by the Regulations' plain meaning, the history of their adoption, or their intended purpose.  See Final Award at p. 10.

61.    The Permanent Arbitrator also held that

> [g]iven Respondents' steadfast refusal to identify any quality concern or breach of contract by Claimant, it is undeniable that his termination was a "business decision."  As such, he was entitled to the benefit of what DHHS called the "provider protection provisions."......The MA Regulations provide physicians joining MA provider networks with some confidence that they will be treated fairly....The MA Regulations also foster public confidence in the MA Provider networks by assuring that Providers will not be excluded for improper reasons.  By requiring that a substantive reason be stated for a termination, the possibility of a termination resulting from an improper motive is greatly reduced. Id. (emphasis added)

62.    Relevant to this litigation, the Permanent Arbitrator in the Salerno

Arbitration indicated that

> Claimant suggested at the hearing that his termination was motivated by Respondents' desire to eliminate competition for a large and growing medical practice [RMG] owned by Respondents' affiliate.  This issue was beyond the scope of the arbitration, since Respondents denied that any substantive reason for their decision [to remove Dr. Salerno from the Plan] was required.  However, the allegation illustrates the kind of "reason" that, if proved, could create a justiciable issue concerning a "without cause" termination.

63.     The Permanent Arbitrator also correctly concluded from the evidence and law that

> [t]here is no question that "the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by [Respondents' Plan] were "relevant" to Respondents' decision to terminate Claimant's contract. Indeed, it was likely the information that was *most relevant* to that decision….. (emphasis in original) The arbitrator finds that Respondents failed to comply with this requirement.  Id. at p. 13.

64.     The Permanent Arbitrator also held that, by failing to give Dr. Salerno the information and data required by the Regulations, the opportunity for an appeal, which is mandated by the Regulations, "provided no real appeal at all."  Id. at p. 14.  The Permanent Arbitrator cited the Regulations' requirement which includes "the right of physicians to present information and their views on the decision," Id. at p. 14, yet because Dr. Salerno was never given the substantive reason for his termination by United, "it was impossible for him to submit any information on that subject."

65.     Finally, the Permanent Arbitrator also disagreed with United's argument that Dr. Salerno lacked a private right of action to enforce the Regulations, Id. at pp. 15-16, and that his claim was preempted by the Medicare Act.  Id. at p. 16.  As a result, the Permanent Arbitrator granted Dr. Salerno permanent injunctive relief, finding that without it he would suffer irreparable harm.  Id. at p. 17.

66.     Subsequently, United confirmed in writing that it would abide by the permanent injunctive relief awarded in the Salerno Arbitration.  Moreover, just a few days later, United notified class counsel herein that United was unilaterally reinstating and/or allowing to remain in the Plan all fourteen (14) of the Providers in SMA and

SHOP, both of the Providers in SMM (Drs. Samuel and Abdulshahid) and two Providers in another Medical Group (Drs. El-atat and Slater).

67.     United, however, without explanation, refused to allow one of the plaintiffs in the Lawsuit, Dr. Wassef, to remain in the Plan but, as set forth herein, and upon information and belief, it is because RMG has opened offices close to Dr. Wassef's two offices.  In any event, as noted above, Dr. Wassef's was granted a preliminary injunction by an emergency arbitrator, allowing her to remain in the Plan at least until the final hearing in her arbitration.

### Even Though the Providers in the Medical Group Named Plaintiffs Now Have Been Reinstated, United's Actions Caused Significant Harm to Medical Groups and their Patients

68.     The Medical Groups have spent years and significant dollars developing and enhancing their good will and the good will of their Providers, forging important doctor-patient relationships with Plan participants and business relationships with other Medical Groups and other Providers in the Plan.

69.     The Patient makeup of various Medical Groups who have Providers in the Plan is as high as eighty (80%) or ninety percent (90%) MA patients and only ten (10%) or twenty percent (20%) Patients under commercial insurance plans.

70.     Providers were not terminated due to the quality of their medical care, and United advised Providers that they were terminated "without cause."  In fact, there was no legitimate basis for terminating the Medical Groups' Providers.

71.     Upon information and belief, the terminations resulted in United denying access to quality and efficient healthcare to thousands of Medicare beneficiaries in violation of the Regulations, including §422.112(a)(1) which requires each MA Plan to

"[m]aintain and monitor a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to covered services to meet the needs of the population served."

72.    Similarly, Medicaid requires states, such as New Jersey, to monitor access for certain types of services provided under the Plan and to include network adequacy requirements.

73.    Under the Act, Medicaid Patients are entitled to have access to quality medical care from enough available Providers so that the care and services available under the Plan are comparable to such care and services available to the "general population in the geographic area."  Act, §1902 (a)(30)(A).

74.    Upon further information and belief, as a result of the Provider terminations, the Plan does not "meet Medicare access and availability requirements through direct contracting network Providers consistent with the prevailing community pattern of health care delivery in the areas where the network is being offered" and it does not satisfy the equal access provision in the Act for Medicaid Patients.

75.    The Medical Groups and their Providers are essential to their communities, and Medicare and Medicaid beneficiaries have relied on them for years to provide high-quality, efficient medical care.

76.    The Medical Groups and their Providers have longstanding physician-patient relationships with many of their Patients with emotional bonds of trust and, in some cases, are the only Medical Groups furnishing accessible services in their geographic areas.

77.     Considering the population they serve (generally inner-city, poor minorities who often distrust the government), without these Medical Groups, many patients and their children likely would go without proper or any medical care.

78.     Medical Groups who have primary care doctors on staff, based upon years of treatment results ("outcomes") and their professional medical judgment, have developed a group of Provider specialists to whom they typically refer patients.  In fact, some Medical Groups are broad based practices having both primary care Providers as well as specialists on staff with whom they often consult as well as to whom they often refer patients in need of expertise in particular areas of medicine. Likewise, Medical Groups who make referrals also often receive referrals from other Medical Groups.

79.     The termination of a primary care Provider from the Plan can have a devastating impact on patients who are covered by the Plan.  For example, by terminating a primary care Provider, patients may only remain with that doctor if they are willing to pay out-of-pocket (without any reimbursement from the Plan) all of the doctor's charges because the Plan does not reimburse the Patient or pay for doctors who are out-of-network.

80.     Because Plan participants are on Medicare and Medicaid, most patients simply could not afford to continue treatment with their doctors if their doctors are terminated from the Plan despite having developed close physician-patient relationships.  This results in Patients having to locate new primary care Providers, which often is difficult because these patients generally reside in inner cities and do not have cars.  Moreover, they live in communities that are medically underserved and some patients likely will be so discouraged by United's changes that they even may be unwilling to seek covered preventive care.

81.     Forcing patients to change primary care Providers also has other, major repercussions.  As noted above, primary care Providers have their "go to" specialists for referrals. If a Patient is forced to drop his or her primary care Provider, it typically results in the patient needing to see new specialists referred by their new primary care Provider.

82.     The change of who is acting as the primary care Provider may also result in a change in the medicines prescribed to a patient even though the former primary care Provider and the Patient were satisfied with the results of the medications prescribed.

83.     Even if a patient tries to follow their primary care Provider who was terminated from the Plan to a different health insurance plan, patients may suffer because each insurance carrier has a different panel of approved pharmaceuticals for treatment of their patients and United's Plan generally provides for reimbursement of over-the-counter medications and other healthcare products not reimbursed to the same level or at all by other insurance companies.  As a result, patients may not be able to continue taking the same medications there were on when with Plan.  They may be forced to start a different regimen or seek an exception from the new plan's prescription drug panel.  This could take weeks, if not longer, and result in patients not being able to fill needed prescriptions during this appeal process.

84.     Moreover, each insurance carrier has a different set of co-payments for which patients are responsible and, as a result, patients under the federal poverty line could see a drastic increase in their co-payments for prescription drugs which many cannot afford to pay.

**United is Lining Its Own Pockets by Terminating Medical
Group Providers and Referring Patients to RMG, a
<u>Medical Group Owned and/or Controlled by It</u>**

85.     In or about 2016, RMG, a large medical group and healthcare Provider under the Plan, with about three hundred (300) doctors, was acquired by Optum Care, which, in turn, is owned by UHCG, a holding company that also owns UHC and UHCCP.

86.     As a result, United has a vested, financial interest in having Plan participants obtain medical services from RMG rather than the Medical Groups who are named plaintiffs herein or other Medical Groups who have Providers in the Plan.

87.     In or about June 2018, RMG first sought to acquire SMA and did so again later, but Dr. Salerno refused all overtures.

88.     Shortly thereafter and, upon information and belief, because Dr. Salerno refused to allow SMA to be acquired by RMG, United, RMG and John Does conspired to force all fourteen (14) of SMA's Providers out of the Plan.

89.     In fact, that is precisely what occurred starting in or about mid 2019 when all of SMA's Providers began receiving the Termination Letters.

90.     Moreover, upon further information and belief, RMG conspired with the other Defendants in a concerted effort to have other Medical Groups' Providers terminated from the Plan such that patients could be steered and redirected to RMG for their medical treatment rather than from the Medical Groups.

91.     For example, RMG has an office in Jersey City approximately one mile from Dr. Wassef's office, and another office near Dr. Wassef's Bayonne office, and Defendants have steered many or her patients to RMG.

92.     Moreover, to protect RMG, United refused to allow Dr. Wassef to remain in the Plan notwithstanding its decision to allow every other plaintiff in the Lawsuit to remain in the Plan or to reinstate them in the Plan.

93.     When asked the reason for United singling out Dr. Wassef and her Medical Group, United's counsel refused to provide an explanation saying United wasn't obligated to give a reason for its decision.

94.     Upon information and belief, United has decided to terminate other Medical Groups' Providers also because it can make more money if it controls what doctors patients of these Medical Groups are treated by even though MAOs and healthcare Providers owe a duty to their patients to ensure they receive proper medical care.

95.     While the Regulations provide that MAOs notify patients at least thirty (30) days in advance of when their providers are coming out of the Plan, United went out of its way to inform patients months beforehand to have patients leave their Providers as soon as possible and well before the Providers' agreements expired.

96.     Moreover, even before Providers' agreements expired, United would not allow them to see new patients or patients of other Providers in their Group.  For example, SMA tried to have patients of those SMA healthcare Providers whose contracts were expiring in 2019 and/or early 2020 transferred to other SMA healthcare Providers whose contracts were not expiring until in or about May and June, 2020, but United would not allow those patients to switch.

97.     SMA hired a geriatrics physician who United allowed in the Plan (because, upon information and belief, he was one of only a handful of doctors practicing in this geographic area), yet United interfered with SMA's efforts to move patients of other SMA Providers who were being terminated to this doctor.

98.    Effective November 15, 2019, enrollment in the Plan by Medicaid recipients in New Jersey was frozen by the New Jersey Department of Human Services ("**NJDHS**") because of "operational and quality issues related to program standards and contract requirements."

99.    NJDHS notified United about certain improvements that are required and, upon information and belief, it is currently monitoring the Plan's status.

100.    Similarly, the United States Department of Health & Human Services, the Centers for Medicare & Medicaid Services ("**CMMS**"), reviewed United's practices with regard to the Plan and determined that, in each of the past three years, United had not reinvested enough of its profits into the Plan to provide acceptable health benefit coverage to Plan participants.

101.    As a result, CMMS took the unusual and drastic step to freeze the Plan such that, during contract year 2020, United is not permitted to allow any new participants enroll in the Plan.

**United Has Also Retaliated Against, Among Others, SMA and Its
Providers as a Result of Dr. Salerno's Refusal to Sell
SMA and His Decision to Challenge United's Action
Terminating Doctors Without Cause from the Plan**

102.    As previously indicated, Dr. Salerno refused various overtures from RMG to sell SMA to it.

103.    Dr. Salerno was the lead plaintiff in the Lawsuit filed in Newark last year in which Plaintiffs challenged United's decision to remove them from the Plan and injunctive relief was awarded pending a determination as to the arbitrability of the Providers' claims.

104.    In that Lawsuit, plaintiffs also were able to gain the support of the Medical Society of New Jersey ("**MSNJ**") as a party and the MSNJ also brought claims on their behalf against United in an arbitration proceeding.

105.    Dr. Salerno was also an outspoken critic concerning United's treatment of the fourteen (14) Providers in his Medical Group as well as its treatment of the other Medical Groups' Providers who also were being terminated without cause.

106.    The Providers in SMA all objected to United and challenged their terminations from the Plan.  After not hearing about the status of their appeals for many months, five of SMA Providers learned that their appeals to United all were rejected "coincidently" on November 26, 2019, the day the Emergency Arbitrator in the Salerno Arbitration heard testimony from Dr. Salerno about his wrongful removal and need for temporary injunctive relief.

107.    Moreover, just a month or so later, in or about January, 2020, United further retaliated against SMA by supposedly reviewing thousands of patient invoices and claiming that SMA was overpaid allegedly by many tens of thousands of dollars, forcing SMA to spend significant sums fighting these frivolous accusations.

108.    United has continued with its retaliatory conduct toward Dr. Salerno, SMA and SHOP, and just recently questioned certain billings by these Medical Groups without United following governing regulations and despite a freeze on such challenges during the COVID-19 pandemic.

109.    As also noted above, United has retaliated against Dr. Wassef by, among other things, refusing to allow her back in the Plan.

**<u>Class Action Allegations</u>**

110.    SMA and SMM bring this action on their own behalf and on behalf of a class of all Medical Groups in New Jersey who do not have direct contracts with United and who, during the relevant class period, had Providers who were notified that they would be removed from the Plan by United without cause when their individual Provider Contracts expire(d), who had patients receive letters from United notifying them that their Providers were being deselected from the Plan and/or who otherwise suffered damages as a result of Defendants' interference with their relationships with their Providers, their patients and Providers from other Medical Groups.

111.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including whether:  (a) the Plan is an MA Plan; (b)  United is an MA Organization; (c) the Final Award is binding upon United; (d)   United terminated the Medical Groups' Providers despite knowing, prior to the terminations, that it failed to comply with the Regulations; (e) Defendants steered patients to RMG; (f) Defendants tortiously interfered with Plaintiffs' contractual and business relationships with the Medical Groups' Providers, their patients, other Medical Groups and other Plan Providers; (g) Defendants engaged in unfair competition; (h) United engaged in an unlawful refusal to deal with Plaintiffs; (i) Defendants were unjustly enriched to the Medical Groups' substantial detriment; and (j) Defendants misappropriated the Medical Groups' trade secrets and/or proprietary information.

112.    The claims of the proposed class representatives are typical of the claims of the Class because United terminated the Providers of all Medical Groups for the same

alleged reason set forth in identical Termination Letters and, upon information and belief, for the same unlawful reason(s).

113.   The named Plaintiffs will fairly and adequately protect the interests of the members of the Class, have retained counsel experienced in Class and complex litigation, and have no interest antagonistic to or in conflict with those of the Class.

114.   The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for United.

115.   A Class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.   Furthermore, considering that the amount of damages suffered by certain, individual Class members or smaller Medical Groups may be relatively small, the expense and burden of individual litigation against such a large insurance company would make it extremely difficult for at least certain Class members individually to redress the harm done to them.  Given the uniform policies and practices at issue, there will be no difficulty in the management of this litigation as a class action.

116.   Greater than two-thirds of Plaintiffs and at least one Defendant are citizens of New Jersey and Plaintiffs seek significant relief from RMG whose conduct forms a significant basis for the claims asserted herein.

117.   Moreover, Plaintiffs' injuries occurred in New Jersey and during the three year period preceding the filing of this litigation, no other class action to Plaintiffs' knowledge has been filed asserting the same or similar factual allegations.

118.    In addition, the primary Defendants, RMG and the Plan, are New Jersey entities and/or have their principal places of business within this State or have such contacts with the State that they consider the State home and, upon information and belief, the remaining Defendants played secondary roles and/or have vicarious liability to Plaintiffs.

### Cause for Action
### (Civil Conspiracy)

119.    Plaintiffs repeat and reallege all of the foregoing allegations as if same were fully set forth herein at length.

120.    Defendants have conspired to, inter alia, unfairly compete with Plaintiffs, tortiously refuse to deal with the Medical Groups and terminate the Medical Groups' Providers from the Plan, and misappropriate the Medical Groups' patients, trade secrets and/or confidential information.

121.    Defendants have further conspired to, inter alia, tortiously interfere with the Medical Groups' contractual and business relationships with their Providers, their Patients, other Medical Groups and other Providers, and with the Medical Groups' prospective economic advantage with their Providers, Patients and other Medical Groups and Providers in order to, among other things, steer those Patients to RMG and/or force certain Medical Groups with whom United cannot make significant profit to become Providers under other insurance companies' plans.

122.    As a direct and proximate result thereof, United has terminated, or shortly will terminate, Medical Groups' Providers from the Plan and have denied, or shortly will deny, said Providers' appeals to the appeal panels hand-chosen by the United.

123.   As a direct and proximate result of Defendants' civil conspiracy, the Medical Groups have suffered, and will continue to suffer, substantial damages.

124.   The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

## SECOND COUNT
### (Tortious Refusal to Deal With the Medical Groups)

125.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

126.   Defendants, without complying with the Regulations, have wrongfully discharged various Medical Group Providers and tortiously refused to deal with the Medical Groups.

127.   As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.

128.   The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

## THIRD COUNT
### (Unfair Competition)

129.   Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

130.   The aforesaid conduct of Defendants including, but not necessarily limited to, notifying patients months in advance that their Providers were being terminated from the Plan, conspiring to terminate, and thereafter terminating, the Medical Groups' Providers from the Plan knowing that United was doing so in violation of the

Regulations, interfering with the Medical Groups' efforts to transfer patients to other Providers in their Medical Groups, failing to re-list terminated Providers (in real-time) to directories after being ordered to do so in the Lawsuit and various individual arbitrations, utilizing the Medical Groups' trade secrets and/or confidential and proprietary information relating to their patients, and directing those patients to RMG, constitutes, inter alia, unfair competition and is otherwise wrongful.

131.    As a direct and proximate result thereof, the Medical Groups have suffered substantial damages.

132.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Medical Groups' rights.

### FOURTH COUNT
### (Unjust Enrichment)

133.    Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

134.    As a direct and proximate result of the aforesaid wrongful conduct of Defendants, Defendants have been unjustly enriched to the substantial detriment of the Medical Groups and will be unjustly enriched unless and until they are required to disgorge their ill-gotten gains.

### FIFTH COUNT
### (Tortious Interference with Contracts and
### Prospective Economic Advantage)

135.    Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

136.    Defendants are aware of the Medical Groups' contractual and business relations with their own Providers and patients, other Medical Groups and their Providers, and their prospective economic advantage with their Providers and patients as well as other Medical Groups and Providers and, notwithstanding that knowledge, intended to cause harm to the Medical Groups.

137.    The aforesaid conduct of Defendants constitutes, inter alia, a tortious interference with Medical Groups' contractual and business relations with their Providers and patients as well as other Medical Groups and their Providers, and with their prospective economic advantage with same.

138.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Medical Groups' rights.

139.    As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.

### SIXTH COUNT
### (Misappropriation of Trade Secrets and/or Proprietary and Confidential Information)

140.    Plaintiffs repeat and reallege all of the previous allegations as if same were fully set forth herein at length.

141.    Defendant(s) misappropriated trade secrets and/or confidential and proprietary information belonging to the Medical Groups consisting of, inter alia, patient names and contact information, and wrongfully disclosed and/or used that information to steer the Medical Groups' patients to other Providers in the Plan.

142.    The aforesaid conduct was willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

143.   As a direct and proximate result thereof, Plaintiffs have suffered substantial damages.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiffs demand judgment on all of the above Counts in the Complaint against Defendants jointly, severally and/or in the alternative, as follows:

    A.  Damages;

    B.  Punitive damages;

    C.  Interest;

    D.  Reasonable attorneys' fees;

    E.  Costs of suit; and

    F.  Such further relief as this Court deems just and equitable.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiffs


By:  */s/Steven I. Adler*
       STEVEN I. ADLER

Dated:  July 17, 2020




## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all matters so triable.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiffs


By:  */s/ Steven I. Adler*
       STEVEN I. ADLER

Dated:  July 17, 2020

## <u>CERTIFICATION</u>

I hereby certify that the within action is not related to any other pending lawsuit and that

no other party needs to be joined in the within action.

MANDELBAUM SALSBURG, P.C.

By: */s/Steven I. Adler*
        STEVEN I. ADLER

Dated: July 17, 2020

# EXHIBIT A



**UnitedHealthcare**
**Community Plan**

1311 W. President George Bush Hwy.   Richardson, TX 75080

March 22, 2019

Senior Healthcare Outreach Program
Attn: Alexander Salerno, MD
613 Park Ave
East Orange NJ 07017-1905

**Re: Your UnitedHealthcare Community Plan Contract, on Behalf of AmeriChoice of New Jersey, Inc. and its Affiliates, Won't be Renewed and Will End on July 29, 2019.**

Dear Alexander Salerno, MD:

We periodically assess our networks to help ensure they meet the needs of our members. As a result, we sometimes have to make difficult decisions around care provider contracts. Unfortunately, we've decided not to renew your UnitedHealthcare Community Plan Agreement. This means your contract will end on July 29, 2019.

**Important Points**
- Your UnitedHealthcare Community Plan Agreement includes Medicaid, Children's Health Insurance Program (CHIP) and Dual Complete Medicare Advantage benefit contract types.
- We're sending this letter to you in accordance with the terms of your Agreement.
- This change doesn't affect any other Participation Agreements you currently have with UnitedHealthcare.
- We'll communicate this change in your participation status to your UnitedHealthcare New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage patients in accordance with any laws that may apply.

**Appeal Rights**
You may have the opportunity to appeal. To understand your appeal rights, please refer to the enclosed Appeal Process document. The scope of the appeal panel's review of your appeal is limited to determining whether UnitedHealthcare acted according to the provisions of your Agreement. The panel will only consider information that is relevant to the scope of the panel's review of your appeal.

**We're Here to Help**
We understand that this change may be of concern to you. We're ready to answer your questions and hear your concerns. We also want to help your patients, who are New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members, access necessary care within their plan's network.

If you have questions or wish to provide information that can help us make this process easier for you or your patients, please call 888-362-3368, 9 a.m. – 6 p.m. ET. Thank you for the service you've provided our New Jersey Community Plan Medicaid, CHIP and Dual Complete Medicare Advantage members.

Sincerely,

Michele Nielsen
Michele Nielsen
Vice President, Network Management

Enclosure

Doc#: PCA-1-015117-03132019_03142019

© 2018 United HealthCare Services, Inc.

# EXHIBIT B

 UnitedHealthcare*

# Appeal Process

<u>Who May Appeal</u>

You may request an appeal before a panel appointed by UnitedHealthcare as described in this document if:

1. You were removed from UnitedHealthcare's network by way of **termination without cause** and:
   - You were removed from UnitedHealthcare's network maintained for any Medicare Advantage benefit plan. **This opportunity to appeal applies to physicians only;**
   - You were removed from UnitedHealthcare's network maintained for any Medicaid, CHIP or any other state program ("Medicaid or other State Program") benefit plans in any of the following states:
     - Delaware
     - Florida
     - Maryland
     - Massachusetts
     - Pennsylvania
     - New Jersey: You do not have an opportunity to appeal in a case involving imminent harm to patient care, a determination of fraud, or a final disciplinary action by a state licensing board or other governmental agency that impairs your ability to practice. This opportunity to appeal does <u>not</u> apply to hospitals or any other facility.
     - New York: This opportunity to appeal does <u>not</u> apply to hospitals or any other facility.
     - Texas: You do not have an opportunity to appeal in a case involving imminent harm to a patient's health, an action by a state medical or other physician licensing board or other government agency that effectively impairs your ability to practice medicine, or fraud or malfeasance.

Or

- You were removed from UnitedHealthcare's network maintained for any commercial benefit plan in any of the following states:
   - California: You only have the opportunity to appeal if UnitedHealthcare has substantial market power and your removal from UnitedHealthcare's network would significantly impair your ability to practice in a particular geographic area. This opportunity to appeal applies to physicians only.
   - Delaware
   - Maine
   - Missouri: This opportunity to appeal does <u>not</u> apply to hospitals or any other facility.
   - New Jersey: This opportunity to appeal <u>only</u> applies to (a) physicians, physician assistants, dentists, podiatrists and any other health care professional licensed pursuant to Title 45, and (b) hospitals and other facilities licensed pursuant to Title 26.
   - New York: This opportunity to appeal <u>only</u> applies to physicians, physician assistants, dentists, podiatrists and any other health care professional licensed, registered or certified pursuant to Title 8 of the New York Education Law.
   - Rhode Island: This opportunity to appeal does <u>not</u> apply to hospitals or any other facility.
   - Texas
   - Vermont

1

2. You were removed from UnitedHealthcare's network by way of nonrenewal of your participation agreement and:
- You were removed from UnitedHealthcare's network maintained for any Medicare Advantage benefit plan. This opportunity to appeal applies to physicians only.
- You were removed from UnitedHealthcare's network maintained for any Medicaid, CHIP or any other state program ("Medicaid or other State Program") benefit plan in any of the following states:
  - Massachusetts
  - Texas
- You were removed from UnitedHealthcare's network maintained for any commercial benefit plan in any of the following states:
  - Delaware
  - Maine
  - Texas
  - Vermont

You also have the opportunity to appeal your removal from UnitedHealthcare's network if this opportunity is granted to you under the terms of your participation agreement.

Please note the following: A termination without cause is not based on a provision in the participation agreement that specifies a particular cause that is needed in order to terminate the agreement. By way of example, a termination without cause is based on a provision in the participation agreement that reads along the lines of, "either you or we can terminate this agreement by providing at least 90 days' prior written notice." A termination without cause is not, for instance, a nonrenewal or a termination of a physician's participation status for material breach or termination of a physician's participation status for failure to comply with UnitedHealthcare's Credentialing Plan, loss of licensure, or a sanction imposed by any governmental agency or authority, including Medicare or Medicaid. A nonrenewal is an action taken by UnitedHealthcare to not renew your participation agreement. By way of example, a nonrenewal is based on a provision in the participation agreement that reads along the lines of, "either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days' prior written notice."

### Scope of the Appeal Panel's Review
The scope of the appeal panel's review of your appeal is limited to determining whether UnitedHealthcare acted in accordance with the provisions of your participation agreement. The appeal panel will only consider information that is relevant to the scope of the appeal panel's review of your appeal.

### How to Request an Appeal
Except as indicated below, if you would like to appeal, you must request an appeal within 30 calendar days after the date of the attached notice.
- Maryland - If you are removed from the network maintained for Maryland Medicaid or other State Program benefit plans you must request an appeal or object to your removal from the network within 90 business days after the date of the attached notice.
- New Jersey - If you are removed from the network maintained for commercial benefit plans in New Jersey or New Jersey Medicaid or other State Program benefits plans, you must request an appeal within 10 calendar days after the date of the attached notice.
- Texas - If you are removed from the network maintained for Texas Medicaid or other State Program benefits plans, you must request an appeal within 60 calendar days after the date of the attached notice.

2

In order to request an appeal, you must complete the attached Appeal Submission Form and submit the form, along with a copy of the attached notice to UnitedHealthcare at the address below. If you have any information that is relevant to the scope of the appeal panel's review and you would like the appeal panel to consider that information, you must provide the relevant information in your appeal request. Please note that you are not required to submit information for the appeal panel's consideration. If you decide to submit relevant information, we will make available to panel members copies of the relevant information you submit.

Your appeal request is deemed to have been given on the date in which UnitedHealthcare receives your appeal request at the address below.

UnitedHealthcare<br>
Attn: Provider Contract Appeals<br>
P.O. Box 31376<br>
Salt Lake City, UT 84131-0376

**When the Appeal Will Be Conducted**

Except as indicated below, the appeal panel will review any relevant information submitted to the panel within 30 calendar days after the date UnitedHealthcare receives your request for an appeal.

- Medicare Advantage - If you only have an opportunity to appeal based on your removal from the network maintained for Medicare Advantage benefit plans, you may present to the appeal panel your views of the decision to remove you from the network. The appeal panel aims to review relevant information within 60 calendar days after the date UnitedHealthcare receives your request for an appeal at the address above.
- Opportunity to Appeal Under Your Participation Agreement - If you only have an opportunity to appeal under the terms of your participation agreement based on your removal from the network, or you only have an opportunity to appeal under the terms of your participation agreement and based on your removal from the network maintained for Medicare Advantage benefit plans, the appeal panel aims to review relevant information within 60 calendar days after the date UnitedHealthcare receives your request for an appeal at the address above.

If you have an opportunity to appeal as indicated above, you may request that the appeal panel conduct a hearing in lieu of a review of relevant information only if:

- UnitedHealthcare has removed you from its network maintained for Medicare Advantage benefit plans;
- UnitedHealthcare has removed you from its network maintained for Medicaid or other State Program benefit plans in the following states: Delaware; Florida; Massachusetts; New Jersey; New York; Pennsylvania;
- UnitedHealthcare has removed you from its network maintained for commercial benefit plans in the following states: California; Maine; Missouri; New Jersey; or New York; or
- UnitedHealthcare has removed you from its network and the terms of your participation agreement specifically indicate that you may request a hearing based on your removal from the network.

If you are eligible for a hearing, as indicated above, and you would like the appeal panel to conduct a hearing, you must specify in your appeal request that you are requesting a hearing. The hearing will be held within the same timeframe as your review would have been held (see the timeframes set forth above). If you do not specify in your appeal request that you are requesting a hearing, the appeal panel will review any relevant information available to it and you will have no further opportunity to appeal unless this opportunity is granted under applicable law or the terms of your participation agreement.

3

UnitedHealthcare will inform you of the date and time of your hearing. Your hearing will be conducted via a conference call and your presence during the call is required. UnitedHealthcare will provide you with information for the conference call. If you fail to call into the hearing within 10 minutes after the scheduled time or fail to call into the hearing at all at the time that UnitedHealthcare schedules for you, the appeal panel will conduct a review of any relevant information that is available to the appeal panel and you will have no further opportunity to appeal unless this opportunity is granted under applicable law or the terms of your participation agreement.

Failure to submit an appeal request within the required timeframe and in the manner described in this document will constitute a waiver of your opportunity to appeal. In the case of such a waiver, you are deemed to have accepted your removal from UnitedHealthcare's network.

Once the appeal panel conducts the appeal, you have no further opportunity to appeal unless this opportunity is granted to you under applicable law or the terms of your participation agreement.

When You Will Be Notified of the Decision Regarding Your Appeal
Except as indicated below, you will be notified in writing of the decision regarding your appeal within 30 calendar days after the date in which the appeal panel reviews the relevant information submitted or conducts your hearing (if a hearing was conducted) or you will be notified in writing of the decision within a shorter timeframe if required by applicable law.
* **Medicare Advantage** - If you only have an opportunity to appeal based on your removal from the network maintained for Medicare Advantage benefit plans, UnitedHealthcare aims to notify you of the decision before the effective date of your removal from the network.
* **Opportunity to Appeal Under Your Participation Agreement** - If you only have an opportunity to appeal under the terms of your participation agreement based on your removal from the network, or you only have an opportunity to appeal under the terms of your participation agreement and based on your removal from the network maintained for Medicare Advantage benefit plans, UnitedHealthcare aims to notify you of the decision before the effective date of your removal from the network.
* **Texas** - If you are removed from the network maintained for commercial benefit plans in Texas or Texas Medicaid or other State Program benefit plans, UnitedHealthcare will provide you the appeal panel's recommendation, if any, upon request. If you are removed from the network maintained for commercial benefit plans in Texas, upon request, UnitedHealthcare will provide you a written explanation of its decision regarding your appeal if UnitedHealthcare's decision is contrary to the appeal panel's recommendation. The appeal panel's recommendation must be considered but is not binding on UnitedHealthcare.

EXPEDITED APPEAL:
On request, UnitedHealthcare will make an expedited appeal available to you. You must indicate in your appeal request whether you are requesting an expedited appeal. You must request an expedited appeal in accordance with the terms set forth in the "How to Request an Appeal" section above within 10 business days after the date of the attached notice and include in your appeal request relevant information you would like the appeal panel to consider, if any. If you have requested an expedited appeal, please note that an expedited review of relevant information will be conducted. Expedited hearings are not available.

If you request an expedited appeal, a decision regarding your appeal will be provided to you within 30 calendar days after the date in which UnitedHealthcare receives your appeal request.

Once the appeal panel reviews any relevant information for your expedited appeal, you have no further opportunity to appeal unless this opportunity is given to you under applicable law or the terms of your participation agreement.

4

**If You Are Dissatisfied with the Decision Regarding Your Appeal**

If you are dissatisfied with the decision regarding your appeal, you may contact your network management representative. If you do not know who your contact is, information is available at UnitedHealthcareOnline.com > Contact Us > Network Contacts. You may also request a second level appeal if such opportunity is granted to you under the terms of your participation agreement or you are removed from the network maintained for (1) Florida Medicaid or other State Program benefit plans, or (2) Maryland Medicaid or other State Program benefit plans. Otherwise, you may exercise any rights available to you under the terms of your participation agreement. In the event of a conflict or inconsistency between your participation agreement and this document, the provisions of your participation agreement will control unless applicable law dictates otherwise.

5

# EXHIBIT C



Northeast Case Management Center
Yvonne Baglini
Assistant Vice President
1301 Atwood Avenue, Suite 211N
Johnston, RI 02919
Telephone: (866)293-4053
Fax: (866)644-0234

March 24, 2020

Steven I. Adler, Esq.
Mandelbaum Salsburg
3 Becker Farm Road
Suite 205
Roseland, NJ 07068
Via Email to: sadler@lawfirm.ms

Brian D. Boone, Esq.
Alston & Bird
90 Park Avenue
New York, NY 10016
Via Email to: Brian.boone@alston.com

**Case Number: 01-19-0003-9667**

**Alexander Salerno, MD**
**-vs-**
**United Healthcare Group, Inc.,**
**UnitedHealthcare Insurance Company,**
**United Healthcare Community Plan, Inc.,**
**AmeriChoice Corp., and**
**AmeriChoice of New Jersey, Inc.**

Dear Parties:

By direction of the arbitrator attached please find the duly executed Award in the above matter. Please remember there is to be no direct communication with the arbitrator. All communication shall be directed to the AAA.

A financial reconciliation has been conducted and each party will receive a separate financial accounting for this matter. Any refunds will be processed as soon as possible and any party with an outstanding balance will continue to receive monthly invoices until the balance is paid in full.

Note that the financial reconciliation reflects costs as they were incurred during the course of the proceeding. Any apportionment of these costs by the arbitrator, pursuant to the Rules, will be addressed in the award and will be stated as one party's obligation to reimburse the other party for costs incurred. Any outstanding balances the parties may have with the American Arbitration Association (the AAA) for the costs incurred during the arbitration proceedings remain due and payable to the AAA even after the final award is issued, and regardless of the arbitrator's apportionment of these costs between the parties in the award.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the date of this letter.

We appreciate the opportunity to assist you in resolving your dispute. As always, please do not hesitate to contact me if you have any questions.

Sincerely,
*Spencer Tubbs on behalf of,*
Sharon Durkin
Manager of ADR Services
Direct Dial: (401)431-4785
Email: sharondurkin@adr.org

cc:     Mohamed Nabulsi, Esq.
        Lee Deneen, Esq.
        Bari Sandler
        Lillian Gasparini
        Bill H. Jordan, Esq.
        Anderson S. Kemp
        Lauren X. Topelsohn, Esq.
        Richard J. Webb, Esq.

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

IN THE MATTER OF THE ARBITRATION BETWEEN

ALEXANDER SALERNO, M.D.
("Claimant")

AND                                                          Case No.: 01-19-0003-9667

UNITED HEALTHCARE GROUP, INC.,
UNITED HEALTHCARE INSURANCE COMPANY,
UNITED HEALTHCARE COMMUNITY PLAN, INC.,
AMERICHOICE CORP., and
AMERICHOICE OF NEW JERSEY, INC.,
("Respondents")

_____

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated to conduct this arbitration under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in accordance with the arbitration agreement entered into between the above-named parties, with the Claimant represented by Mr. Steven Adler of Mandelbaum Salsburg P.C., and the Respondents represented by Brian Boone of Alston & Bird, LLP, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby AWARD as follows:

### Introduction

Claimant, Alexander Salerno, M.D. (hereinafter "Claimant" or "Dr. Salerno"), commenced this arbitration with the AAA on or about November 7, 2019 against Respondents, UnitedHealth Group, Inc., UnitedHealthcare Insurance Company, United Healthcare Community Plan, Inc., Americhoice Corp., and Americhoice of New Jersey, Inc. (collectively, "Respondents" or the "UHC Companies"). Claimant is a medical doctor licensed to practice in New Jersey. His medical practice operates offices in Orange, East Orange and Newark, New Jersey, and provides services to a largely medically underserved population. Respondents own and operate health insurance plans in New Jersey, including the UHC Community Plan (the "Plan"), a Medicare/Medicaid plan regulated under Medicare Part C, and the Medicare Advantage (or "MA") program. Claimant's claims arise from the March 2019 decision by the Respondents not to renew Claimant's Physician Contract ("Claimant's Contract") for participation in the Plan as a Primary Care Physician. Throughout this arbitration, Claimant was represented by counsel of Mandelbaum Salsburg, P.C., and Respondents were represented by counsel of Alston & Bird, LLP.

### Procedural History

1

Case Number 01-19-0003-9667

Prior to commencing this arbitration, on or about September 9, 2019, Dr. Salerno and other physicians who had been terminated from the Plan filed a putative class action against the UHC Companies in the United States District Court for the District of New Jersey. The Medical Society of New Jersey later joined as an additional plaintiff. The plaintiffs in that action sought declaratory and injunctive relief against the UHC Companies enjoining and restraining them from terminating the plaintiffs as providers and compelling the UHC Companies to provide unbiased hearing panels to hear appeals of the termination decisions. The plaintiffs also challenged the validity and enforceability of the arbitration clause in their Physician Contracts with the UHC Companies, including the Claimant's Contract. On October 11, 2019, the Hon. Kevin McNulty, U.S.D.J., issued an Order granting temporary restraints and holding that the validity and enforceability of the parties' arbitration agreements was for an arbitrator to decide.

Following Judge McNulty's Order, on October 16, 2019 the Medical Society of New Jersey ("MSNJ"), asserting associational standing, filed an arbitration claim with the AAA (the "MSNJ Arbitration"). The MSNJ claim challenged the validity and enforceability of the arbitration agreement in the Physician Contracts that had been terminated by the UHC Companies, including the Claimant's Contract. On November 4, 2019, the Emergency Arbitrator appointed in the MSNJ Arbitration, Justice Gary H. Stein (Retired), held that the Medical Society of New Jersey lacked standing to proceed as a party in arbitration under the Physician Contracts, and dismissed the MSNJ's claim.

After dismissal of the MSNJ Arbitration, Claimant filed this arbitration with the AAA and sought the appointment of an Emergency Arbitrator under AAA Commercial Rule 38. Paul E. Burns, Esq., was appointed as Emergency Arbitrator on November 7, 2019. On or about November 15, 2019, Claimant moved to amend his Statement of Claim to add parallel claims by other providers (physicians and nurse practitioners) employed by or under contract with Dr. Salerno or his wholly owned corporate entities, Salerno Medical Associates, LLP ("SMA") and Senior Healthcare Outreach Program, Inc. ("SHOP"). Claimant asserted the right to pursue these claims in arbitration as the assignor or agent of the other providers (the "Assignors").

The relief sought by Claimant in the emergency proceedings before the Emergency Arbitrator included: (1) a determination that the arbitration agreement in the Claimant's Contract and the Assignors' Physician Contracts with the Respondents are invalid and unenforceable; (2) a determination that Claimant could in this arbitration assert the parallel claims of the Assignors under their Provider Contracts with the Respondents; and (3) injunctive relief in favor of Claimant and the Assignors temporarily restraining the Respondents from terminating Claimant's Contract and the Assignors' Physician Contracts, and maintaining their participating status in the Network pending the completion of this arbitration and a Final Award.

Following preliminary hearings, an evidentiary hearing, briefing by both Parties and oral argument, the Emergency Arbitrator issued Emergency Interim Award No. 1 in this arbitration on December 3, 2019. That Emergency Interim Award includes a thorough statement of the arguments made by the Parties, the Emergency Arbitrator's reasoning and legal conclusions, and the relief granted. These will not be

2

Case Number 01-19-0003-9667

repeated here. The Emergency Arbitrator determined that: (1) the arbitration agreement in Claimant's Contract is valid and enforceable; (2) the arbitration agreement in Claimant's Contract does not permit the claims of the Assignors to be pursued in this arbitration; and (3) Respondents are enjoined and restrained from terminating Claimant from the Network until the issuance of a Final Award.

The undersigned was appointed as Arbitrator in this case on December 13, 2019. Preliminary hearings by telephone conferences with counsel were held on January 8, January 13 and January 17, 2020. At the initial conference, counsel for Claimant raised the possibility that Claimant would seek leave to amend his Statement of Claim to include a claim for damages. On January 10, 2020, counsel for Claimant confirmed by letter that Claimant would not seek to add a claim for damages. By email on February 5, 2020, counsel for Claimant requested that Claimant be granted leave to file a motion to amend his Statement of Claim to include a claim for damages. Following another preliminary hearing by telephone conference with counsel on February 11, 2020, Claimant's request was denied.

Preliminary Hearing and Scheduling Order #1 was entered on January 21, 2020 providing for an evidentiary hearing to be held by videoconference on February 18, 2020. Both Parties submitted initial briefs and reply briefs in advance of the evidentiary hearing. At the hearing on February 18, testimony on behalf of the Claimant was heard from Dr. Salerno and three of his patients, Ms. Leslie Jones, Ms. Rosetta Williams and Ms. Velylia McIver. Testimony on behalf of Respondents was heard from two members of Respondents' management team: Ms. Michele Nielsen, Vice President and Market Lead New Jersey Networks United Healthcare, and Mr. Michael Racette, Associate Director of Regulatory Adherence for UnitedHealthcare Government Programs Operations. Various documentary Exhibits were introduced into the record. At a second videoconference hearing session on February 24, 2020, counsel for both Parties presented extensive oral summations in lieu of post-hearing briefs. Counsel for both Parties also answered questions from the Arbitrator at that time. It being agreed that the Parties had no further evidence to present, the hearing was closed on February 24, 2020.

### Claimant's Claim

Claimant and Respondents entered into Claimant's Contract in 2016. Pursuant to that Contract, Claimant became a participating provider in Respondents' provider network for the Plan. This designation enabled patients in the Plan to utilize Claimant as an "in-network" provider. A substantial portion of Claimant's patients are members of the Plan. By letter dated March 22, 2019, Respondents advised Claimant that Claimant's Contract would end on July 29, 2019. By letter dated April 16, 2019 (the "Termination Letter"), Respondents corrected the previous letter to say that Claimant's Contract would not be renewed and would end on November 19, 2019.

The Termination Letter stated in part as follows:

"We periodically assess our networks to help ensure they meet the needs of our members. As a result, we sometimes have to make difficult decisions around care provider contracts. Unfortunately, we've decided not to renew your UnitedHealthcare Community Plan Agreement."

3

Case Number 01-19-0003-9667

Claimant's Contract at page 5 contains the following provision concerning termination and non-renewal:

"In addition, either you or we can terminate this agreement, effective on an anniversary date this agreement begins, by providing at least 90 days prior written notice. Either you or we can terminate this agreement at any time if the other party has materially breached this agreement, by providing 60 days written notice, except that if the breach is cured before our agreement ends, the agreement will continue."

Although the Termination Letter does not reference the term "without cause," Respondents assert that their clear and obvious intent was to not renew (and thereby terminate) Claimant's Contract without cause as permitted by the language quoted immediately above.

Following his receipt of the Termination Letter, Claimant submitted an "appeal" of Respondents' termination decision on the form provided by Respondents. That appeal was ultimately heard by a three-person panel within the Respondents' administration. Two members of the panel were physicians. The panel reviewed and confirmed that Respondents had given Claimant 90 days' prior written notice of termination, and accordingly upheld the termination.

It was not disputed that Respondents' corrected Termination Letter provided notice of non-renewal to Claimant at least 90 days prior to his anniversary date. However, Claimant asserts that Respondents' actions in terminating Claimant's Contract breached that Contract and did not comply with (i) the requirements of Respondents' Provider Manual, (ii) a common law right to a fair procedure under New Jersey law, (iii) substantive and procedural due process, (iv) applicable federal regulations implementing the Medicare Advantage program, 42 C.F.R. § 422.202 (the "MA Regulations"), or (v) an implied covenant of good faith and fair dealing. Claimant further asserts that Respondents' actions warrant injunctive and declaratory relief.

Specifically, Claimant asserts he is entitled to the relief requested in Claimant's Amended and Corrected Statement of Claim dated November 15, 2019, *as modified by* the Emergency Interim Award No. 1 dated December 3, 2019:

***

B. Declaring and adjudging the Termination Letters to be invalid and ineffective in terminating and/or not renewing the Claimant's … right to participate as [a] Provider under the Plan;

C. Declaring and adjudging that Respondents must comply with the MA Regulations and Manual prior to terminating or failing to renew Claimant's … Contract;

D. Enjoining and restraining Respondents from terminating Claimant …under the Plan and from notifying Patients that [he] will be terminated and/or that [he] is not, or will not be, participating as [a] Provider under the Plan;

4

Case Number 01-19-0003-9667

E. Enjoining and restraining Respondents from removing Claimant's … information from any of their directories or marketing materials and from notifying [his] Patients that [he is] not accepting new patients under the Plan;

F. Compelling Respondents to advertise and market Claimant …as [a] Provider under the Plan as they do other Providers in the Plan, including listing Claimant …in the 2020 directories for the Plan;

G. Compelling Respondents to form independent and unbiased appeal panels of Claimant's… peers composed of Primary Care Providers to review any decision of Respondents to terminate or not renew [his] Contract;

H. Enjoining and restraining Respondents from terminating or failing to renew Claimant's …Contract until the appeal process set forth in the MA Regulations and Manual has been concluded;

I. Reasonable attorneys' fees;

J. Costs and expenses of this arbitration; and

K. Such further relief as the arbitrator deems just and equitable under the circumstances.

## Respondents' Arguments and Defenses

Respondents assert the following arguments and defenses in response to the Claimant's Claim:

1. The Medicare Act preempts Claimant's claim.

2. Claimant has no private right of action to enforce the MA regulations.

3. Respondents complied with Claimant's Contract.

4. Respondents complied with the MA regulations.

5. Claimant's due process argument is unsupported in the law.

6. Claimant has not suffered irreparable harm or otherwise established grounds for injunctive relief.

## Consideration of the Merits of Claimant's Claim

### Breach of Contract Based Upon the Provider Manual

5

Case Number 01-19-0003-9667

Claimant's Contract, at page 8, states that a copy of Respondents' Provider Manual is "enclosed" with the Contract, stating that "[t]his guide governs the mechanics of our relationship." The Provider Manual includes one section dealing with contract termination and rights of appeal, Chapter 17: Quality Management Program. That Chapter provides that Respondents may take various corrective actions to address quality of care issues concerning a provider in the network, including contract termination. It contains a detailed process to be followed, including elaborate procedures for hearings, presentation of evidence, arguments and briefs. It is not disputed that the process and procedures set forth in the Provider Manual were not followed as part of Respondents' termination of Claimant's Contract.

The Provider Manual is attached to and made part of the Claimant's Contract, and the terms of the Provider Manual concerning termination and appeals based upon quality of care concerns are material to that Contract. However, the existence of these extensive provisions applicable to certain terminations based upon quality of care concerns does not mean that Claimant's Contract does not allow for termination under other circumstances, with or without cause. The provisions of Provider Manual Chapter 17 are in addition to the Parties' rights and obligations concerning termination as set forth in the body of the Claimant's Contract itself.

There is no evidence in the record indicating that Claimant's Contract was terminated because of quality concerns about Dr. Salerno. As such, Respondents were not obligated to provide Claimant with the hearing and appeal process mandated by the Provider Manual. The Arbitrator finds that Claimant's Claim for breach of contract in this respect is without merit.

**Fair Procedure Under New Jersey Common Law**

Claimant asserts that notwithstanding the "without cause" termination provision in the Claimant's Contract, the Respondents' unilateral decision to terminate his Contract and exclude him from participation in the Plan, without stating any justification, and without providing a meaningful opportunity to question the decision, deprived him of a common law right of fair procedure under New Jersey law. Claimant relies primarily on two California cases, Pinsker v. Pacific Coast Society of Orthodontics, 1 Cal. 3d 160, 526 P.2d 253 (1969), and Potvin v. Metropolitan Life Ins. Co., 997 P.2d 1153 (Ct. App. 2000). Otherwise, Claimant cites New Jersey cases which *did not* involve the defendant's exercise of a contractual, "without cause" termination provision.

The authorities cited by Claimant on this point are not persuasive in this arbitration which is governed by New Jersey law. The California law cited by Claimant was not shown to be widely accepted elsewhere, and Claimant cites no governing authority in New Jersey creating a right to procedural due process in favor of a party to a commercial contract containing a "without cause" termination provision. The Arbitrator finds that Claimant's Claim in this respect is without merit.

**Substantive and Procedural Due Process**

6

Separate and apart from his claim for procedural fairness under New Jersey common law, Claimant asserts that his termination from Respondents' Network deprived him of substantive and procedural due process. Claimant essentially contends that by entering into contracts with the federal government and the State of New Jersey to offer products to Medicare and Medicaid beneficiaries through the Plan, Respondents have "stepped into the shoes" of the government. Under Claimant's argument, the Respondents' decision to terminate Claimant's Contract and the process used to do so must be evaluated as "state action."

Claimant cites no authority to support the proposition that Medicare Advantage organizations ("MA organizations") like the Respondents should be deemed state actors by reason of their participation in the Medicare Advantage program. There is no basis in the record to create such rights in favor of Claimant under the circumstances presented here.

### Non-Compliance with the MA Regulations

The MA Regulations impose very specific requirements on MA organizations concerning the termination of physician providers from their networks. These regulations applied to the Respondents with respect to their decision to terminate Claimant's Contract, and the process they followed to accomplish that result. Claimant asserts that Respondents did not comply with the MA Regulations in effecting the termination of Claimant's Contract.

Claimant expresses this aspect of his claim in two ways: (1) that Respondents failed to materially comply with the MA Regulations, and that failure, in itself, entitles Claimant to relief (*i.e.*, separate from any breach of contract claim); and (2) that the MA Regulations are part of Claimant's Contract, making Respondents' noncompliance a breach of that Contract entitling Claimant to relief.

The statute authorizing the MA Regulations states in pertinent part:

***

**(j) Rules Regarding Provider Participation.**

  (1) Procedures. Insofar as a Medicare+Choice plan offers benefits under a Medicare+Choice plan through agreements with physicians, the organization shall establish reasonable procedures relating to the participation (under an agreement between a physician and the organization) of physicians under such plan. Such procedures shall include –

***

  (B) providing written notice of participation decisions that are adverse to physicians, and

  (C) providing a process within the organization for appealing such adverse decisions, including the presentation of information and views of the physician regarding such decision.

7

Case Number 01-19-0003-9667

**42 U.S.C.A. §1395w-22(j)**

It is undisputed that Respondents are "an MA Organization," and that the MA Regulations apply to the Respondents' termination of Claimant's Contract, which excluded him as a participating provider in the Plan. The relevant portions of the MA Regulations follow.

**42 CFR § 422.202 Participation Procedures**

**(a) Notice and appeal rights.** An MA organization that operates a coordinated care plan or network MSA plan must provide for the participation of individual physicians…through reasonable procedures that include the following:

\*\*\*

**(3)** Written notice of participation decisions that are adverse to physicians.

**(4)** A process for appealing adverse participation procedures, including the right of physicians to present information and their views on the decision. In the case of termination or suspension of a provider contract by the MA organization, this process must conform to the rules in §422.202(d).

\*\*\*

**(d) Suspension or termination of contract.** An MA organization that operates a coordinated care plan or network MSA plan providing benefits through contracting providers must meet the following requirements:

**(1) Notice to physician.** An MA organization that suspends or terminates an agreement under which the physician provides services to MA plan enrollees must give the affected individual written notice of the following:

**(i)** The reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization.

**(ii)** The affected physician's right to appeal the action and the process and timing for requesting a hearing.

**(2) Composition of hearing panel.** The MA organization must ensure that the majority of the hearing panel members are peers of the affected physician.

\*\*\*

Case Number 01-19-0003-9667

**(4) Timeframes.** An MA organization and a contracting provider must provide at least 60 days written notice to each other before terminating the contract without cause.

Claimant asserts that Respondents failed to comply with these MA Regulations in the following respects:

1. They failed to provide for "reasonable procedures" as required by §422.202(a).

2. They failed to provide Claimant with a process for appealing the decision against him, including the right to present information and his views on the decision, as required by §422.202(a)(4).

3. They failed to provide Claimant with written notice of the reasons for the action taken against him, as required by §422.202(d)(1)(i).

4. They failed to provide Claimant with the standards and profiling data used to evaluate him and the number and mix of physicians needed by the Respondents' Plan, as required by §422.202(d)(1)(i).

5. They failed to provide Claimant with a right to appeal the action taken against him and notice thereof, including a hearing by a panel of which a majority are his peers, as required by §422.202(d)(1)(ii) and (2).

Respondents assert that their termination of Claimant's Contract fully complied with the MA Regulations. In particular, they emphasize that this was a termination without cause, and as such the Termination Letter and the appeal process they provided were all that the MA regulations require. In Respondents' view:

1. By telling Claimant his Contract would not be renewed, and via other communications following the Termination Letter, it was clear Claimant's Contract was being terminated "without cause," and that in and of itself was sufficient "reason" under §422.202(d)(1)(i).

2. Because §422.202(d)(1)(i) requires the provision of evaluative standards and profiling data only "if relevant," and in Respondents' view such information is only relevant in the case of a "for cause" termination, Respondents did not violate this regulatory requirement.

3. They provided Claimant with a right to appeal the decision to a three-person panel, including two physicians, who upheld the termination on the basis that the required 90 days written notice had been provided, thereby complying with §422.202(d)(1)(ii). Further, because they offered Claimant an opportunity for a hearing before the hearing panel, which he did not expressly request, they satisfied §422.202(a)(4) and §422.202(d)(2).

There is no question that an MA organization may terminate or not renew a physician's participation in accordance with that physician's contract. The central issue in this arbitration is how the MA Regulations should be interpreted to apply to a physician contract termination or non-renewal "without cause."

9

Case Number 01-19-0003-9667

The MA Regulations cannot reasonably be interpreted to permit Respondents' termination of Claimant's Contract in the manner it occurred here. Respondents' interpretation of the MA Regulations is not supported by the regulations' plain meaning, the regulatory history of their adoption, or their intended purpose.

**Re: providing "the reasons for the action" under §422.202(d)(1)(i)**

Respondents contend that notice of "the reasons for the action" taken (*i.e.*, the termination) are sufficiently given by saying "you are being terminated without cause." Leaving aside that the Termination Letter did not even say this, such notice provides no "reason" under the commonly accepted understanding of that word. Notice is taken of the definition of "reason" in the online Merriam-Webster Dictionary:

a. a statement offered in explanation or justification.
b. a rational ground or motive.
c. the thing that makes some fact intelligible: CAUSE.
d. a sufficient ground of explanation or of logical defense.

Respondents provided Claimant with no explanation, justification, rational ground or cause for his termination. Instead, Respondents essentially told Claimant, "you are being terminated because we chose to terminate you." By so doing, Respondents effectively nullified any meaningful "appeal rights," since the only issue that possibly could be appealed was whether notice had been given.

In issuing the Final Rule containing §422.202(d)(1)(i), the Department of Health and Human Services ( "DHHS") responded to comments concerning the requirement that MA organizations provide appeal rights to providers. This was a subject of considerable interest and comment at the time of adoption.

One commenter protested the requirement (in the previously proposed regulations) of appeal rights for physicians who are denied participation in a plan at the time of their initial application for membership. DHHS agreed with the commenter and revised the regulations, stating "it would not be appropriate to grant appeal rights to physicians who have never been accepted into the…network, … [since] the Congress intended only that an organization grant rights to its current contracting physicians." As a result, physicians who are denied initial application or admission to a provider network simply receive a notice that the MA organization chose not to admit them. There are no "appeal rights." Under Respondents' interpretation of the MA Regulations, this is the very same result that would occur in every "without cause" termination, despite the clear legislative intent to "grant rights to [the MA organization's] current contracting physicians."

A second commenter urged DHHS that appeal rights should only apply when a contract termination is based on quality of care issues, and not when termination was simply a "business decision." Federal

Register, Vol. 64, No. 31, February 17, 1999, at 7977 (quotation marks in original). In response, DHHS stated:

"Finally, we have not adopted the suggestion to limit appeal rights to situations where terminations are based on quality of care issues. *We believe that the elimination of appeal rights for any termination characterized as a "business decision" would undermine the intent of the provider protection provisions."* (emphasis added).

The first paragraph of the Termination Letter, while not expressly using this phrase, confirms that the termination of Claimant's Contract was what DHHS referred to as a "business decision." Given Respondents' steadfast refusal to identify any quality concern or breach of contract by Claimant, it is undeniable that his termination was a "business decision." As such, he was entitled to the benefit of what DHHS called the "provider protection provisions." It is not reasonable to suggest that DHHS crafted "provider protection provisions" that offered *no protection* for physicians terminated by "business decisions." It is also unreasonable to suggest that DHHS agreed with Respondents' interpretation of what constitutes a "reason" in a "without cause" termination, yet somehow avoided saying it when that would have been so obvious, important and easy to do.

The Medicare Managed Care Manual further supports Claimant's interpretation of the MA Regulations on this point. This Manual provides agency guidance to MA organizations subject to the MA Regulations. It states:

"Preamble to the February 17, 1999, final rule responded to public comment that *notice and appeal requirements apply* regardless of whether suspension or termination of the physician contract is due to quality deficiencies or not, *unless the physician voluntarily agreed to leave the organization's network.* In addition, it was clarified that *these requirements apply to nonrenewal of contracts.*" Medicare Managed Care Manual, Chapter 6 (Rev. 82, 04-27-07) (emphasis added).

All of the emphasis in the commentary and Manual on providing appeal rights to physicians adversely affected by "business decisions" and "nonrenewals" did not occur solely to assure that the days of notice given were correctly counted.

The MA Regulations provide physicians joining MA provider networks with some confidence that they will be treated fairly. The requirement that MA organizations provide a substantive "reason" for a termination without cause does not mean that participating physicians have a perpetual contract or can be terminated only "for cause."

Termination or nonrenewal "without cause" means "without a breach of contract." Nothing in the MA Regulations or in this Award suggests that the "reasons" to be provided in the notice *must* allege a breach of contract. But if termination occurs for a "business reason," as many probably do, that reason must be disclosed.

11

Case Number 01-19-0003-9667

The MA Regulations also foster public confidence in the MA provider networks by assuring that providers will not be excluded for improper reasons. By requiring that a substantive reason be stated for a termination, the possibility of a termination resulting from an improper motive is greatly reduced.

Claimant suggested at the hearing that his termination was motivated by Respondents' desire to eliminate competition for a large and growing medical practice owned by Respondents' affiliate. This issue was beyond the scope of the arbitration, since Respondents denied that any substantive reason for their decision was required. However, the allegation illustrates the kind of "reason" that, if proved, could create a justiciable issue concerning a "without cause" termination.

More generally, such issues could arise from any "reasons" that evidence a breach of contract by Respondents. For example, if Claimant was terminated for acting "as an advocate for a [Plan] member in seeking appropriate, medically necessary health care services," Respondents could be in breach of Claimant's Contract (Provider Manual Chapter 17, p.97). Yet Respondents' interpretation of the MA Rules says they need not disclose this reason, nor may Claimant raise it in any appeal of a termination "without cause." This is not the result intended by MA Regulations designed to provide "reasonable procedures" for "provider protection."

Finally, interpreting the MA Regulations to require Respondents to provide Claimant with substantive "reasons" for his termination does not mean, as Respondents suggest, that termination must be for a "good reason." Respondents may terminate "without cause," that is, without asserting Claimant's breach of contract. Subjective terms such as "good" or "bad" are irrelevant to the Parties' legal rights. Whether the substantive reasons given in some future termination notice (if any) give rise to justiciable issues between the Parties will be for a future arbitrator to decide.

The cases cited by Respondents to support the claim that the MA Regulations permit termination of participating physicians "without cause" are distinguishable from the facts and issues presented here, and in any event are not controlling.

Accordingly, the Arbitrator finds that Respondents did not provide Claimant with "the reasons" for his termination as required by 42 CFR §422.202(d)(1)(i).

**Re: providing "standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed under §422.202(d)(1)(i)**

Respondents did not provide Claimant with "the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by [Respondents' Plan]," as required by §422.202(d)(1)(i). Respondents' point out that this regulation requires such information to be provided only "if relevant," and they assert that this information is only relevant in the case of a termination "for cause." Respondents offer no regulatory history or case law to support this interpretation. The regulatory history and context of this provision support a different conclusion.

As discussed above with respect to the regulatory requirement that "the reasons" for termination be provided, DHHS commentary to the adoption of the MA Regulations evidences an intent to create "provider protection." The kinds of information required by §422.202(d)(1)(i) are most relevant to terminations resulting from "business decisions," that is, the very situation DHHS expressly wanted to include within the provider's "appeal rights." The words "if relevant" were only added to the Final Rule in response to a comment that such information may not be necessary in *all* cases. This would certainly be true if, for example a "for cause" termination was based on a physician's act of malpractice, loss of license or breach of contract. Eliminating the requirement to produce unnecessary information in such cases inspired DHHS to insert the words "if relevant" into the regulation.

Read in context, interpreting the words "if relevant" to automatically exclude all terminations "without cause" is not reasonable. It is difficult to imagine a termination "for cause" scenario in which "the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization" *would be* relevant. "For cause" terminations are terminations based upon a breach of contract. The composition of the provider network and how the subject physician's profile compared to others would have no bearing upon whether the physician breached his contract. Conversely, this data is *exactly* the kind of information that *would be* relevant to a decision to terminate a provider as part of a network resizing, realignment, or other such "business decision."

The Termination Letter suggests that just such a "business decision" was made concerning Claimant, although it does not reveal the basis for the decision. Respondents' briefs and argument consistently denied there was any basis for Claimant's termination other than "without cause." Yet testimony from Respondents' witness, Ms. Nielsen, suggested Respondents' management team responsible for the Plan met to discuss a reduction in the provider network and for some reason chose to include Claimant and his group among those to be terminated. The witness could not recall a specific reason and could not produce any record of the discussion or rationale for the decision. Presumably, such rationale would have included the reason why Respondents chose to reduce the size of their provider network, and the reason why Claimant was selected for termination from among all of the providers in the network.

There is no question that "the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by [Respondents' Plan]" were "relevant" to Respondents' decision to terminate Claimant's Contract. Indeed, it was likely the information that was *most relevant* to that decision.

CFR §422.202(d)(1)(i) required Respondents to provide Claimant with the standards and profiling data used to evaluate Claimant and the numbers and mix of physicians needed by the Respondents' Plan. The Arbitrator finds that Respondents failed to comply with this requirement.

**Re: providing an appeal procedure including the opportunity to present before a hearing panel with a majority of peers under §422.202(a)(4), (d)(1) and (d)(2)**

13

Case Number 01-19-0003-9667

Respondents assert that by providing Claimant with the opportunity to appeal his termination without cause, including the offer of a hearing, they fully complied with the requirements of the MA Regulations. The Respondents clearly did provide Claimant with an appeal process. The question is whether the process they provided was sufficient.

The appeal process given to Claimant assumed that the Termination Letter and subsequent affirmations of "termination without cause" provided sufficient notice of "the reasons" for the termination. It further assumed that Respondents had no obligation to provide Claimant with the standards and profiling data used to evaluate Claimant, and the numbers and mix of physicians needed by the Respondents' Plan. For the reasons stated above, these assumptions were incorrect. The opportunity for an appeal based upon these false assumptions provided no real appeal at all.

Claimant's appeal rights were limited to verifying whether he had been given 90 days written notice of termination, which was never disputed. This is not the kind of "reasonable procedures" contemplated by the MA Regulations, which include "the right of physicians to present information and their views on the decision." §422.202(a) and (a)(4).

The hearing panel convened to review Claimant's termination received no information other than that he had been terminated without cause, along with the dates of his notice and contract anniversary. They confirmed that 90 days written notice had been given. Since the Claimant was not told of any substantive reason for his termination, it was impossible for him to submit any information or his views on that subject.

Claimant's opportunity for appeal included a right to appear before the hearing panel, but Claimant did not affirmatively request that opportunity when submitting his appeal request on the form provided by Respondents. In his testimony, Claimant said he thought he had done all that was required to perfect his appeal, and that he could not understand what the hearing panel would be doing if there was no dispute about the timing of the Termination Letter.

The requirement of the MA regulations that a hearing panel reviewing a physician termination must include a majority made up of the physician's peers reveals DHHS's intent that such hearings be substantive and fair. This requirement must be read in conjunction with the other sections of the MA Regulations requiring notice of "the reasons" for the termination and disclosure of the standards, profiling data, numbers and mix of physicians needed by the MA organization. Obviously, it would make no sense to require that a panel with a majority of medical doctors be convened solely to count the days of notice provided in a termination "without cause."

Further, without knowing the reason why Respondents terminated Claimant's Contract, and therefore the capability and appropriateness of the hearing panel convened to hear Claimant's appeal, it is not possible to assess whether that hearing panel would have satisfied the requirement of §422.202(d)(2) that "the majority of the hearing panel members are peers of the affected physician."

14

Case Number 01-19-0003-9667

In order to comply with the "right to appeal" provision of the MA Regulations, Respondents needed to comply with each and every component of the process those regulations require. The Arbitrator finds that in terminating Claimant's Contract, Respondents failed to provide him with the appeal required by the MA Regulations.

**Breach of Contract Based Upon the MA Regulations**

Claimant's Contract, at page 6, states as follows:

"Federal law and the applicable law of the jurisdiction where you provide health care services govern our agreement. Such laws and ***the rules and regulations promulgated under them, when they are applicable, control and supersede our agreement***." (emphasis added).

The plain language of this provision has the effect of requiring Respondents to comply with the MA Regulations. This is not a case of "implying" regulatory provisions into a contract, but an express agreement of the Parties to be governed by "applicable" regulations.

This language also cannot be confused with a typical choice of law or "agreement to comply with law" provision. The MA Regulations are not some obscure or unknown regulation otherwise unrelated to the Parties' business and their relationship. Indeed, the Respondents argue vigorously in another context that the MA Regulations provide a comprehensive set of rules governing the subject matter of this dispute.

The language providing that the applicable regulations shall "control and supersede our agreement" is also noteworthy. The Respondents knew that a critical aspect of their business is assuring ongoing compliance with the body of laws and regulations governing MA organizations. They understandably wanted Claimant to acknowledge and be bound by those rules as well.

The termination provisions of the Claimant's Contract must be read together with the requirements imposed by the MA Regulations. As noted by one federal court, "the Medicare Act's procedural requirements for terminations of physicians without cause from [MA Plans] …***provid[e] a baseline level of protection for physicians. These provisions are complementary to United's contracts with individual physicians***, and they do not supersede or displace stronger protections set forth in United's individual Physician Contracts." Fairfield County Med. Ass'n v. United Healthcare of New England, 985 F. Supp.2d 262 (D. Conn. 2013), aff'd as modified sub nom., 557 F. App'x 53 (2d Cir. 2014).

The Arbitrator finds that (i) Respondents were bound by contract to fully comply with the MA Regulations, and (ii) Respondents' failure to fully comply with the MA Regulations in effecting the termination of Claimant's Contract was a material breach of that Contract.

**The Breach of Contract Claim is Not an Unauthorized "Private Right of Action"**

15

Case Number 01-19-0003-9667

Respondents assert that even if their termination of Claimant's Contract failed to comply with the MA Regulations, Claimant cannot compel their compliance because Congress did not expressly create a "private right of action" for aggrieved physicians to enforce the MA Regulations. In support of this view, Respondents cite numerous cases from the body of law concerning "private rights of action."

"Private rights of action" are generally understood to be lawsuits filed by private individuals to enforce public laws. A body of case law generally requires a showing of Congressional intent to create a private right of action, largely in order to limit enforcement efforts to the government agency charged with the subject law's implementation. This argument might be persuasive if Claimant had no breach of contract claim and filed a claim against Respondents to compel their compliance with laws and regulations unrelated to Claimant's Contract. It also might be persuasive if one of Claimant's patients filed a lawsuit against Respondents to compel their compliance with the MA Regulations. Neither of these scenarios occurred here.

Claimant makes a sound argument that a "private right of action" can be implied because the very purpose of the statute and regulations at issue is to assure certain due process rights to physicians under contracts with MA Plans. Under Respondents' interpretation of (i) the MA Regulations, (ii) the requirement of a "private right of action," and (iii) Medicare preemption, Claimant's *only* opportunity for a remedy of a wrongful termination "without cause" (*e.g.*, one resulting from Respondents' breach of Claimant's Contract or some unlawful conduct) would exist by way of DHHS initiating an investigation and enforcement action against Respondents resulting in reinstatement of Claimant's Contract.

But Claimant's strongest argument on this point is his claim for breach of contract. Respondents offered no persuasive response to the suggestion that the Parties engrafted the requirements of the MA Regulations into their contract. The Arbitrator finds that Claimant's breach of contract claim under New Jersey law based upon Respondents' noncompliance with the MA Regulations is not barred because Congress did not expressly create a "private right of action" to enforce the MA Regulations.


### **The Breach of Contract Claim is not Preempted by the Medicare Act**

Respondents point out that the Medicare Act contains a preemption provision that applies to MA Plans like Respondents' Plan: "The standards established under this part [Part C Medicare Advantage] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan insolvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C.§1395w-26(b)(3).

The Medicare Act's preemption provision does not bar claims for breach of contract when the breach occurs by way of noncompliance with the MA Regulations. As stated by the Federal District Court of Connecticut in similar circumstances:

"…the Medicare Act requires that states do not interfere with the scope, implementation, or performance of Medicare plans offered by private organizations. ***It does not, however, preempt courts from reviewing***

16

Case Number 01-19-0003-9667

*agreements between physicians/providers and private Medicare plan providers to enforce the procedural rights set forth in those agreements and in the Medicare regulations governing physician terminations.* 42 C.F.R.§422.202(d) (Emphasis added). <u>Fairfield County Med. Ass'n v. United Healthcare of New England</u>, supra, at 270.

Respondents cited no case holding that the Medicare Act preempts Claimant's claim for breach of contract on the facts presented here. The Arbitrator finds that Claimant's breach of contract claim is not barred by the preemption provision of the Medicare Act.


## The Implied Covenant of Good Faith and Fair Dealing

Claimant asserts that in addition to the express terms of the Claimant's Contract, the law attaches to that Contract an implied covenant of good faith and fair dealing. Claimant's initial Hearing Brief at page 19 states: "A Party to a contract must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefit or reasonable expectations of the contract," citing Model Civil Jury Charge, 4.10 J.; Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc., 182 N.J. 210, 230-31 (2005).

Respondents here did not act in bad faith, or with dishonesty or improper motive to destroy or injure Claimant or deprive him of the benefit of Claimant's Contract. The precise issue raised by this arbitration has not been the subject of any controlling legal precedent. Respondents' actions in terminating Claimant from the Network were based on their good faith (but incorrect) interpretation of the MA Regulations and the Claimant's Contract.

The Arbitrator finds that Claimant's claim in this respect is without merit.


## Claimant is Entitled to Injunctive Relief

Claimant seeks injunctive relief. To establish a basis for permanent injunctive relief, Claimant must show (1) he has established Respondents' liability; (2) irreparable harm will result if the relief is not granted; and (3) on balance, the benefits of the relief granted will outweigh any harm such relief will cause other interested parties. Claimant has established Respondents' liability for breach of Claimant's Contract. The other criteria must now be addressed.

Respondents strongly contested the issue of irreparable harm. This issue was also pressed by Respondents before the Emergency Arbitrator, who granted Claimant's application for emergency restraints. As cited by Claimant and accepted by the Emergency Arbitrator, the District Court in <u>Fairfield County</u> when faced with this same question in the context of an application for a preliminary injunction provided a cogent analysis:

"…several district and circuit courts have found that ***disruption of the physician-patient relationship can cause irreparable harm*** that justifies issuing preliminary injunctive relief, ***particularly when the patient belongs to a vulnerable class or may have a deep trust relationship with the physician*** because of the serious nature of the patient's illness or medical needs. Schisler v. Heckler, 574 F. Supp. 1538, 1552-53 (W.D.N.Y. 1983); see also Roudachevski v. All-Amer. Care Ctrs., Inc., 648 F.3d 701, 706-07 (8th Cir. 2011). Other district courts have also found that ***dropping certain physicians from insurance plans, or altering elderly patients' access to specialists by terminating provider plan with those physicians, may cause irreparable harm and offend the public interest.*** See, e.g., Barron v. Vision Serv. Plan, 575 F. Supp.2d 825, 835-36 (N.D. Ohio 2008)."

"…courts have found that **irreparable harm may exist when the moving party could suffer a loss of goodwill, suffer reputational harm, face exclusion from certain business opportunities, or face a significant threat to that party's business.**"

Fairfield County, 985 F. Supp.2d at 270, 271 (emphasis added).

Claimant offered his own testimony and that of three of his patients to demonstrate that he largely serves "a vulnerable class," and that he has "a deep trust relationship" with his patients "because of the serious nature of the patient's illness or medical needs." Given the size and market significance of the Plan and the nature of Claimant's medical practice model, it is also clear that exclusion from Respondents' network would have a substantial negative effect on his goodwill, reputation and business prospects. Irreparable harm will occur in the absence of injunctive relief.

The benefits of the relief sought far outweigh any harm such relief will cause other interested parties. The harm to Respondents is minimal. Claimant has been participating in their Plan for many years and the record contains no evidence that continuing such participation causes any harm to Respondents or their Plan members. To the extent any such harm should occur in the future by way of Claimant's conduct, Claimant's Contract provides ample means for it to be addressed.

Given the determination herein that Respondents failed to comply with the MA Regulations and breached Claimant's Contract, the public interest is also served by providing injunctive relief. It will correct an outcome that is inconsistent with the purpose and intent of the law and regulations creating the MA program.

Claimant is not barred from an award of injunctive relief by reason of having requested to add a claim for damages. Claimant's request was denied, without prejudice, so there is no pending claim for damages. Further, the possibility that Claimant may seek and be entitled to damages in the future does not rule out injunctive relief at this time. The harms noted above to support injunctive relief are not remediable by an award of damages. The potential award of damages in the future may provide only partial relief. Accordingly, Claimant's demand for injunctive relief will be granted.

**Claimant is Entitled to Declaratory Relief**

Claimant seeks declaratory relief. Courts are generally authorized to grant declaratory relief. To maintain such an action there must be a justiciable controversy between the parties, and the parties in interest must be before the court. *See* 28 U.S.A. §2201(a), N.J.S.A. 2A:16-51 *et seq.*

AAA R-47(a), concerning the scope of an Award, provides:

"(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of the contract."

There is nothing in the Claimant's Contract to suggest that declaratory relief is not permitted in this arbitration. Under the circumstances presented, such relief is necessary to fairly resolve the parties' dispute. Accordingly, Claimant's demand for declaratory relief will be granted.

## AWARD

Based on the above, the Arbitrator AWARDS as follows:

1. The Termination Letters are hereby declared and adjudged to be invalid and ineffective in terminating and/or not renewing the Claimant's Contract and Claimant's participation in and right to participate under the Plan;

2. Respondents are hereby permanently enjoined and restrained from terminating Claimant as a participating physician in the Plan without cause, or from terminating without cause or not renewing Claimant's Contract, except in full compliance with the MA Regulations at 42 C.F.R. §422.202, as the same may be amended from time to time, including, without limitation, the obligation to:

   a. Provide written notice of the reasons for the decision to terminate or not renew, which reasons shall state a substantive, rational explanation for the decision sufficient to fully inform a reasonable person of why the decision was made, and not simply recite the Respondents' right to terminate or not renew without cause. A bare reference to "a business decision" or similar conclusory phrase shall not satisfy this requirement.

   b. Provide Claimant with the standards and profiling data used to evaluate Claimant and the numbers and mix of physicians needed by the Respondents' Plan. The requirement to provide such information shall not apply if the decision to terminate or not renew, as substantively and rationally explained in the required notice, clearly demonstrates that profiling data used to evaluate Claimant, as well as data concerning the numbers and mix of physicians needed by the Respondents' Plan, were demonstrably irrelevant to the decision.

19

Case Number 01-19-0003-9667

c. Provide a reasonable procedure for appealing any adverse participation decision, including the right of Claimant to present information and his view on the decision. Such appeal shall include the right of Claimant to a hearing before a hearing panel of which a majority of members are the Claimant's peers.

3. Commencing immediately, and for so long as Claimant remains a participating physician in the Plan:

a. Respondents are hereby permanently enjoined and restrained from removing Claimant's identifying information from any marketing materials and provider directories for the Plan, and from notifying any members of the Plan that Claimant has been or will be excluded from the Plan or precluded from accepting new patients in the Plan.

b. Respondents are hereby ordered and directed to in all respects treat Claimant as a participating physician provider in the Plan, in good standing.

c. Respondents are hereby ordered and directed to list Claimant as a physician provider in the 2020 directories for the Plan and all updates and future editions of such directories. In the event such directories have been produced and will not be updated for 2020, Respondents shall include Claimant in the next edition of such directories.

4. Claimant's claims for attorneys' fees and costs of arbitration are denied.

5. The administrative fees of the American Arbitration Association, totaling $7,730.00, and the compensation of the emergency relief arbitrator, Paul Burns, totaling $29,353.50 and the compensation of arbitrator, Richard Webb, totaling $25,000, shall be borne equally by the Parties, that is, 50 percent (50%) by Claimant and 50 percent (50%) by Respondents.

6. This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims and counterclaims not expressly granted herein are, hereby, denied.


March 24, 2020                          //s// Richard J. Webb
_____                _____
Date                                    Richard J. Webb, Arbitrator

I, Richard J. Webb, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

March 24, 2020                          //s// Richard J. Webb
_____                _____
Date                                    Richard J. Webb, Arbitrator


20

Case Number 01-19-0003-9667

# Civil Case Information Statement

## Case Details: ESSEX | Civil Part Docket# L-004846-20

**Case Caption:** SALERNO MEDICAL ASSO CIATES,LL  VS RIVERSIDE MEDI

**Case Initiation Date:** 07/17/2020

**Attorney Name:** STEVEN I ADLER

**Firm Name:** MANDELBAUM SALSBURG PC

**Address:** 3 BECKER FARM RD STE 105

ROSELAND NJ 07068

**Phone:** 9737364600

**Name of Party:** PLAINTIFF : Salerno Medical Associates,LLP

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Salerno Medical Associates,LLP?** NO

**Are sexual abuse claims alleged by: Senior Healthcare Outreach Prg?** NO

**Are sexual abuse claims alleged by: SM Medial, LLC?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**
Yes, Class Action.

**Do you or your client need any disability accommodations?** NO

**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

07/17/2020
Dated

/s/ STEVEN I ADLER
Signed