**MANDELBAUM SALSBURG P.C.**
**Steven I. Adler, Esq.**
**Lauren X. Topelsohn, Esq.**
**3 Becker Farm Road, Suite 104**
**Roseland, New Jersey 07068**
**Ph.: 973-736-4600**
**Fax: 973-736-4670**
**Attorneys for Plaintiffs**

| | |
|---|---|
| **SALERNO MEDICAL ASSOCIATES, LLP, SENIOR HEALTHCARE OUTREACH PROGRAM, INC., and SM MEDICAL LLC, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**RIVERSIDE MEDICAL GROUP, LLC,[1] UNITEDHEALTHCARE COMMUNITY PLAN, INC., OPTUM, INC., OPTUM CARE, INC., UNITEDHEALTHCARE GROUP, INC., UNITEDHEATHCARE INSURANCE COMPANY and JOHNS DOE 1-20,**<br><br>**Defendants.** | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**<br>**CIVIL ACTION NO. 2:20-CV-10539 (KM) (JBC)**<br><br><br>**ORAL ARGUMENT REQUESTED**<br><br>**MOTION DAY:  November 2, 2020** |

**BRIEF IN OPPOSITION TO DEFENDANTS' COMBINED
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION,
TO COMPEL ARBITRATION, AND ALTERNATIVELY, TO DISMISS
FOR FAILURE TO STATE A CLAIM**

**On the Brief:**
**Lauren X. Topelsohn, Esq.**
**Steven I. Adler, Esq.**
**Alex J. Keoskey, Esq.**

---

[1]Riverside Medical Management, LLC is incorrectly identified in the caption as "Riverside Medical Group, LLC."

1

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ii

PRELIMINARY STATEMENT .......................................................................................1

INTRODUCTION ............................................................................................................1

BACKGROUND................................................................................................................4

      A.  General and Specific Jurisdiction ................................................................4

      B.  The Arbitration Clause.................................................................................4

      C.  The 2019 Case ............................................................................................7

      D.  The Individual Arbitrations ......................................................................10

LEGAL STANDARDS...................................................................................................10

      (1)  Under the Federal Arbitration Act...........................................................10

      (2)  Standards to Compel Arbitration in the Absence of an Agreement,
              Under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim and to
              Replead ....................................................................................................12

ARGUMENT ..................................................................................................................15

POINT I       THE COURT HAS BOTH GENERAL AND
                  SPECIFIC JURISDICTION ...........................................................15

      A.  General Jurisdiction...................................................................................15

      B.  Specific Jurisdiction ..................................................................................17

POINT II     PLAINTIFFS ARE NOT PARTIES TO THE PROVIDER
                  CONTRACTS AND IT IS FOR THE COURT TO DETERMINE IF
                  THEY ARE BOUND BY THE ARBITRATION CLAUSE ......................18

      A.  Plaintiffs are Not Parties to the Provider Contracts................................18

      B.  The 2019 Decision Applies .......................................................................20

POINT III  PLAINTIFFS ARE NOT BOUND BY THE PROVIDER
CONTRACT'S ARBITRATION CLAUSE......................................................22

    A.  Plaintiffs Do Not Seek to Enforce the Provider Contract
or any Direct Benefit Under that Agreement...........................................22

    B.  Defendants' Assertion that Two Non-Signatories to an Arbitration
Agreement Can be Compelled to Arbitrate is Nonsensical...................26

POINT IV   PLAINTIFFS STATE VIABLE CAUSES OF ACTION ...........................29

    A.  Plaintiffs' Claim for Tortious Interference .............................................29

    B.  Plaintiffs' Claim of Civil Conspiracy.....................................................31

    C.  Plaintiffs' Claim of Unjust Enrichment...................................................33

    D.  Plaintiffs' Claim of Misappropriation ....................................................34

    E.  Plaintiffs' Claim of Unfair Competition..................................................35

    F.  Plaintiffs' Claim of Tortious Refusal to Deal  ........................................35

CONCLUSION .............................................................................................................36

APPENDIX

Transcript of October 4, 2019 Hearing in the Matter of *Salerno v. UnitedHealthcare Grp., Inc.*, No. 2:19-cv-18130-KM-JBC (D.N.J. 2019)

Physician Contract dated February 25, 2010 with Fadi A. El-atat

# TABLE OF AUTHORITIES

## Cases

Alston v. Parker, 363 F.3d 229 (3d Cir. 2004) ..........................................................14

AT&T Tech., Inc. v. CWA, 475 U.S. 643 (1986) .....................................................20

Atalese v. U.S. Legal Servs. Grp., L.P., 99 A.3d 306 (N.J. 2014), cert. denied, 135 S. Ct. 2804 (2015) ........................................................................................................................8

Banco Popular N.Am. v. Gandhi, 184 N.J. 161 (2005) .............................................31

Bayonne Drydock & Repair Corp. v. Wartsila N. Am., Inc., 2013 WL 3286149 (D.N.J. June 28, 2013) .....................................................................................................................25

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ........................................ 13, 14

Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435 (3d Cir.1999) ....................11

Bouriez v. Carnegie Mellon Univ., 359 F.3d 292 (3d Cir.2004) ..............................23

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) .............................................16

Conley v. Gibson, 355 U.S. 41 (1957) .......................................................................13

Connelly v. Lane Const. Corp., 809 F.3d 780 (3rd Cir. 2016) ............................. 13, 14

Daimler AG v. Bauman, 571 U.S. 117 (2014) ............................................................4

E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187 (3d Cir. 2001 .............................................10, 11, 26

Eaton Corp. v. Maslym Holding Co., 929 F.Supp. 792 (D.N.J. 1996) ......................16

First Options of Chicago v. Kaplan, 514 U.S. 938 (1995) ........................................20

Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444 (2003) .............................................20

Griswold v. Coventry First LLC, 762 F.3d 264 (3d Cir. 2014) .....................11, 22, 24

Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764 (3rd Cir. 2013) ......12

Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979), rev. on other grounds, 446 U.S. 754 (1980) ......................................................................................................................32

Haskins v. First Am. Title Ins. Co., 866 F.Supp.2d 343 (D.N.J.2012) ......................23

Long v. Wilson, 393 F.3d 390 (3d Cir.2004) .............................................................14

Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337 (App. Div. 1993) ..................................................................................................................32

Muhammad v. County Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 912 A.2d 88, 912 A.2d 88 (2006) .........................................................................................................21

Neal v. Asta Funding, Inc., 2016 WL 3566960 (D.N.J. June 30, 2016), aff'd, 756 Fed. Appx. 184 (3rd Cir. 2018) ...............................................22, 23, 25, 26

Noble Drilling Services, Inc. v. Certex USA, Inc., 620 F.3d 469 (5th Cir.2010) .......23

O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312 (3d Cir. 2007) ...........................16

Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51 (3d Cir.1980) .....12

Phillips v. City of Allegheny, 515 F.3d 224 (3d Cir. 2008) ................................. 13, 14

Puleo v. Chase Bank, N.A, 605 F.3rd 172 (3rd Cir. 2010) ........................................20

Sandvik AB v. Advent Int'l Corp., 220 F.3d 99 (3d Cir.2000) ..................................11

Sheridan v. NGK Metals Corp., 609 F.3d 239 (3d Cir. 2010) ..................................13

State v. Murphy, 168 N.J. Super. 214 (App. Div.), certif. denied, 82 N.J. 264 (1979) ............32

State v. Porro, 152 N.J. Super. 179 (App. Div. 1997) ...............................................32

United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960) ....11

Weil v. Express Container Corp., 360 N.J. Super. 549 (App. Div. 2003)..................................31

**Rules**

Fed. R. Civ. P. Rule 12(b)(6) ........................................................................................ 12, 14
Fed. R. Civ. P. Rule 15(a) ...................................................................................................14
Fed. R. Civ. P. Rule 4(k) ....................................................................................................16
N.J. Ct. R. 4:4-4                    16

## PRELIMINARY STATEMENT

Plaintiffs Salerno Medical Associates, LLP, Senior Healthcare Outreach Program, Inc. and SM Medical LLC (collectively, "**Plaintiffs**" or "**Practice Groups**"), respectfully submit this Brief in Opposition to the Combined Motion to Dismiss for Lack of Personal Jurisdiction, to Compel Arbitration, and alternatively to Dismiss for Failure to State a Claim (the "**Instant Motion**") of defendants Riverside Medical Management, LLC ("**Riverside**"), UnitedHealthcare Community Plan, Inc. ("**UHC Community**"), Optum, Inc., Optum Care, Inc. (together, "**Optum**"), UnitedHealthcare Group, Inc. ("**UHG**"), United Healthcare Insurance Company ("**UHC Insurance**") (collectively "**Defendants**" or the "**UHC Companies**"). (UHC Community, Optum, UHG, and UHC Insurance are referred to collectively as "**United**").

## INTRODUCTION

"Plaintiffs in ***this*** case … are medical groups." (DBrief at 3).[2]  Plaintiffs "employ one or more healthcare providers" (id. 6), including physicians, osteopaths and nurse practitioners (collectively "**Providers**") (Comp. at ¶26), who ***individually*** entered into a "Physician Contract" or "Practitioner Contract"[3] with UHC Insurance Company "on behalf of itself, … and it other affiliates" (Physician Contract at 2, ECF 19-5) that enabled those Providers to treat their New Jersey Medicare and Medicaid patients on an  "in-network" basis under United's lines of business (the "**Plan**"), and who United attempted to remove from the Plan in 2019 by not renewing their

---

[2] Defendants' Brief in support of the Instant Motion [ECF 19] is cited as "DBrief".

[3] The Physician Contracts and Practitioner Contract are virtually identical, and are generally referred to as "**Provider Contracts**" unless context otherwise requires.

Provider Contracts.   (Compl. at ¶¶ 12, 15, 20, ECF 1-1).   Ultimately, United reinstated all of the Providers, with the exception of one, who is not employed by any Plaintiff here, but the arbitrator in that doctor's arbitration ordered that Defendants keep this doctor in the Plan as well, and all of those Providers pursued damages claims against United in individual arbitrations. Id. ¶¶66-67).[4]

Plaintiffs assert claims for conspiracy, tortious-refusal-to-deal, unfair competition, unjust enrichment, tortious interference (with contract and business relationships) and misappropriation of confidential information and/or trade secrets based on facts alleged in the Complaint.  Plaintiffs do not assert a breach of contract claim, the Providers' primary claim, because Plaintiffs have no contract with Defendants.  Relatedly, Plaintiffs sustained damages as a direct consequence of Defendants' tortious conduct.  Stated differently, Plaintiffs damages are independent from and not derivative of the damages claimed by the Providers.

In defense, Defendants first assert that the this Court lacks jurisdiction as to 4 of the 6 Defendants (specifically, UHG, UHC Community and the two Optum entities, together "Optum") since they are not New Jersey citizens and, according to Defendants, Plaintiffs do not allege sufficient "suit-related contact" with New Jersey "as required for specific jurisdiction." (DBrief 1).  This is wrong for several reasons, as established below.  First, all four of defendants, UHG, UHC Community, and the two Optum entities have strong ties to this state. They have established business enterprises in New Jersey, interact with a broad spectrum of New Jersey residents, including health providers, and health consumers, and have been litigants in several civil matters within the District Court in New Jersey as recently as this year.

---

[4]Upon information and belief, United refused to reinstate of Dr. Inas Wassef, owner of a pediatric clinic in Jersey City ad Bayonne, because Riverside "has opened offices close to Dr. Wassef's two offices." (Id. ¶¶54 and 67).

All of these entities hold themselves out to New Jersey residents to transact the business of health care in one form or another. All have a significant presence in this state, including interactive websites and provider manuals which convey that they are New Jersey entities in every way.  Most significantly, their conduct is directed at New Jersey healthcare Providers and practice groups and substantially affects residents within this jurisdiction, as only New Jersey-based Providers participate in the Plan and only New Jersey residents are insureds under the Plan.

As for the remaining defendants, UHC Insurance and Riverside, Defendants demand that the Complaint be dismissed, and Plaintiffs compelled to arbitrate based on the arbitration clause United includes in its Provider Contracts (id.) -- to which Plaintiffs are not party. (Discussed *infra*).  Indeed, the Practice Groups are "not parties to any agreement with United concerning the Plan." Compl.¶1.  The only contracts and business relationships at issue here -- and with which United tortiously interfered -- are those between Practice Groups, on the one side, and on the other, their respective Providers and/or providers outside each of the Practice Groups, and the Practice Group's patients.  Id. ¶3.   Simply put, Plaintiff are not bound by any arbitration agreement with Defendants.   Nevertheless, in a fictionalized version of the facts, Defendants contend that "this Court last year … held" that Plaintiffs' "claims belong in arbitration." (DBrief at 1).  As established below, Defendants' characterization of the Court's decision is wholly inaccurate.

## BACKGROUND

### A.     General and Specific Jurisdiction

Defendants' argument, that the Court lacks general jurisdiction over four of the defendants, is meritless. The Court has both general jurisdiction and specific jurisdiction. With respect to the former, there are adequate facts to establish that the UHG, UHC Community and Optum have a clear and unequivocal presence in this State such that they can be "fairly regarded as at home." Daimler AG v. Bauman, 571 U.S. 117, 137 (2014).

Specific jurisdiction is also established as to United based on their conduct directed at New Jersey Providers and Groups and which substantially affected residents within this jurisdiction.  Notably, only New Jersey-based Providers participate in the Plan and only New Jersey residents are insureds under the Plan.

### B.     The Arbitration Clause

Notwithstanding that there is no contract of any kind between the Practice Groups and Defendants with respect to the Plan, Defendants insist the Practice Groups are bound by the virtually identical arbitration clause included in each Provider Contract (the "**Arbitration Claus**e"). Defendants do not contend that Plaintiffs are bound in all respects by the Provider Contracts. Instead, they argue that the Practice Groups are bound solely by the Arbitration Clause, which they assert

> "require[s] ***the parties***" to those agreements "arbitrate 'all disputes' 'on an individual basis.'"

(DBrief at __ citing, Ex. A, Nielsen Decl. Ex. 1 at 5–6) (emphasis added).

It is undisputed that the Practice Groups are not "***parties***" to the Provider Contracts.  Indeed, Defendants' own documentary evidence irrefutably establishes this fact.  With each Provider Contract, United sends an introductory letter in which the term "practice" refers to the Provider (not the Group) to whom the letter is addressed.  (See, e.g., August 29, 2017 letter to Amanda Marino, MD, ECF 19-5) ("By signing the participation agreement, you are attesting that you have full authority to bind the above referenced practice to the agreement").  As would be expected, the Provider Contract includes signature lines only for the Provider and United -- there is no signature line for any Practice Group.[5]

Furthermore, in each Provider Contract, United expressly distinguishes between the individual Provider, the party to the agreement, and any "medical group" with which that Provider may be affiliated.  Specifically, United states:

> This agreement applies to **you and the services you provide** in all of **your** practice arrangements and for all of your tax identification numbers, **except** that **if your services** are **covered under an agreement between us and a *medical group*** that you are part of, services that you provide through **that medical group will be subject to that other agreement and not this agreement**.

Id. at ¶2.   Thus, United expressly states that the Provider Contract applies to "you", the Provider, and that if the Provider's services "are covered under an agreement" between United and a "Medical Group", the Medical Group is "subject to that other agreement… not this agreement."  Id.   Simply put, United makes clear that the "you" to whom Physician

---

[5]See, e.g., Physician Contracts with Alexander Salerno, MD, Elizabeth D. Evans, MD, Amanda Marino, MD, Rakesh K. Sahni MD (d/b/a Healthpoint Medical Group, Old Bridge), Ramez W. Samuel, MD, and Inas Latif Shaker Wassef, MD, at 2, ECF 19-3 to 19-8.

4844-5942-3439, v. 3

Contract refers is the Provider ***only***, and clearly distinguishes between the Provider and any

Practice Group with which he/she may be associated.

Likewise, the Arbitration Clause makes clear that it applies only to United and

the Provider:

> **We** will resolve all disputes **between us** by following the dispute **procedures set out** in our ***Provider* Manual**. If **either of us** wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://www.adr.org) within one year.
>
> We **both** expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with **any third party(ies)** may be consolidated or joined with our dispute. We both agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling. … We **both** acknowledge that this agreement involves interstate commerce, and is governed by the Federal Arbitration Act… .
>
> If a court allows any litigation of a dispute to go forward, we **both** waive rights to a trial by jury with respect to that litigation. … This section of the agreement governs any dispute between **us** arising before or after execution of this agreement and this section shall survive and govern any termination of this agreement.

(Emphasis added).  As an initial matter, the "Provider Manual" to which Defendants refer is

a manual for **Providers**.   There is no evidence that it has any application to Plaintiffs.

Further, United repeatedly refers in the Arbitration Clause, to "we" and "we ***both***."  There is

no "royal we" and  "we both" clearly refers to two parties --- not "we, three" (or four or six,

or even "we both" and every entity, person and/or patient that "you" (the Provider)

interfaces while providing "services."

4844-5942-3439, v. 3

Equally significant, the Arbitration Clause prohibits the individual Providers from pursuing a "dispute" against United "with any third party(ies)." Thus, even if United had not otherwise expressly excluded the Practice Groups as parties to the Provider Contracts, by specifically declaring that any "medical group" through which the Provider provides service is "subject" to a separate agreement, United excludes the Practices Groups as "third parties" in any arbitration brought pursuant to the Arbitration Clause. Certainly, Defendants cannot have it both ways. Defendants cannot both exclude the Practice Groups from the Provider Contracts and bar them from joining in any arbitration with their employee Providers, and simultaneously insist they are nevertheless bound by the Arbitration Clause in a contract to which they are not a party.

## C.    The 2019 Case

On September 19, 2019 Plaintiffs, another medical practice not a plaintiff here, and 22 Providers, some of whom are not employed by any Plaintiff here, brought an action by Order to Show Cause, seeking temporary restraints enjoining the UHC Companies named therein from terminating the Providers from the Plan without a hearing, and damages for breach of contract, breach of the covenant of good faith and fair dealing and civil conspiracy, tortious refusal to deal, unfair competition, tortious interference with contract and prospective economic advantage  and permanent restraints, declaratory relief and as entitled _Salerno v. UnitedHealthcare Grp., Inc._, No. 2:19-cv-18130-KM-JBC (D.N.J. 2019) (the "**2019 Case**"). Shortly thereafter the Medical Society of New Jersey ("**MSNJ**") was added as plaintiff and an Amended Complaint filed.

As indicated by the foregoing, while there is some overlap between the Plaintiffs in the present action, and those in the 2019 Case, they are not identical; indeed, the defendants are also different.[6]

On October 4, 2019, the Hon. Kevin McNulty, U.S.D.J. held oral argument on Plaintiffs' application for temporary restraints. (2019 Case, ECF 21, cited in DBrief at 10).[7] During the hearing, Plaintiffs' counsel, Steven I. Adler, Esq., argued that the Arbitration Clause was invalid and unenforceable under Atalese v. U.S. Legal Servs. Grp., L.P., 99 A.3d 306, 311 (N.J. 2014), cert. denied, 135 S. Ct. 2804 (2015). (See, e.g., 10/4/19 Tr. 4-9, and 23-24). In response, defendants' counsel, Brian D. Boone, Esq., argued that it was for the arbitrator to decide the clause's validity. Id. at 16- 22. Notably, both attorneys addressed the Arbitration Clause only as it related to the Providers, not the Practice Groups named therein as plaintiffs. See, e.g., Id. 4-9 and 16-22.

Judge McNulty noted that because the Arbitration Clause incorporated the Rules of the American Arbitration Association, the issue of "whether … Atalese" rendered the clause unenforceable ()was "initially for the arbitrator to decide." Id. at 30/8-10. The Court

---

[6] Specifically, the 2019 Case included the following plaintiffs who are not parties here: (1) the MSNJ; (2) Pediatrics and Adolescent Saint Mary Clinic, LLC and (3) the 22 Providers, specifically: Alexander Salerno, M.D., Svetlana Salerno, M.D., Amanda Marino, M.D., Diana Larrea, D.O., Andrea Fodor, N.P., Guetty Gabaud, N.P., Bela Laschiver, N.P, Aida Ramos, F.N.P., Maryellen Roberts, N.P., Rakesh K. Sahni, M.D., Elizabeth D. Evans, D.O., Kuang-Yiao Hsieh, M.D., John H. Rundback, M.D., Kevin Herman, M.D., Roel P. Galope, D.O, Victoria A. Howell, N.P., Mariela Pabon, R.D., Nilay R. Shah, M.D., Ramez W. Samuel, M.D., Mounir Abdelshahid, M.D., Catalina Delacruz, M.D., and Inas Wassef, M.D.

Similarly, the 2019 Case included three (3) defendants not named here: UnitedHealth Group, Inc., Americhoice Corp., and Americhoice of New Jersey, Inc.

[7] A copy of the transcript October 4, 2019 hearing is attached as an Appendix to this Brief and cited as "10/4/19 Tr."

4844-5942-3439, v. 3

did not hold that it was for the arbitrator to determine whether the Practices, who were (and are) not parties to the Provider Contracts, are bound by the Arbitration Agreement.  Indeed, the Court specifically held to the contrary:

> if the claim is that …. these two people didn't have an [arbitration] agreement or something like that, then, yes, it's got to be the Court, no matter what it says.
> **_A and B cannot agree, for example, that C is bound to arbitration.  That certainly is an issue for the Court at the outset._**

Id. 16/23-17/10 (emphasis added).  See also, Id. at 27/5-6 ("arbitrability[,] by default[,] is to be decided by the Court unless the parties agree otherwise").  Thus, Judge McNulty specifically addressed the precise situation presented here.  The Practice Groups "are not parties to any agreements with United concerning" the Plan "which contain an arbitration clause." (Compl. at ¶1).  The Provider Contract, which does contain the Arbitration Clause is between United and each Provider -- i.e. A and B.  Here, C, the Practice Groups, as well as A and B, do not agree that "C is bound to arbitration."  Thus, as Judge McNulty determined, that "issue is for the Court at the outset."  Id.

On October 11, 2019, the Court issued a written Order, preliminarily restraining Defendants from terminating the Providers and, "refer[ring] to arbitration with the American Arbitration Association (AAA)" the "initial determination of arbitrability." (Salerno, 2:19cv18130, Dkt. 25).  Thus, while the October 11, 2019 Order refers to "Plaintiffs" generally, without differentiating the Providers and Practices (DBrief 4), the Court expressly did differentiate in issuing its decision on October 4, 2019.  As such, that the hearing transcript

and written Order must be read together for a complete understanding of the Court's decision (hereafter together, the "**2019 Decision**").

## D.   The Individual Arbitrations

In the months that followed, approximately ten (10)l Providers filed individual arbitrations with the AAA (and, as noted above, Defendants ended up allowing them to remain in the Plan). (Comp. ¶¶3, 54, ECF 1-01).  The Plaintiffs here -- the Practice Groups -- who were not parties to the Provider Contracts and who deny they are bound by the Arbitration Clause in those agreements, now bring their own claims before this Court as is their right.

## LEGAL STANDARDS[8]

## (1)   Under the Federal Arbitration Act ("FAA")

While there is a "strong federal policy" underlying the FAA that generally "favors … enforcing arbitration agreements" (DBrief 6), Defendants ignore that this presumption does <u>not</u> apply to non-signatories to the agreement -- such as Plaintiffs.  "[A]t bottom," that policy is intended to ensure "the enforcement of private contractual arrangements."  <u>E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187, 194 (3d Cir. 2001) (non-signatory corporation could not be compelled to arbitrate claim, on basis of intended third party beneficiary theory, agency

---

[8]Plaintiffs do not take issue with Defendants' recitation of the law concerning jurisdiction (address infra at Point I).

theory, or equitable estoppel theory); quoting, Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104-05 (3d Cir.2000) (citation omitted).   Thus,

> the presumption in favor of arbitration does not extend, … to non-signatories to an agreement; it applies only when both parties have consented to and are bound by the arbitration clause.

Griswold v. Coventry First LLC, 762 F.3d 264, 271 (3d Cir. 2014) (emphasis added; plaintiffs/non-signatories to purchase agreement, could not be compelled to arbitrate); citing, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960) ("[A] party cannot be required to … arbitrat[e] any dispute which he has not agreed so to submit"); and Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir.1999).

Thus, "under the FAA, 'a court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute." E.I. DuPont, at 194.   Stated differently, "if a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." Bel-Ray, at 444.

While it is true that a non-signatory may "be bound to arbitrate … under traditional principles of contract and agency law" that is only true where "[the party is] akin to a signatory of the underlying agreement. E.I. DuPont de Nemours & Co, at 194 (3d Cir. 2001), quoting, Bel–Ray Co., Inc., at 444 (finding the "parties resisting arbitration" were not bound, under "traditional principles of contracts and agency," by an arbitration agreement "they did not sign" and noting that "an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract.").

-11-

As demonstrated *infra*, Defendants cannot force Plaintiffs, with whom they have no agreement, and who Defendants expressly exclude from the Provider Contract according the plain language United drafted, to arbitrate.

**(2)      Standards to Compel Arbitration in the Absence of an Agreement, Under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim and to Replead**

United contends that the case must be dismissed pursuant to Rule 12(b)(6) on two basis, arguing that:  (1) the Court must compel Plaintiffs to arbitrate because they are bound by the Arbitration Clause;  and (2) Plaintiffs allege sufficient facts to state any viable claim against Defendants. (DBrief at Point II and Point II).  With respect to Defendants' first argument, "when it is apparent, based on "the face of a complaint, and documents relied upon in the complaint," that a party's claims "are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6)." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 776 (3rd Cir. 2013) (quoting). However, where, as here, "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts" that raise an issue as to whether there is an "agreement to arbitrate" the parties are entitled to "limited discovery" and the determination must be made "under a summary judgment standard." Id.   The underlying rationale for this heightened standard is that "'[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.'" Id. at 774, quoting, Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 (3d Cir.1980).

-12-

As for whether Plaintiffs substantively state a claim upon which relief can be granted "detailed pleading is not generally required. The Rules demand "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Connelly v. Lane Const. Corp., 809 F.3d 780, 786–87 (3rd Cir. 2016) (reversing trial court's dismissal of complaint), quoting, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting, Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Indeed, all that is required is that the Complaint's "factual allegations" meet the low threshold of "rais[ing] a right to relief above the speculative level."  Twombly, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quote marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  See also, Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n. 27 (3d Cir. 2010). The plausibility standard "does not impose a probability requirement," Twombly, 550 U.S. at 556.  It simply calls for enough facts to raise an expectation that discovery will reveal evidence of the necessary elements." Phillips v. City of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)(quoting, Twombly, at 556). The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Connelly v. Lane Construction Corp., at 679.

4844-5942-3439, v. 3

Twombly did not "undermine [the] principle" that all reasonable inferences are to be drawn in favor of the plaintiff and "reaffirm[ed] that "the facts alleged must be taken as true," Connelly, at 780, quoting, Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)), "even if" those facts are "unrealistic or nonsensical", "chimerical", or 'extravagantly fanciful." Id., quoting, Iqbal, 556 U.S. at 681.

Plaintiffs submit that they readily meet and exceed the foregoing standards. However, in the event the Court considers otherwise with respect to any claim, Plaintiffs request leave to replead pursuant to Fed. R. Civ. P. 15(a) and as mandated in this Circuit.  A pretrial motion for leave to replead is governed by Rule 15(a), which instructs that such leave is to be freely given "when justice so requires."  Indeed, the Third Circuit has held that here, if a complaint is vulnerable to Rule 12(b)(6) dismissal, "a District Court must permit a curative amendment, unless an amendment would be inequitable or futile." Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).  In accord, Long v. Wilson, 393 F.3d 390, 400 (3d Cir.2004) (motion to amend the pleadings should only be denied where there is "bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiencies by amendments previously allowed or futility of amendment.") (Internal quote omitted).

-14-

# ARGUMENT

## POINT I

## THE COURT HAS BOTH GENERAL AND SPECIFIC JURISDICTION

### A.   General Jurisdiction

In terms of general jurisdiction, a cursory search on Federal Court's *Pacer* system reveals that two of the four United Defendants recently have been litigants before this Court.  Not only have they defended claims, at least in one case they prosecuted a counterclaim (Ayala v. Unitedhealth Group, Et Al, 1:03-cv-03704-*JBS).*  As such, not only have those two United Defendants accepted service of process in New Jersey and retained local counsel to represent them, in many of these civil actions they have litigated through discovery, they engaged settlement negotiations and ultimately entered into a settlement agreement.  UHG and Optum, Inc. have been defendants in a number of civil matters where the subject of general or specific jurisdiction was never argued, briefed or conveyed to the court in any manner by those defendants. This fact alone negates any argument by the United Defendants that they are "not at home" in New Jersey. These facts readily establish general jurisdiction over those Defendants.

Specific jurisdiction of this Court has also been unequivocally established. United argues that UHC Community Plan has no involvement in the administration of their health plan in New Jersey and that the plan is administered by Oxford Health Plans (NJ), Inc. and AmeriChoice of New Jersey, Inc.   However, Defendants readily admit that they operate a d/b/a entity known as UnitedHealth Community Plan (DBrief at 9). Furthermore,

the footer in a Provider Manual provided to some of the Plaintiffs contains the following text identifying the author:

*UnitedHealth Community Plan New Jersey*

The footer also includes the following link identifying their webpage:

*UHCprovider/com/njcommunityplan*

While the mere presence of a 'passive' website which does not encourage interaction with residents of the forum state is not sufficient to establish specific jurisdiction, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), a website utilized for the specific purpose of encouraging providers in New Jersey to log on in order to seek assistance or guidance more than meets the threshold for specific jurisdiction.   Such interaction between provider and plan administrators cannot simply be categorized as "random" and "attenuated", but are more than sufficient to warrant the exercise of jurisdiction *Id.*

Pursuant to Federal Rule of Civil Procedure 4(k), a federal district court may exercise jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which it sits. O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007). New Jersey's long-arm statute permits the exercise of personal jurisdiction over non-resident defendants to the fullest extent as allowed under the Fourteenth Amendment of the United States Constitution. N.J. Ct. R. 4:4-4;  Eaton Corp. v. Maslym Holding Co., 929 F.Supp. 792, 796 (D.N.J. 1996).

United is also registered to do business and have agents for the receipt of process in New Jersey, tacitly acknowledging  that they can be sued in New Jersey and in the case of two

of these defendants, Optum and UHG, have been sued in this jurisdiction.  As such, they have

consented to the jurisdiction of this Court, such that the Court has general jurisdiction over them.

## B.  <u>Specific Jurisdiction</u>

This Court also has specific jurisdiction over United because their tortious

conduct was directed to and felt by the Practice Groups, as well as the Plan beneficiaries, in New

Jersey.  Plaintiffs assert that United wrongly notified patients, many of whom are elderly or

disabled, and all who reside in New Jersey, that their chosen medical providers, all of whom

practice in New Jersey, are being dropped from the Plan. (See, e.g., Compl. ¶¶46, 95-96, 110).

United further provided false and misleading information to these patients, in order to steer

business to an entity in New Jersey which the Defendants own. (<u>Id</u>. ¶¶90, 111, 121 141). As such,

Defendants' actions affect a broad spectrum of the New Jersey health care community. Since

United's conduct was directed to New Jersey, and the resulting harm sustained here, specific

jurisdiction exists.  If any doubt remains as to jurisdiction however, Plaintiffs should be afforded

an opportunity to conduct discovery in this regard. At a minimum, there are genuine issues of

material fact that can only be thoroughly and adequately explored through the process of

discovery.

Plaintiffs respectfully submit Defendants' motion must be denied.  If there is

any doubt, however, discovery should be allowed prior to any motions based upon general

or specific jurisdiction.

4844-5942-3439, v. 3

# POINT II

## PLAINTIFFS ARE NOT PARTIES TO THE PROVIDER CONTRACTS AND IT IS FOR THE COURT TO DETERMINE IF THEY ARE BOUND BY THE ARBITRATION CLAUSE

### A.     Plaintiffs are Not Parties to the Provider Contracts

As alleged in the Complaint (and established above), Plaintiffs are not parties to the Arbitration Clause -- nor to the Provider Contracts.  As discussed above, in the Provider Contracts, United (1) refers only to the Provider as "you", the party to the Provider Contract and to whom it is addressed (Provider Contact at 2);[9]  (2) expressly distinguishes between the Provider and any "medical group" he/she may be associated with (id);  (3) states that the Provider Contract applies only to "service" the Provider and his/her "tax identification numbers", and that "if" he/she renders any services "under an agreement between us [United] and a medical group," those services "will be subject to that other agreement and not this agreement."  (Id).

Likewise, the Arbitration Clause expressly applies only to United (and its "affiliates") and the Provider, repeatedly refers to the parties as "we" and "we both", refers to the dispute procedures in the Provider Manual -- a manual for Providers -- and expressly excludes arbitration "involving third party(ies)." Id.   United acknowledges the effort it made to draft and a clear and unambiguous Arbitration Clause.  As United states, it is

> important [that] the [United] spent more than 300 words
> explaining when the arbitration agreement applies, what

---

[9]The Physician Contracts with Alexander Salerno, MD, Elizabeth D. Evans, MD, Amanda Marina, MD, Rakesh K. Sahni MD (d/b/a Healthpoint Medical Group, Old Bridge), Ramez W. Samuel, MD, and Inas Latif Shaker Wassef, MD, are ECF 19-3 to 19-8.

4844-5942-3439, v. 3

> arbitration rules would govern the proceeding, where those rules
> may be found, the binding effect of the arbitration, whether multi-
> party or classwide arbitrations are allowed, whether the arbitrator
> may vary from the contract, what law applies to the arbitration
> agreement,…and affirming that the arbitration agreement is
> comprehensive.

(DBrief at 16).  Plaintiffs agree, it is "important" that United used "more than 300 words" to

express the Arbitration Clause.  Indeed, what is important is that among those 300 words,

United's only mention of third parties is to expressly preclude them from joining in any

arbitration "involving" the Provider:  "We both expressly intend that any dispute between us

be resolved on an individual basis so that no other dispute with any third party(ies) may be

consolidated or joined with our dispute."  (Provider Contract at 6).   UHC Insurance makes

clear that it is entering into the Provider Contract "with you", the Provider, on "behalf of

itself, … and its other affiliates." (Id. at 1).   **United describes the Arbitration Clause as**

**"comprehensive**."  If United intended that the Provider enter into the Provider Contract on

his/her own behalf <u>and</u> on behalf of any Practice Group of which he/she is a part, or

otherwise bind any Medical Group in anyway by executing the Physician Contract, United

would (and should) have included language to that effect -- for example, am acknowledgment

that the Provider was authorized to do so.  United did not.  Instead, United did otherwise, and

expressly carved out "Medical Groups," which are "subject to" a separate agreement and

barred their joining in any arbitration between United and Provider.

Thus, the express language of the Provider Contract, including without

limitation, the Arbitration Clause, as well as the language United did not include, establishes

there is simply no arbitration agreement between the Plaintiffs here and United.

4844-5942-3439, v. 3

**B.**     **The 2019 Decision Applies**

The sole issue the parties appear to agree on is that the 2019 Decision is

binding on them, albeit in different respects. (See, DBrief at 9) ("The 2019 order binds the

Plaintiffs").

As this Court held on October 4, 2019, where there is no agreement between

the parties, a dispute whether one or the other is bound by an arbitration clause to which it is

not a signatory, is for the Court to decide. (10/4/19 Tr. 27/5) ("Of course, it is true that

arbitrability by default is to be decided by the Court unless the parties agree otherwise",

citing, AT&T Tech., Inc. v. CWA, 475 U.S. 643 (1986).  Stated differently, the question of

the arbitrability of a contract is one for judicial determination unless the parties "clearly and

unmistakably" provide otherwise.  AT&T, at 649.  Here, there is no agreement whatsoever

between the parties.  As such, it is axiomatic that they did not "clearly and unmistakably"

agree to submit the question of arbitrability to arbitration, or indeed, any question to

arbitration.  Therefore,

> the court should decide that question just as it would decide any
> other question that the parties did not submit to arbitration,
> namely, independently.

First Options of Chicago v. Kaplan, 514 U.S. 938, 944 (1995)(citations omitted).  See also,

Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003) ("whether the parties have a valid

arbitration agreement at all" is a "gateway" question that requires judicial resolution"); cited

in, Puleo v. Chase Bank, N.A, 605 F.3rd 172, 179 (3rd Cir. 2010) ("when there is a question

regarding whether the parties should be arbitrating at all" it is "for the court to decide").  See

also, Muhammad v. County Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 912 A.2d 88,

912 A.2d 88 (2006) (whether the parties have a valid arbitration agreement at all is a gateway question that requires judicial resolution), <u>cert. denied</u>, 549 U.S. 1338 (2007).

Here, it is undisputed that there is no arbitration agreement between Plaintiffs and Defendants.  It is also undisputed that Plaintiffs deny that they are bound by the Arbitration Clause in the Provider Contracts, to which they are not party, while United maintains otherwise.  As such, as this Court held, the threshold issue, whether the Practice Groups, strangers to the Provider Contracts, the "C" in the Court's October 4, 2019 analysis, "clearly and unmistakably" agreed to arbitrate any issue or dispute with United, indeed whether the Plaintiffs are bound in anyway at all by the Provider Contracts, is for the Court to decide. (10/4/19 Tr. 17/2-3).

Finally, as established *supra*, Defendants' claim that this Court held that the arbitrator is to determine whether the Practice Groups are bound by the Arbitration Clause, is just not so.  (DBrief 10).  Yes, the Court "referred" the issue of the Arbitration Clause's legal validity to arbitration because the Provider Contracts incorporate the AAA Rules, thereby reflecting *the parties* "clear and unmistakable" intent to delegate that question to the arbitrator. (DBrief 16).  However, the Practice Groups are ***not*** parties to the Provider Contracts, and assert it is not binding on them.  As such, they had no reason challenge its validity as the Providers did in their individual arbitrations (and do not now, at least at this juncture).  Moreover, the Court did not hold, as Defendants contend, that the Arbitration Clause is binding on the Practice Groups and that their "claims belong in arbitration." (DBrief 1).  To the contrary, while the Court did not specifically address that interest, it held where "two people" have no "agreement",  and the parties to an agreement with an

-21-

arbitration clause "cannot agree… that C is bound to arbitration", that "certainly is an issue for the Court to decide at the outset." (10/4/19 Tr. 16/24-17/4).  (See also, *infra* Legal Standards (1))(discussing the caselaw that the presumption favoring arbitrability does not apply to non-signatories to the arbitration agreement).

As the Court found on October 4, 2019, in the absence of an arbitration agreement, it is for the Court to decide whether Plaintiffs are bound by an Arbitration Clause to which they are not a party.  Based on the law and facts set forth below, Plaintiffs respectfully submit that this issue must be decided in the negative.


## POINT III

## PLAINTIFFS ARE NOT BOUND BY THE PROVIDER CONTRACT'S ARBITRATION CLAUSE

United's arguments that Plaintiffs, non-signatories to the Provider Contract, are bound by the Arbitration Clause as a matter estoppel and intertwinement, are legally and factually insupportable.   (DBrief 12).


**A.     Plaintiffs Do Not Seek to Enforce the Provider Contract or any Direct Benefit Under that Agreement**

The equitable estoppel "exception", by "which a non-signatory may be bound to an arbitration … is a narrow one."  Neal v. Asta Funding, Inc., 2016 WL 3566960, at *17 (D.N.J. June 30, 2016), aff'd, 756 Fed. Appx. 184 (3rd Cir. 2018), citing, Griswold v. Coventry First LLC, 762 F.3d 264, 274 (3d Cir. 2014).  Equitable estoppel "may apply under one of two theories", the "first" is that

> courts have held non-signatories to an arbitration clause when the non-
> signatory knowingly exploits the agreement containing the arbitration
> clause despite having never signed the agreement… .

Under the "knowing exploitation" theory, "'a non-signatory may be bound by an arbitration clause if it "embraces the agreement **_and_** directly benefits from it."'" Id., quoting, Bouriez v. Carnegie Mellon Univ., 359 F.3d 292, 295 (3d Cir.2004) (emphasis added). In accord, Neal at *18.

> "A nonsignatory can 'embrace' a contract in two ways: (1) by knowingly **_seeking and obtaining direct benefits_** from that contract; **_or_** (2) by **_seeking to enforce terms of that contrac_**t or asserting **_claims [based on the contract_**'s other provisions]."

Id., quoting, Haskins v. First Am. Title Ins. Co., 866 F.Supp.2d 343, 350 (D.N.J.2012) (quoting, Noble Drilling Services, Inc. v. Certex USA, Inc., 620 F.3d 469, 473 (5th Cir.2010) (internal quotation marks and citation omitted)).

Thus, Defendant distort the Court's holding in ASTA Funding, Inc. v. Neal; it is not enough that the non-signatory merely "benefitted from the contractual relationship between the parties." (DBrief 2, citing, Neal, at *18). Defendants' error is that they fail to recognize that in Neal v. ASTA Funding, the principle, David Shaun Neal ("**Neal**"), "was a direct beneficiary of the ITS Agreement" between his company New World Solutions, Inc. ("**NWS**") and the plaintiff ("**ASTA**"), that included the arbitration clause he attempted to disavow. Id. Indeed, "Neal personally applied for a job as Asta's IT director" but was required to "using a consulting company." Id. at 6. Not only did the ITS Agreement enable Neal, personally, to perform services it identified him by name, id. at 18. Indeed, as the Court found,

> [i]n fact, the very purpose of entering into the ITS Agreement was to ensure that Neal would continue to provide IT services to Asta. … Thus, Neal was the intended beneficiary of the contract in that it facilitated his employment. Furthermore, Neal was paid in accordance with the ITS Agreement, and … all payments NWS received from Asta for IT services were passed through to Neal and Coyne. Accordingly, the record supports the conclusion that Neal was a direct beneficiary of the contract and may be estopped from avoiding arbitration purely on the grounds that he was not a signatory.

Id. at *18.

Furthermore, in the arbitration that ultimately ensued between the parties, Neal filed a counterclaim on NWS' behalf of which he became the "sole potential beneficiary" after NWS was dissolved.  Id.  at 16.  Based on that Counterclaim the Court held that Neal

> attempted to use the contract as a sword at the same time as using his non-signatory status as a shield. Neal signed NWS's Counterclaim against Asta [and] … after … Coyne assigned his interest in NWS… to Neal, Neal became [its] sole beneficiary… . That **_Counterclaim is premised entirely on the ITS Agreement_**. See Griswold v. Coventry First LLC, 762 F.3d 264, 273 (3d Cir. 2014) (noting that in order for estoppel to apply, the claims must be **_based directly on the agreement_**). In Count 1, the Counterclaim asserted that Asta owed NWS for unpaid "services rendered under the contract." … Count 2 sounds in breach of contract, alleging that Asta … breached [the contract's exclusivity provision] … . The third cause of action also sounds in breach of contract, on the grounds that Asta violat[ed the ITS Agreement's]  termination provisions.  … Neal was the only one who stood to gain from this Counterclaim…. Thus, it is evident that Neal, through NWS, sought to enforce the provisions of the ITS Agreement, including the Services and Termination provisions; he cannot both enforce those provisions of the ITS Agreement but seek to avoid the arbitration clause also contained therein.

Id. at \*19 (emphasis added). "Accordingly," the Court found, Neal was "bound to arbitrate under the theory of equitable estoppel." Id.

In stark contrast to the facts in Neal, Plaintiffs are not "direct beneficiaries" of the Provider Contracts -- they are neither identified by name nor do the Provider Contracts enable the Practice Groups to treat patients on a United "in-network" basis. Indeed, the Practice Groups are not entitled to any benefit under the Provider Contracts.

Similarly, and again, unlike the facts in Neal, Plaintiffs do not "seek to enforce" the terms of Provider Contract nor do they assert any claim "based directly on the agreement." Whereas Neal prosecuted a counterclaim sounded only in breach of contract and based entirely on the terms of the ITS Agreement, Plaintiffs do not seek to enforce any rights under the Provider Contract. Plaintiffs' claims are entirely separate from the Provider Contract, as is the damages they sustained as a result of Defendants' wrongful conduct. Here, the only contracts and business relationships at issue are those between Plaintiffs and the Providers who they employ or with whom they have a referral relationship, and those with their patients. As for Plaintiffs' conspiracy and misappropriation claims, they do not involve any contract at all.

For these same reasons, among others, Defendants' reliance on Bayonne Drydock & Repair Corp. v. Wartsila N. Am., Inc., 2013 WL 3286149, at \*6 (D.N.J. June 28, 2013) is wholly misplaced. (DBrief 13). In Bayonne Drydock, a ship repair service ("**BDD**") and client ("**Patriot**"), entered into a contract that included an arbitration clause. Thereafter, BDD subcontracted the work out to a third party ("**WNA**"). Ultimately, Patriot

refused to pay BDD, asserting it has a warranty claim for defective work, BDD sued for breach, and Patriot moved to compel arbitration. Id. at *2.  Significantly, Patriot was a signatory to the arbitration agreement at issue.  Furthermore, Patriot asserted a cross-claim against WNA, with which it had no contact, but which had been brought in by BDD, based on the agreement between those parties. Id. at *6.  Based on these facts, as well the Court's determination that Patriot was a "direct beneficiary" of the BDD-WNA contract,  without which, it "would have" had to contract with "another provider to perform the" work, the Court held if the cross-claim had "been properly served" Patriot would have had to arbitrate with WNA. Id. at 7.

Here, Plaintiffs are not signatories to an arbitration agreement.  Likewise, they are not seeking to enforce any right under the Provider Contract.  Indeed, in the absence of the Provider Contract, Plaintiffs would not -- as the Court found with respect to Patriot -- "have to contract" with "another provider."  In other words," Plaintiffs are not "non-signator[ies to the Provider Contract] seek[ing] enforcement of certain contractual provisions while at the same time 'turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.'" (DBrief at 14, quoting, Neal, at *19)(quoting, E.I. DuPont, 269 F.3d 187, 350 (3d Cir. 2001).  In short, the "knowingly exploit" theory of estoppel simply does not apply.

## B.  Defendants' Assertion that Two Non-Signatories to an Arbitration Agreement Can be Compelled to Arbitrate is Nonsensical

Defendants' final argument regarding estoppel requires an examination of exactly which United-related entities Defendants claim are parties to the Physician Contract,

and hence bound by the Arbitration Clause.   However, as demonstrated below -- it is entirely unclear.

Defendants argue "the Court should … order Plaintiffs to arbitrate their claims because" UHC Insurance "executed  the providers' contracts  'on behalf of itself, AmeriChoice of New Jersey, Inc. and its other affiliates" (DBrief at 15, citing ECF 15-3) (emphasis added).[10]  Although the foregoing language is accurately quoted from the five (5) exemplary contracts United submits in support of the instant motion (see, ECF 19-3 to 19-8), it is not accurate as to all Physician Contracts.  For example, in UHC Insurance's prefatory paragraph to its Provider Agreement with Dr. Fadi A El-Atat, UHC Insurance states that it is entering into the agreement "on behalf of itself, Oxford Health Plans (NJ), Inc., and its other affiliates."  (See, Appendix doc. 2) (emphasis added).

In addition, despite UHC Insurance's reference to "affiliates", nowhere is that term defined in the Physician Contract.  As such, a  Provider would have no idea who, in terms of United-related entities (or "affiliates" -- whatever that may mean) is a party.

Still, without identifying what/which United-related entity is a party to the Provider Agreement, Defendants assert that "UnitedHealthcare aside, equitable estoppel also requires the Plaintiffs to arbitrate their claims against Riverside … (and against the other defendants if the Court had personal jurisdiction over them)."  Let's step back for a moment.  Defendants appear to concede that Riverside, at a minimum, is not a signatory to Arbitration Clause.  As established above, Plaintiffs are also not signatories.  Ergo:

---

[10]In fact, Defendants claim that the Court relied on this precise language in the 2019 Case and holding that the issue of the Arbitration Clause's validity must be determined by an arbitrator in that contract in the 2019 Case).  (DBrief at 9).

4844-5942-3439, v. 3

Defendants contend that a non-signatory may compel another non-signatory to arbitrate.

Indeed, Defendants assert that

> "a signatory to a contract may compel a non-signatory, *and vice versa*, to arbitrate … by means of equitable estoppel …" <u>Torlay v. Nelligan</u>, No. 19-6589, 2019 U.S. Dist. LEXIS 159478, at *9 (D.N.J. Sept. 18, 2019) "in at least two situations": "First, <u>a non-signatory</u> <u>may compel</u> arbitration when the issues to be litigated are inextricably intertwined with the arbitration agreement such that the claims asserted <u>against the</u> <u>signatory</u> and the non-signatory are identical. <u>A non-signatory may also</u> <u>compel</u> arbitration . . . where there is a requisite nexus of the claim to the contract together with [an] integral relationship between the non-signatory and the other <u>contracting party</u>." <u>Precision Funding Grp. v.</u> <u>Nat'l Fid. Mortg.</u>, No. 12-cv-5054 (RMB/JS), 2013 U.S. Dist. LEXIS 76609, at *13–14 (D.N.J. May 31, 2013); Torlay, 2019 U.S. Dist. LEXIS 159478, at *12–13

(DBrief at 14).

Let's break that down as well. In both instances, Defendants refer to a non-signatory to an arbitration agreement seeking to compel a signatory. <u>See</u>, <u>Precision Funding</u> (non-signatory compelling signatory); and <u>Torlay</u> (where non-signatory defendant sought to compel plaintiff who was signatory to one agreement and who claims were based on another, both which contained arbitration clauses). That is not the case here.

Finally, the New Jersey Supreme Court has stated in no uncertain terms that "that [the] intertwinement of claims and parties, by itself, is insufficient to warrant application of equitable estoppel." <u>Hirsch v. Amper Fin. Servs., LLC</u>, 215 N.J. 174, 195, 71 A.3d 849, 861 (2013). Thus, Defendants' characterization of the law is as baseless as it is nonsensical.

-28-

## POINT IV

## PLAINTIFFS STATE VIABLE CAUSES OF ACTION

**A.** **Plaintiffs' Claim of Tortious Interference**

Plaintiffs' tortious interference claim is bolstered by salient and undeniable facts. Under New Jersey law, to succeed on a claim for tortious interference with contractual relations (or prospective economic benefit), a plaintiff need only establish the following elements: "(1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." New Jersey Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc., 141 F. Supp. 3d 298, 309 (D.N.J. 2015).

Plaintiffs have met all of the elements outlined in New Jersey Physicians United Reciprocal Exchange and have clearly pled an actionable claim for tortious interference. Simply put, Plaintiffs allege (1) the existence of a protected interest in the contractual relations with their patients; (2) Defendants' willful, wanton, malicious and/or reckless conduct intentionally interfered with Plaintiffs' protected interest, without justification; (3) Defendants' conduct caused the loss or the prospective gain; and (4) Plaintiffs have suffered substantial damages as a direct and proximate result thereof.

Contrary to Defendants' false claims, the Practice Groups are "not parties to any agreement with United concerning the Plan." Id. ¶1. as the only contracts and business relationships at issue here are those the Practice Groups have with their respective Providers and/or providers outside each of the Practice Groups, and with the Practice Group's patients. Id. ¶3. Those contracts are the instruments which United tortiously interfered with. Defendants'

specious argument that the Practice Groups are somehow parties to the Physician Contracts is simply false.  No individual or entity can be considered a party to a contract for which they have not acknowledged and assented to by signature. United's introductory letter for each Physician Contract specifies that the term "practice" refers to the Provider to whom the letter is addressed. (See, e.g., August 29, 2017 letter to Amanda Marino, MD, ECF 19-5) ("By signing the participation agreement, you are attesting that you have full authority to bind the above referenced practice to the agreement") and includes no signature line for any Practice Group.[11]

Similarly, Plaintiffs have plead a valid claim for tortious interference with prospective economic advantage and have met all of the elements necessary to sustain this cause of action--a reasonable expectation of advantage from a prospective contractual or economic relationship; that the defendant interfered with this advantage intentionally and with malice; that the interference caused the loss of the expected advantage; and that the injury caused damages.  Prima v. Darden Restaurants, Inc., 78 F. Supp. 2d 337, 354 (D.N.J. 2000).  The primary difference between tortious interference with contractual relations and tortious interference with prospective economic advantage is that the first requires the existence of a contract. Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 256 F.Supp.2d. 249, 288 (D.N.J. 2003), aff'd, 173 F. App'x 178 (3d Cir. 2006) ("The requirements for each claim are identical except that the tortious interference with contractual relations claim requires proof of an existing contract.").

---

[11]See, e.g., Physician Contracts with Alexander Salerno, MD, Elizabeth D. Evans, MD, Amanda Marina, MD, Rakesh K. Sahni MD (d/b/a Healthpoint Medical Group, Old Bridge), Famez W. Samuel, MD, and Inas Latif Shaker Wassef, MD, at 2, ECF 19-3 to 19-8.

Contrary to Defendants' assertions that the underlying facts constitute a simple case of a third party payer exercising their options under the terms of a contract, the Defendants herein have intentionally, willfully interfered with the underlying contractual relationship between the practice groups and their providers, and the practice groups and their patients and referral sources, in order to benefit their bottom line. Thus, the Complaint more than adequately pleads viable tortious interference claims.

**B.      Plaintiffs' Claim of Civil Conspiracy**

Plaintiffs have pled a well-grounded claim for civil conspiracy. All of the Defendants shared and acted upon a common goal to enrich themselves at the expense of the Plaintiffs.

A civil conspiracy is (1) "a combination of two or more persons acting in concert" (2) "to commit an unlawful act, or to commit a lawful act by unlawful means," (3) "the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another," and (4) "an overt act that results in damage." D'Agostino v. Wilson, 2019 WL 5168621, at *3 (D.N.J. Oct. 11, 2019).  As to the third element, the agreement between the parties need not be expressed.  All that is required is that the parties share a general, conspiratorial objective. Marina Dist. Dev. Co., LLC v. Ivey, 216 F. Supp. 3d 426, 435 (D.N.J. 2016).  Moreover, each participant in the conspiracy does not have to know all of the details of the plan or possess the same motives.  Ibid.

The gist of the claim in civil conspiracy is not the unlawful agreement, but rather "the underlying wrong which, absent the conspiracy, would give a right of action."  Wiatt v. Winston & Strawn LLP, 838 F. Supp. 2d 296, 317 (D.N.J. 2012) quoting, Morgan v. Union

County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993). In other words, a "conspiracy cannot be the subject of a civil action unless something is done which, without the conspiracy, would give a right of action." Marroccelli v. Kelly Constr., LLC, 2017 N.J. Super. Unpub. LEXIS 657, *73 (N.J. Sup. Ct., March 2, 2017) (quoting Farbenfabriken Bayer, A.G. v. Sterling Drug, 153 F. Supp. 589, 592-593 (D.N.J. 1957).

"The acts and declarations of a conspirator in furtherance of the conspiracy are binding on all parties to the conspiracy." State v. Porro, 152 N.J. Super. 179, 188 (App. Div. 1997), appeal dismissed, 77 N.J. 504 (1998); State v. Murphy, 168 N.J. Super. 214, 217 (App. Div.), certif. denied, 82 N.J. 264 (1979) ("[o]nce a conspiracy is formed, each conspirator, while a member is liable for every act and declaration of each and all of the conspirators, done or made in the pursuance of … the conspiracy.")   These principles are equally applicable to civil conspiracies.  Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979), rev. on other grounds, 446 U.S. 754 (1980).    Moreover, it is inappropriate to consider each Defendant's conduct in isolation.  What one defendant does is binding on the other.  Thus, a "defendant's conduct cannot be dissected into discrete, watertight compartments.  Instead, the sequence of events, viewed in its entirety, [can] create [ ] a substantial enough possibility of a conspiracy to defeat" an individual defendant's motion.  Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993).

The underlying facts in this matter point perspicuously to a conspiracy. In 2016, RMG, a large medical group and health care provider under the Plan, was acquired by Optum Care, which is owned by UHCG, a holding company that also owns UHC and UHCP. RMG had well over 300 billing providers on staff. As a result, UHC a had a vested

interest in having Plan participants obtain medical services from RMG, rather than Plaintiff or other health care providers. Plaintiff's cause of action for civil conspiracy is neither "frivolous" nor "conclusory", as Defendants allege. At the very least, Plaintiffs should be permitted to engage in further discovery in order to further establish the civil conspiracy claim.

Defendants assertion that "United cannot conspire against itself" is also misplaced. The case cited by Defendant, <u>Copperwald Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752 (1984) involves an anti-trust action in which it was alleged that defendants had conspired to violate § 1 of the Sherman Act (Id. At 752). The court in that case specified that:

> The appropriate inquiry in this case is not whether the coordinated conduct of a parent and its wholly owned subsidiary may ever have anticompetitive effects or whether the term "conspiracy" will bear a literal construction that includes a parent and its subsidiaries, but rather whether the logic underlying Congress' decision to exempt unilateral conduct from scrutiny under § 1 of the Sherman Act similarly excludes the conduct of a parent and subsidiary. It can only be concluded that the coordinated behavior of a parent and subsidiary falls outside the reach of § 1. Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an "intra-enterprise conspiracy" doctrine. A corporation's initial acquisition of control is always subject to scrutiny under § 1 of the Sherman Act and § 7 of the Clayton Act, and thereafter the enterprise is subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act.  467 U. S. 774-777.

As this is not an antitrust case, Copperwald does not apply to this matter.

## C.   <u>Plaintiffs' Claim of Unjust Enrichment</u>

"To establish a claim for unjust enrichment under New Jersey law, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'"  <u>Stewart v. Beam Glob. Spirits & Wine, Inc.</u>, 877 F. Supp. 2d

192, 196 (D.N.J. 2012) quoting, VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (N.J.1994). Unjust enrichment is not appropriate where "an express contract exists concerning the identical subject matter." Loceria Colombiana, S.A. v. Zrike Co., 2011 WL 735715, at *5 (D.N.J. Feb. 22, 2011) quoting, Suburban Transfer Service, Inc. v. Beech Holdings, Inc., 716 F.2d 220, 226–227 (3d Cir.1983).

Plaintiffs' complaint outlines a clear and concise fact pattern which points inexorably to unjust enrichment. Defendants tortiously interfered with the Practices' relationships with their Providers as well as their patients. In so doing, UHC benefited financially at the expense of the Plaintiffs.

### D.   **Plaintiffs' Claim of Misappropriation**

Defendants' argument against Plaintiffs' misappropriation claim misses the mark. Far from frivolous, Plaintiffs' Complaint asserts a factual truth—that Defendants wrongfully utilized patient names and contact information to which they were not entitled.  Far from "doing what federal regulation requires", the federal regulation cited by Defendants, 42 CFR § 422.111, does not specifically address patient data:

> **(e) *Changes to provider network.*** The MA organization must make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contract is terminating, irrespective of whether the termination was for cause or without cause. When a contract termination involves a primary care professional, all enrollees who are patients of that primary care professional must be notified.
> It is one thing to notify patients, but quite another to steal those patients through the ruse of the Medicare Advantage regulations and keep those patients for themselves and their own large medical group at the expense of groups such as plaintiffs.

-34-

E.      **Plaintiffs' Claim of Unfair Competition**

"New Jersey law is not precise about what constitutes unfair competition. But while '[t]he amorphous nature of unfair competition makes for an unevenly developed and difficult area of jurisprudence,' at heart it 'seeks to espouse some baseline level of business fairness.'" *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 386 (3d Cir. 2016) *quoting Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F.Supp. 747, 786 (D.N.J. 1995).

"In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another—or property which has some sort of commercial or pecuniary value. The misappropriation usually takes the form of 'palming off' another's goods as your own, although the modus operandi is not essential." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 815 (D.N.J. 2000) *quoting New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.*, 144 N.J. Super. 411, 427, 365 A.2d 956, 965 (Ch. Div. 1976), aff'd, 160 N.J. Super. 81, 388 A.2d 1299 (App. Div. 1978).  "An unfair competition claim, however, protects more information than a traditional trade secret claim." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 387 (3d Cir. 2016).

Here, for the same reasons that Plaintiffs have state viable unjust enrichment and misappropriation claims, they too have stated a valid claim of unfair competition.

F.      **Plaintiffs' Claim of Tortious Refusal to Deal**

Defendants wrongly claim that Plaintiffs cause of action for tortious refusal to deal is frivolous. While parties may generally do business with whomever they please, the right of one party to refuse to deal with another is not absolute. The Restatement of Torts § 762 (1939) states:

> **Privilege of selecting persons for business relations.**
>
> One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not
> (a) a breach of the actor's duty to the other arising from the nature of the actor's business or from legislative enactment, or
> (b) a means of accomplishing an illegal effect on competition, or

(c) part of a concerted refusal by a combination of persons of which he is a member.

The Complaint alleges that the Defendants have committed acts or omissions which clearly indicate a goal of accomplishing an illegal effect on competition, by dropping Plaintiffs from their Plan in order to benefit themselves.  This cause of action exists in order to discourage such tortious behavior on the part of business entities. The Court should allow it to stand or, at the very least, allow for further discovery on this issue.

## **CONCLUSION**

For the reasons set forth above, plaintiffs respectfully request Defendants' motion be denied in all respects.

Dated:  October 19, 2020               MANDELBAUM SALSBURG, P.C.
                                       Attorneys for Plaintiffs


                                       By:   /s/Steven I. Adler
                                             Steven I. Adler, Esq.
                                             3 Becker Farm Road, Suite 105
                                             Roseland, New Jersey 07068
                                             (973) 736-4600

4844-5942-3439, v. 3

# APPENDIX

```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2    _____

 3    ALEXANDER SALERNO, MD, et al.,
                                          CIVIL ACTION NUMBER:
 4            Plaintiffs,
      vs.                                 2:19-cv-18130-KM-JBC
 5
      UNITEDHEALTHCARE GROUP, INC.,        Show Cause Hearing
 6    et al.,

 7            Defendants.
      _____
 8    MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
      50 Walnut Street
 9    Newark, New Jersey  07101
      October 4, 2019
10    Commencing at 2:00 p.m.

11    B E F O R E:     THE HONORABLE KEVIN MCNULTY
                       UNITED STATES DISTRICT JUDGE
12
      A P P E A R A N C E S:
13
      MANDELBAUM SALSBURG, P.C.
14    BY:  STEVEN I. ADLER, ESQUIRE
      3 Becker Farm Road, Suite 105
15    Roseland, New Jersey  07068
      For the Plaintiffs
16
      ALSTON & BIRD LLP
17    BY:  STEVEN L. PENARO, ESQUIRE
      90 Park Avenue
18    New York, New York  10016
      For the Defendants
19

20           Rhéa C. Villanti, Official Court Reporter
                      RheaVillanti@Yahoo.com
21                      (732)895-3403

22    Proceedings recorded by mechanical stenography; transcript

23            produced by computer-aided transcription.

24

25
```

2

(Continuing)

A P P E A R A N C E S:

ALSTON & BIRD LLP
BY:  BRIAN D. BOONE, ESQUIRE
101 South Tryon Street, Suite 4000
Charlotte, North Carolina  28280-4000
For the Defendants

```
1              (PROCEEDINGS held in open court, before The Honorable

2   Kevin McNulty, United States District Judge, at 2:00 p.m.)

3              THE DEPUTY CLERK:  All rise.

4              THE COURT:  Good afternoon.

5              MR. BOONE:  Good afternoon.

6              THE COURT:  We are here on Salerno, et al., v.

7   UnitedHealthcare Group, Inc., et al., 19-cv-18130.

8              Let's have appearances of counsel, please.

9              MR. ADLER:  Yes.  Good afternoon, Your Honor.

10  Steven Adler, from Mandelbaum Salsburg, for the plaintiffs.

11             MR. BOONE:  Good afternoon, Your Honor.  Brian Boone,

12  from Alston & Bird, for the defendants.

13             Forgive my voice.  I'm a little under the weather

14  today.

15             THE COURT:  I didn't hear what you said, but I think

16  I know what you said.  You're a little hoarse today?

17             MR. BOONE:  I am, yes.

18             THE COURT:  And?

19             MR. PENARO:  Good afternoon, Your Honor.

20  Steven Penaro, also with Alston & Bird, on behalf of the

21  defendants.

22             THE COURT:  You'll jump in whenever he fails, right?

23             MR. PENARO:  Yes.

24             THE COURT:  Be seated.

25             What I have before me is an emergent motion for
```

United States District Court
Newark, New Jersey

4

```
1    injunctive relief.  I put it on on pretty short notice, giving
2    the other side the opportunity to respond in writing, but
3    things are still moving kind of fast here.
4            So let me hear from you, Mr. Adler, on your
5    application.  The initial hurdle, it seems to me, is
6    arbitration.  And so why don't you address that first, and then
7    we'll move on to the other issues.
8            MR. ADLER:  Yes.  Thank you, Your Honor.
9            As to arbitration, I think the one thing both counsel
10   can agree on is that some form of restraints or status quo
11   order is necessary to give the parties the opportunity to
12   follow the Medicare Advantage regulations and/or arbitration,
13   and I think that's our main difference here today, Your Honor.
14           We're suggesting that, both pursuant to contract and
15   the regulations, that we are entitled, first, to go to an
16   appeal panel of the providers' peers; and once we're through
17   that process, it's our position that the arbitration clause in
18   the provider contracts, whether it's the physician contracts or
19   the participation contracts, the arbitration clause is not
20   enforceable under the law.
21           THE COURT:  Atalese you're talking about?
22           MR. ADLER:  Yes.  It starts with Atalese.  But going
23   back to Garfinkel, which also involved a physician where there
24   was no mention of a waiver of statutory or regulatory claims,
25   was found to be an unenforceable arbitration clause.
```

United States District Court
Newark, New Jersey

1          But in terms of this particular clause, there are, I

2   think, no less than five reasons why this clause doesn't comply

3   with the law.  If I may, I'd like to quickly recount the ways

4   that they don't.

5          THE COURT:  Yes, let's count the ways.  But then once

6   you've done that, I want to back up and talk about who decides.

7          MR. ADLER:  Yes.  Correct.  Yes.

8          THE COURT:  Go ahead.

9          MR. ADLER:  So in terms of the noncompliance of the

10  arbitration clause, the language does not say, as Atalese

11  requires, that going to arbitrations, quote, in lieu of court,

12  end quote.

13         What it does is talk about arbitration, and then it

14  jumps to a discussion about what happens if it's in court.  But

15  it doesn't say that the parties must go to arbitration in lieu

16  of court, so that's number one.

17         Number two, it does not say, also as Atalese

18  requires, that there is a waiver of the right to seek relief in

19  court.  It doesn't specify that at all.

20         Number three, Atalese says there needs to be some

21  explanation of the difference between arbitration and court.

22         This doesn't describe that either.  And for the same

23  reason as the failure of the arbitration clause in Garfinkel to

24  comply with the law, even though it was a professional who

25  understands the practice of medicine, here the lack of

6

1    explanation to a doctor is the same as to any other person,

2    whether we're dealing with a consumer contract or an

3    arbitration clause in some other agreement.

4                THE COURT:  The doctor may not know any more about

5    law than I do about medicine, I guess, is one way to put it.

6                MR. ADLER:  Yes.  Correct.

7                In addition, Atalese says very clearly that there has

8    to be mutual assent.  There has to be a clear and unambiguous

9    waiver of the right to go to court.

10               Here we don't have that.  The clause at issue refers

11   to something called dispute going to binding arbitration in

12   accordance with the commercial dispute procedures of the

13   American Arbitration Association.

14               Well, frankly, there is no such animal.  It's not

15   a -- the rules are not the commercial dispute procedure rules.

16   The rules are commercial arbitration rules.

17               And what this means is anyone's guess.  But the

18   inclusion of the word "procedure," one could argue, only deals

19   with the procedural requirements of the AAA.  But, clearly, if

20   a doctor went online by clicking on the reference to the AAA's

21   website, he wouldn't know where to look to see what rules apply

22   or don't apply.

23               In fact, just recently in a case involving Sills

24   Cummis, there was a finding that the arbitration clause there

25   was not enforceable because Sills Cummis, despite referencing

United States District Court
Newark, New Jersey

1    the arbitration rules as being attached, never gave them to the

2    client prior to him executing the agreement.  And the Court

3    found there was a lack of mutual assent, among other

4    violations, including various RPCs.

5            THE COURT:  Yes, I was going to say that's a

6    lawyer/client.  They don't let us get away with anything, and

7    rightly so.

8            MR. ADLER:  But the Court found there was no mutual

9    assent because the client didn't know what he was agreeing to

10   by signing the document.  So, Your Honor, I think there needed

11   to be a number of corrections to this arbitration clause for it

12   to be found enforceable.

13           Your Honor's other question, which I think correctly

14   says this is something we need to deal with as well, which is

15   who is the gatekeeper?

16           Our position is that under the First Options case,

17   it's clear that generally it's the Court.  And here in this

18   agreement there is no -- while they refer to this commercial

19   dispute procedure, whatever that is, I understand there's a

20   line of cases that say if the agreement incorporates the AAA

21   rules and that would then cover Rule 7 or even Rule 38 --

22           THE COURT:  Right.

23           MR. ADLER:  -- dealing with expedited proceedings,

24   that that may be sufficient for there to be some mutual assent

25   and agreement at least that the arbitrator should decide his

1   own jurisdiction.

2                But we don't have that here because --

3                THE COURT:  For the same reasons you just talked

4   about.

5                MR. ADLER:  Yes.

6                THE COURT:  Yes.

7                MR. ADLER:  Yes.

8                So our view, again, respectfully submitted about how

9   we think this should be going forward from today, is that there

10  needs to be a restraining order maintaining the status quo.

11               And just to digress a minute, there's an indication

12  in their papers that two of the plaintiffs had their contracts

13  expire within the last few days.

14               I just want to point out to Your Honor that we filed

15  the papers on September 19th.  I understand that the judges

16  were in Trenton that day, and it was prior to those two

17  contracts expiring.

18               THE COURT:  Yes, but on that subject, I mean, wasn't

19  this in the wind or in the air, I should say, in April or

20  something?

21               MR. ADLER:  Well, it was in the wind, but the

22  clients -- and as we indicated in the certifications that we

23  filed yesterday, the clients followed the procedures and

24  appealed.  And they were waiting to hear back from

25  UnitedHealthcare about the hearings that were guaranteed them

1   both in the contract and under the regulations and that never

2   happened.   In fact, some of them haven't heard yet from

3   UnitedHealthcare.

4           As we were approaching the dates where this would

5   come due, that was the urgency, coupled with the urgency based

6   upon the open enrollment period starting in a few weeks.   So I

7   think we did timely come in to court.   We didn't sit on our

8   rights here.   We expected, as per the contract and the

9   regulations, that we would be entitled to that procedural due

10  process.

11          So, again, going back to what I was saying, I think

12  we need a temporary restraining order.   I believe, based on the

13  reasons I set forth for Your Honor, that the ==arbitration clause==

14  ==is not enforceable.==

15          But if Your Honor wants additional briefing, I would

16  respectfully submit that can happen while the parties are going

17  before an appeal tribunal.   And once that procedure is done, we

18  will have the determination, I would suspect, from Your Honor

19  about whether we're compelled to go to arbitration or go to

20  court.

21          And for the same reason why the arbitration clause is

22  not enforceable, the same holds true with regard to the waiver

23  of a class action proceedings in an arbitration proceeding.

24  Because if the arbitration clause fails, that language, it all

25  goes away --

United States District Court
Newark, New Jersey

```
 1              THE COURT:  Everything -- yes.  Yes.  I understand.
 2              Do me a favor.  I read it, but I can't find it as I
 3    sit here.  Where is the most convenient place I can find an
 4    arbitration clause?
 5              MR. ADLER:  Yes.  It's attached to the verified
 6    complaint as Exhibit A.  It's on the bottom of page 5 and the
 7    top of page 6 in the physician contract.
 8              THE COURT:  Hang on a second.  Hang on.
 9              MR. BOONE:  Your Honor, it's on pages 4 and 5 of our
10    opposition brief, if that would be easier.
11              THE COURT:  I'm looking at --
12              MR. ADLER:  I should point out, Your Honor, I didn't
13    list this as another reason it doesn't comply; but it clearly
14    was not in different size type, didn't stand out, and maybe
15    Your Honor had a hard time finding it because --
16              THE COURT:  Oh, no, no, no.
17              MR. ADLER:  -- of the papers that were submitted.
18              THE COURT:  No.  I found it.  I just had a hard time
19    finding it again.
20              MR. ADLER:  Yes.  But, again, it says in lower-sized
21    type, "What if we do not agree?"
22              THE COURT:  Yes.  Let's just look at it.
23              What if we do not agree?
24              We will resolve all disputes between us by following
25    the dispute procedures set out in our Provider Manual.
```

```
 1          If either of us wishes to pursue the dispute beyond

 2   those procedures, they will submit the dispute to binding

 3   arbitration in accordance with the commercial dispute

 4   procedures of the American Arbitration Association -- and they

 5   give the website -- within one year.

 6          We both expressly intend that any dispute between us

 7   be resolved on an individual basis so that no other dispute

 8   with any third party or parties may be consolidated or joined

 9   with our dispute.

10          We both agree that any arbitration ruling by an

11   arbitrator allowing class action arbitration or requiring

12   consolidated arbitration involving any third party or parties

13   would be contrary to our intent and would require immediate

14   judicial review of such ruling.  The arbitrator will not vary

15   the terms of this agreement and will be bound by governing law.

16          We both acknowledge that this agreement involves

17   interstate commerce and is governed by the Federal Arbitration

18   Act, 9 U.S. Code, Section 1, et seq.  The arbitrator will not

19   have the authority to award punitive or exemplary damages

20   against either of us except in connection with a statutory

21   claim that explicitly provides for such relief.  Arbitration

22   will be conducted in Essex County, New Jersey.

23          Then there is sort of a backup paragraph.

24          If a Court allows any litigation of a dispute to go

25   forward, we both waive rights to a trial by jury with respect
```

```
 1    to that litigation and the judge shall be the finder of fact.
 2    Any provision of this agreement that is invalid or
 3    unenforceable shall not affect the validity or enforceability
 4    of the remaining provisions of this agreement or the validity
 5    or enforceability of the offending provision in any other
 6    situation or in any other jurisdiction.
 7              This section of the agreement governs any dispute
 8    between us arising before or after execution of this agreement,
 9    and this section shall survive and govern any termination of
10    this agreement.
11              Now, sorry to make you sit through that, but it will
12    maybe the record more intelligible.
13              MR. BOONE:  Your Honor, if I may add just one thing.
14    In the conclusion of the contract on page 7 of Exhibit A, it
15    also says that the parties affirm that they understand that the
16    dispute resolution procedures described in the section of this
17    agreement entitled "What if we do not agree" apply, and in
18    bold, all caps, "This agreement contains a binding arbitration
19    provision that may be enforced by the parties."
20              THE COURT:  Yes, I see that in capitals on page 7.
21              Now, is that it for the arbitration provisions in the
22    agreement?
23              MR. ADLER:  Yes, Your Honor.
24              THE COURT:  Yes, I just wanted to make sure.  I just
25    had them all so we were all on literally the same page.  So
```

1   let's proceed from there.

2           Let's just stick to arbitration for a minute, so let

3   me go to your adversary.

4           MR. BOONE:  Yes.  I'll come closer so you can hear

5   me, Your Honor.

6           So first off, I don't agree with my friend that

7   there's a basis for any TRO or other sort of injunctive relief

8   today.

9           The parties -- or the ==providers have had months to==

10  ==file individual arbitrations, months to seek administra==tive

11  appeals.  In most cases they have not done either -- well, in

12  every case they haven't sought arbitration.  In most cases they

13  have not even filed an administrative appeal.

14          To give you one example, Dr. Alexander Salerno got

15  notice in April 2019 of his non-renewal on November 19, 2019,

16  and he has not filed any individual arbitration.  So there is

17  no emergency --

18          THE COURT:  You said individual arbitration but did

19  he go administrative on it?

20          MR. BOONE:  He is one of five providers, by our

21  records, that filed an administrative appeal.  On appeal, the

22  non-renewal was upheld by the panel.

23          But only 5 of the 22, by our records, filed

24  administrative appeals.

25          THE COURT:  Okay.

1      MR. BOONE:  So there is no emergency.  They still

2  have time to file individual arbitrations.  Most of the

3  non-renewal dates are in 2020, in fact.

4      THE COURT:  Didn't I see a date October 15?

5      MR. BOONE:  There's one within the next 30 days; but

6  outside of that one case, all are beyond 30 days and most are

7  in 2020 -- or at least more than half.

8      So they have time.  There's no basis for any kind of

9  TRO, given those facts.

10     And on top of that, as I mentioned on the call the

11 other day, my client offered to give the providers 30 days to

12 file individual arbitrations in which they can seek emergency

13 relief if they like.  And during that period anybody who would

14 be slated for non-renewal, which would include the one

15 gentleman that you just mentioned, he would have an opportunity

16 to seek emergency relief from the arbitrator before any

17 non-renewal will take effect.

18     THE COURT:  Sounds like the order that was entered in

19 New York as modified by the Second Circuit, right?

20     MR. BOONE:  That's right, Your Honor.  It's

21 essentially the same relief.  The other thing I would say is

22 that this arbitration clause is virtually identical to the

23 arbitration clause that was upheld in Fairfield County.  Not

24 really --

25     THE COURT:  That's the name of the New York case?

1    I'm sorry.

2         MR. BOONE:  That's right, Your Honor.  So there

3    really is no emergency --

4         THE COURT:  Oh, wait.  It wasn't in New York.  Was

5    that a Connecticut case or New York?

6         MR. BOONE:  Connecticut.

7         THE COURT:  Connecticut, yes.

8         MR. BOONE:  The appeal was in New York.

9         THE COURT:  Got it.

10        MR. BOONE:  Yeah.  So there's no emergency.  They

11   have plenty of time to file individual arbitrations.  If they'd

12   like, they can seek emergency relief, which can happen really

13   quickly, having done it a few times in my career.  So there's

14   no basis for a TRO just on those facts alone.  That's not even

15   getting to the merits of the dispute.

16        But as the Court is already intuiting and probing,

17   this Court shouldn't get to the merits because this is all

18   subject to binding arbitration.  And even the question of

19   arbitrability, enforceability is left for the arbitrator in the

20   first instance on the face of the arbitration clause.

21        And even -- and I know that my friend has said, Well,

22   the words used in the arbitration clause to describe the

23   procedures are not exactly the same as what you see when you go

24   to the website.

25        That's neither here nor there.  There is no "magic

```
1   words" test.  It points to the website.  It very clearly is

2   pointing to the AAA commercial arbitration rules.

3          And if you look at Rule 1 of the AAA's commercial

4   arbitration rules it says that when parties agree to arbitrate

5   through the AAA, even if they don't say anything about

6   incorporating the rules, they are, in fact, incorporating the

7   rules; which the rules, as you know, leave for the arbitrator

8   issues of arbitrability, including enforceability.  Any

9   questions about what Atalese means for this arbitration clause

10  really are for the arbitrator in the first instance.

11         THE COURT:  Yes.  I mean, I don't want to stack

12  incorporation on incorporation on incorporation here, but I

13  take your point about the general principles for interpreting

14  the rules.  But I am looking primarily to the clause, the

15  arbitration clause itself to determine whether it is

16  incorporated.

17         MR. BOONE:  Understood, Your Honor.

18         THE COURT:  Look, all of these cases -- and I've had

19  a few.  You cited a couple of them.  You know, you have the

20  pump-priming problem, which is who decides; who decides; who

21  decides?  And that gets you into some conundrums pretty

22  quickly.

23         What I'm really looking for is, listen, if the claim

24  is that, look, we're just out of the box; these two people

25  didn't have an agreement or something like that, then, yes,
```

1   it's got to be the Court, no matter what it says.

2          A and B cannot agree, for example, that C is bound to

3   arbitration.   That certainly is an issue for a Court at the

4   outset.

5          But, I mean, just putting it kind of in the

6   colloquial way, if we're in the ballpark in terms of there

7   being an agreement and being an agreement to arbitrate and then

8   incorporating rules that the arbitrator decides arbitrability,

9   then the Court will stand aside and let the arbitrator decide

10  that.

11         Now, that can be subject to motions to confirm or

12  vacate any award that's entered, of course, and then that could

13  wind up blowing the whole thing up some day.  But that's

14  something else.  All right.

15         MR. BOONE:  Two things, if I may, Your Honor --

16         THE COURT:  Yes.

17         MR. BOONE:  -- on that.

18         So you're right.  In the federal system, the

19  presumption is in favor of arbitration.  So the tie should go

20  to arbitration.

21         And, also, I would point the Court to Rule 7 of the

22  commercial --

23         THE COURT:  Well, the tie goes to the Court deciding

24  arbitrability, too.  That's the default position.

25         MR. BOONE:  Unless the arbitration clause, the

```
 1   contract clause --

 2              THE COURT:  That's what I mean.  The default

 3   position, unless they -- everything, every issue in arbitration

 4   should be followed by the phrase "unless the parties agree

 5   otherwise."  That's how arbitration works.

 6              MR. BOONE:  I think I understand what you're saying,

 7   Your Honor.

 8              THE COURT:  Yes.

 9              MR. BOONE:  The other thing that I would say is that

10   even under the commercial arbitration rules, under Rule 7b, it

11   says that the arbitrator shall have the power to determine the

12   existence or validity of a contract of which an arbitration

13   clause forms a part.

14              So even the questions of contract formation are for

15   the arbitrator in the first instance.

16              THE COURT:  Yes.  That's why I used the word

17   "ballpark" as opposed to something more formal.  Like it's more

18   than a sniff test, frankly, in terms of whether we are in the

19   ballpark to the point where the arbitrator can decide the issue

20   itself.

21              All right.  Anything further on the arbitration

22   issue?

23              MR. BOONE:  Two other things -- or I guess maybe

24   three things on Atalese.

25              First, it really is -- those questions are for the
```

1  arbitrator in the first instance.  Secondly, I don't --

2           THE COURT:  Whether he's right or wrong about

3  Atalese, you're saying it's for the arbitrator to decide?

4           MR. BOONE:  That's right.  He can make all those

5  arguments to the arbitrator or his clients can in individual

6  arbitrations, and that will be for the arbitrator.

7           The second thing I would say is in looking back now

8  over the Supreme Court precedence over the last four or five

9  years, I don't think that Atalese would survive U.S. Supreme

10 Court review.

11          It very clearly -- the New Jersey Court very clearly

12 was discriminating against arbitration, I think, which is why

13 you see later in Kernahan the Court trying to rehabilitate

14 Atalese by saying no, no, no, we weren't really singling

15 arbitration out for unfavorable treatment.

16          Well, they said that because, in fact, that's what

17 was going on.

18          THE COURT:  Yes.  I stayed a case while Kernahan was

19 pending, waiting for Kernahan, but found it didn't help much.

20 So we sort of took it from there.

21          MR. BOONE:  But the last thing that I would say is

22 even under Atalese's wrong view of arbitration, this clause is

23 enforceable.  It's clear.  It's unambiguous.  It tells the

24 parties what they're submitting to.  It does it in bold, in all

25 caps in the conclusion just to make sure they understood what

20

```
 1    they're doing.

 2              It distinguishes between arbitration on the one hand

 3    and litigation in court on the other, which I understand from

 4    reading Atalese, at least, was the purported defect in that

 5    arbitration clause in that -- in that dispute, which also that

 6    arbitration clause did not incorporate by reference any

 7    arbitration rules.

 8              So many, many differences here.  Again, we're talking

 9    about essentially the same arbitration clause that was upheld

10    and applied in the Fairfield County litigation coming out of

11    Connecticut, and I am not aware of any case anywhere

12    invalidating this particular arbitration clause.

13              THE COURT:  Okay.  Let me ask you something, though.

14    One of the things that has been said about Atalese in

15    subsequent case law without -- for example, in Kernahan,

16    without strictly confining it, certainly indicating that a lot

17    of what was concerning the Atalese Court was the consumer

18    nature of the transaction.

19              You've made arguments in your brief to the effect

20    that these are sophisticated parties and so on.  They're

21    medically sophisticated, I grant you.  But how about legally?

22    Is this more like a commercial contract between corporations or

23    more like a contract between a consumer and a vendor?

24              MR. BOONE:  It's certainly more like the former.  In

25    fact, it is the former in some cases.
```

1              This is not a consumer contract, where I think in

2    Atalese it involved a debt collector and some kind of --

3              THE COURT:  Yes.  Yes.

4              MR. BOONE:  -- agreement.

5              That's not what's going on here.  These contracts are

6    negotiated extensively.  In a lot of cases the parties know

7    what they're doing.  In a lot of cases they have representation

8    even as they are negotiating these contracts.

9              I'm not saying that necessarily happened here.  I

10   don't know those facts.  But these are sophisticated parties on

11   both sides of the bargain negotiating, so it's not like what

12   was the purported defect in --

13             THE COURT:  Well, negotiating.  To what extent is

14   this a "take it or leave it" proposition?

15             MR. BOONE:  You mean the overall contract?

16             THE COURT:  The language of the contract, yes.

17             MR. BOONE:  I guess any contract at some level is a

18   "take it or leave it" proposition from one side to the other --

19             THE COURT:  Well --

20             MR. BOONE:  -- but these are sophisticated parties --

21   these providers -- or not these providers but providers,

22   generally speaking, are negotiating to get into networks all

23   the time.  They know what they're doing.  And so it's not like

24   what we think of as a consumer contract situation where Courts

25   might think that there's unequal bargaining power in the

1   extreme, which I think is really what was driving or animating

2   Atalese.

3          But, again, I don't think Atalese would survive today

4   in light of Kindred Healthcare and Epic Systems and Lamps

5   Plus -- I don't think that Atalese would survive in light of

6   the Supreme Court's decisions in Epic Systems and Kindred

7   Healthcare and Lamps Plus, not to mention AT&T Mobility v.

8   Concepcion, where there has been a steady stream of cases from

9   the highest court in the land making clear that we favor

10  arbitration in the United States in the federal system.  The

11  Federal Arbitration Act embodies those values.

12         And so if you have a contract that contains an

13  arbitration provision and there's some question about whether

14  it's enforceable, the tie should go to enforceability, I think

15  is what is coming out of the cases.

16         And certainly, when you have an arbitration clause

17  like we have here that says that this is going to be happening

18  through the AAA and incorporates by reference the rules that

19  govern AAA arbitrations, all of these issues about validity and

20  enforceability are for the arbitrator in the first instance.

21         THE COURT:  Let me give your adversary the last word

22  on this one.  He may have heard a thing or two he disagrees

23  with.

24         MR. ADLER:  Yes.  Thank you.

25         Just to clarify, because I'm not sure the Court is

1    aware, yesterday we did file two certifications --

2              THE COURT:  Yes.

3              MR. ADLER:  -- which confirm that many people did

4    appeal.  In fact, I believe all of them except for some of the

5    specialists who received notices much later than the others,

6    everyone else has appealed.

7              I don't understand UnitedHealthcare's records, but

8    it's clear that they did timely appeal.

9              THE COURT:  By the way, let me just interrupt you.

10   Don't lose your argument.

11             Is he right that we have an October 15 deadline for

12   at least one person but the bulk of them are in 2020?

13             MR. ADLER:  I believe that's correct, other than the

14   two that recently passed, since we filed our papers.

15             THE COURT:  Oh, the ones that have happened already?

16   Yes.

17             MR. ADLER:  That just happened a few days ago.

18             THE COURT:  Yes.  Yes.

19             MR. ADLER:  I believe the rest is accurate.

20             THE COURT:  Okay.

21             MR. ADLER:  Secondly, I know counsel indicates that

22   this clause complies and that it distinguishes between

23   arbitration and litigation.

24             Your Honor just read it into the record.  There's no

25   discussion whatsoever in this arbitration provision about what

1    arbitration is, how it differs from litigation, what expenses

2    might be incurred, what the procedures are, none of that is in

3    here.  And I submit that the case law requires those things.

4            Number three, I think Atalese is and will remain good

5    law.  The Court, the New Jersey Supreme Court specifically said

6    that it was not holding an arbitration clause to any higher

7    standard than other clauses and whether there was a meeting of

8    the minds with regard to there being a contract formation.

9            Finally, Your Honor, I think, asked a very key

10   question, which is:  Is this contract more like a consumer

11   contract or a commercial contract?

12           And I don't know how many doctors Your Honor may have

13   represented in your career before the bench; but generally,

14   they're not only bad business people, but as Your Honor --

15           THE COURT:  So are lawyers by the way.

16           MR. ADLER:  Yes, yes.

17           THE COURT:  We all know how law firms are run.

18           MR. ADLER:  But if Your Honor would look at all of

19   the physician contracts and all of the participation

20   agreements, I think they're identical.

21           They were not negotiated.  UnitedHealthcare, as we

22   state in the verified complaint, is the largest healthcare

23   company in the world.  We're dealing with here -- I saw

24   yesterday there was an announcement of some changes to the

25   Medicare Advantage regulations that President Trump wants to

1     implement.  It's clear from there that something like 30 or

2     40 million Americans are in one of these types of private

3     plans.

4           In fact, I think UnitedHealthcare and the other four

5     or five largest healthcare providers in the world generate

6     something like 60 percent of their revenues from acting as

7     private insurers in lieu of Medicare and Medicaid.

8           This was that not an arm's-length negotiation.

9     Nothing was changed in these agreements.  And I think the way

10    that UnitedHealthcare is treating these doctors and providers

11    now is reflective of the lack of negotiations and lack of

12    bargaining power that any of these providers would have had or

13    had when entering into these agreements.

14          If they wanted to provide healthcare to the indigent

15    and the elderly in their community, this was the agreement they

16    had to sign because UnitedHealthcare is by far the largest

17    provider to those types of individuals in the world.  So I

18    would respectfully submit this is just as one-sided as the

19    consumer agreement that was entered into in Atalese.

20          MR. BOONE:  Your Honor, if I may say one thing.

21          THE COURT:  Yes.

22          MR. BOONE:  So that certainly was one aspect of the

23    Atalese decision, the consumer contract context -- context.

24    But the Court also said a few times that an arbitration clause

25    is enforceable so long as it's clear and unambiguous, which

```
1   this one is.
2          Again, I'm not aware of any Court ever striking down
3   this particular arbitration clause.  I guess also to
4   Mr. Adler's point that this is a one-sided bargain.  If that's
5   true and this contract is infirm from the beginning, then they
6   would have no right to be in any network under the contract.
7   And I don't think that's what he's saying today.  But, again,
8   on arbitration --
9          THE COURT:  I didn't follow you there.  What do you
10  mean?
11         MR. BOONE:  So I think he was suggesting that the
12  contracts themselves were infirm because there was really no
13  bargain.  There was no agreement, no real agreement by his
14  clients.  Maybe he can correct me when he stands back up.  But
15  if that were true, then there would be no contract governing
16  their network participation at all.
17         THE COURT:  No.  I think he's talking about the
18  arbitration provision in particular, not that the entire
19  contract was a contract of adhesion and void.
20         MR. BOONE:  I'm sorry.  I took him to be talking more
21  generally, but maybe I'm wrong.
22         THE COURT:  No, no, no, I don't think so.  Or at
23  least I didn't take it that way.
24         MR. ADLER:  Your Honor understood my argument.
25         THE COURT:  Yes.  Okay.  Listen, let's take this one
```

1   step at a time.  The arbitration clause is, if I can use my

2   informal terminology, in the ballpark.  That is, I think it is

3   certainly clear enough to result in submission of the

4   arbitrability issue itself to the arbitrator for decision.

5          Now, excuse me a moment.  Of course, it is true that

6   arbitrability by default is to be decided by the Court unless

7   the parties agree otherwise.

8          One of the ways, an example of that principle -- I

9   mean, it's all over the place, but an example of it is the

10  AT&T v. Communications Workers case, 475 U.S. 643.  And when

11  it's contested and there's no contrary agreement then the Court

12  decides it either on the pleadings or on the summary judgment

13  standard.  Technically, it could even be tried, though I have

14  not had to do that so far.

15         All that said, as in all of these issues, the parties

16  are masters of their own contract.  And they may provide that

17  an arbitrator can determine his or her own jurisdiction.  That

18  general principle is not controversial.  An example of it would

19  be the Sandvik v. Advent case, 220 F.3d 99, Third Circuit,

20  2000.

21         Now, one way they can do that, of course, is to say

22  in their arbitration clause whether this is arbitrable shall be

23  decided by an arbitrator.  Well, that would be one way to do

24  it.  That would be a very clear way to do it.  Maybe people

25  should do it, but that's not the only way to do it.

1          I have previously held, relying on Third Circuit

2    precedent, that by agreeing to arbitrate in accordance with AAA

3    rules, the parties to an arbitration agreement clearly and

4    unmistakably agreed to arbitrate the issue of arbitrability

5    itself and that one example of that was my own case of

6    loanDepot it was called.  That was Civil Number 18-12091.  I'm

7    sure it's on Westlaw somewhere.

8          Now there is Neal v. Asta, which was Civil Number

9    13-6981.

10         The Third Circuit case law, as examples, I give

11   Quilloin, if that's how you say it, Q-u-i-l-l-o-i-n, versus

12   Tenet HealthSystem, 673 F.3d 221.  That's a Third Circuit case

13   from 2012.

14         That kind of set the scene but distinguished it

15   because there was not such an incorporation in that case.  But

16   later in Chesapeake Appalachia, 809 F.3d 746, Third Circuit,

17   2016, the Court endorsed the principle that the parties could

18   agree to arbitrate arbitrability itself and holding only that

19   the AAA rules themselves did not give an arbitrator the power

20   to rule on the arbitrability of class claims because the

21   agreement is between the parties, not between absent parties.

22   So it limited that principle.

23         But here I find that we are in the realm of the

24   commercial arbitration rules of the AAA.  Those rules clearly

25   do provide that the arbitrators have the power to resolve

1    arbitrability questions.  Rule 1 and Rule 7 both so provide.

2          Now, I know that the plaintiff points to what he

3    regards as an ambiguity in that the name, the name of the rules

4    have the word "procedure" inserted in them in such a way that

5    it's not verbatim, the proper name of the AAA commercial

6    arbitration rules.  But I find it clear enough and more.  I

7    mean, it refers to the AAA.  It cites you to the AAA website.

8    It is very much clear enough of an invocation of the rules of

9    the AAA and, therefore, I think, puts us before the arbitrator

10   in terms of the arbitrability issue itself.

11         Now, given that that's the case, I kind of go no

12   further on that.  I do note, however, that the main barrier

13   that's thrown up to arbitration by the plaintiffs is the

14   Atalese case.

15         I have discussed Atalese at some length in other

16   cases and have found that Atalese, particularly as it's

17   explicated in Kernahan, very much hinges on the consumer nature

18   of the contract.

19         Now, they never came down and said it's only sort of

20   clickwrap consumer situations, and I don't mean to imply that.

21   All I mean, though, is they certainly indicated that that's

22   what they had in mind in Atalese.

23         I think if it went much further than that, we would

24   run afoul of the Supreme Court case law, such as Kindred

25   Nursing at 137 Supreme Court 1421, that prohibits a state from

 1   treating arbitration contracts differently from others or less

 2   favorably than others.

 3          That is, I think there's room for a state like

 4   New Jersey to say in all contracts we give special

 5   consideration to the fact of unequal bargaining power and the

 6   plight of the consumer.  But it can't go over the line to

 7   treating arbitration agreements less favorably.

 8          But I think, whether Mr. Adler is right or wrong

 9   about Atalese, it is initially for the arbitrator to decide,

10   and I so hold.

11          Now, given that, what to do in the interim?  I do

12   have some sympathy for what you're proposing Mr. Atalese [sic],

13   and I think the other side has kind of agreed to it, which is

14   that we need to hold things status quo while people exhaust

15   their remedies and/or go to the arbitrator.

16          Now, I'm not sure if they have to exhaust their -- I

17   hesitate to even say exhaust administrative remedies, because

18   that isn't quite what we're talking about here.  It's not going

19   before an administrative agency and an ALJ, but it is an

20   internal appeal process.  And I won't even opine on whether you

21   can skip that and go straight to the arbitrator.

22          But at any rate, to get before an arbitrator, to get

23   an arbitrator selected, to get your application for any kind of

24   quasi-injunctive restraint takes a little bit of time.

25          So I am certainly sympathetic to the argument that I

should enter an order giving -- the agreed-upon figure seems to

be 30 days, for people who are affected here to get their

claims in order and to get before an arbitrator if that's what

they want to do.

There does not seem to be an emergency, except

perhaps in relation to the one or two who have the 10/15

deadline.  And there are two others for whom I guess the

administrative -- for whom the deadline has passed; but they,

nevertheless, might want to get in front of the arbitrator very

fast and try to get that turned around.  So I certainly

sympathize with that.

By the way, nobody is saying you can't do it faster

than 30 days.  I'm just saying they ought to have 30 days to do

it.  That will give them time; that will give the arbitrator

time to make whatever ruling the arbitrator needs to make in

terms of holding things status quo during the pendency of the

arbitration.

So with that, let me just ask for comment on the

remedy, I guess, is what I want.

Mr. Adler, I think you were indicating that's what

you wanted.

Oh, I should also point out this closely parallels

what you got in the Connecticut case, not that it's entirely

parallel on the merits, but I think it is kind of parallel in

terms of situation.

1           Talk to me about the remedy.

2           MR. ADLER:  Yes.  Okay.

3           I guess two things jump out at me.

4           Number one, as indicated in our papers there have

5   been misrepresentations made by UnitedHealthcare to plan

6   participants about doctors not accepting new patients even

7   though, as counsel indicates, some of these doctors still have

8   their provider contracts in place until some time next year.

9           There were indications about doctors coming out of

10  the plan.  What I would ask for, in terms of maintaining sort

11  of the status quo here, is that those types of representations

12  not be permitted pending the proceeding moving forward as

13  indicated by Your Honor, because that really is causing

14  problems to patients.  And they're also giving out incorrect

15  information about not accepting patients.

16          There was a letter that went out that we attached.

17  I'm sure counsel will tell me the date was wrong.  But the

18  letter said this particular doctor was no longer in the plan as

19  of 2016.

20          So I think that as part of this period to allow us to

21  get a ruling on the arbitration clause, there should be an

22  indication that the doctors who are currently in the plan

23  should be treated like every other member of the plan while

24  this proceeding moves forward.

25          THE COURT:  Unless and until, yes.  I understand.

1          MR. ADLER:  The other issue is that, as I indicated

2     earlier, we can deal with the issue of arbitration, hopefully

3     agree on an arbitrator, and get a decision rather quickly.  But

4     the regulations and the contract clearly provide what type of a

5     hearing the doctors are entitled to.

6          When you look at the likelihood of success on the

7     merits of this application, there's really been no argument

8     made by UnitedHealthcare that they've given any of the

9     providers any of the rights that are spelled out in the

10    regulations and in the contract.

11         We would like, simultaneously, to be able to proceed

12    with our statute regulatory rights before a panel as provided

13    for by the regulations.  And simultaneously, we can ask the

14    arbitrator to make a determination about his or her own

15    jurisdiction.

16         THE COURT:  Okay.  Let me hear from your adversary on

17    that.

18         His concern is, essentially, that the effectiveness

19    of any relief an arbitrator can give can be undermined by

20    communications, for example, saying this doctor is out of the

21    plan; don't expect to have your medical bills covered.  There's

22    something to that, isn't there?

23         MR. BOONE:  I don't think so.  My clients are really

24    just trying to protect members and their ability to make

25    choices along the way about their healthcare.

United States District Court
Newark, New Jersey

1        At this point sending new letters out saying that

2    these providers may, after all, stay in the networks in

3    question I think would inject more confusion into the process

4    because, as it worked out and the providers filed individual

5    arbitrations, we think that we're going to win those

6    arbitrations because we had a right under the contract to

7    non-renew on 90 days' notice on the anniversary date, which is

8    what we did.

9        The Medicare Advantage regulations contemplate on

10   their face without-cause terminations.  We gave a reason in the

11   letters that we sent to these providers, saying that we were

12   assessing our networks and we have a contractual right to

13   non-renew.

14       So we think we're going to win.  And so once we win

15   in those arbitrations, these providers would be out of the

16   network, in which case, at least on the Medicare Advantage

17   side, the plan members would be --

18       THE COURT:  High and dry, yes.

19       MR. BOONE:  -- in the plan for the plan year.

20       As I understand it, that would not be true on the

21   Medicaid side.  I think Mr. Adler had submitted the declaration

22   from a --

23       THE COURT:  Why the distinction?

24       MR. BOONE:  -- Miss McIver.

25       THE COURT:  Sorry.

1          MR. BOONE:  Just because of the way the regulations

2     work under Medicaid, as I understand it, a Medicaid plan member

3     can follow their preferred physician out of the network to

4     another Medicaid network.

5          THE COURT:  I see.

6          MR. BOONE:  I believe Mr. Adler can talk to this, but

7     I think that's what happened with Miss McIver.  As soon as she

8     heard about Dr. Salerno's pending non-renewal, she switched to

9     a new plan in the same month.  So for all those reasons --

10         THE COURT:  New plan, same doctor, you mean?

11         MR. BOONE:  That's -- according to the declaration,

12    that's what happened.  Yes, Your Honor.

13         So we would not want to send out new letters.  We

14    think that will make things even more confusing.  We can just

15    move speedily into individual arbitrations.  They would need to

16    be individual arbitrations under the plain terms of the

17    arbitration clause.  It doesn't allow for any kind of class or

18    coordinated or consolidated proceeding even in arbitration.

19         But I think in light of the offer that we made even

20    before this hearing, that we would be willing just to say, Go

21    to arbitration.  And, in fact, for the providers who did not

22    appeal, according to our records, they would not have an

23    opportunity now because they had to do it within 30 days of the

24    notice of their non-renewal.

25         And so we can just move into arbitrations, individual

1   arbitrations if they like.  And if they want to seek emergency

2   relief, they can do that.

3          We have already offered essentially, as you've noted,

4   the relief that the Second Circuit fashioned as modified in the

5   Second Circuit order.

6          So we're okay with that.  We don't think the Court

7   would need to enter that order.  We can do it by an agreement

8   between the parties.  But if the Court is inclined to enter an

9   order, we think that that would be all right, a good way to

10  proceed.

11         THE COURT:  Okay.  Mr. Adler, I guess what he's

12  saying is such an order would only make things worse and that

13  it doesn't apply to Medicaid anyhow and that isn't the real

14  answer here just to hurry up?

15         MR. ADLER:  No, Your Honor.  Because -- what's today,

16  the 4th?

17         THE COURT:  Yes.

18         MR. ADLER:  October 15th is the open-enrollment

19  period.  If Your Honor doesn't enter restraints and preclude

20  the misrepresentations that I mentioned, my clients, who

21  generally 80 or 90 percent of their practice is based on

22  Medicaid and Medicare patients, they're going to scatter like

23  the wind.

24         I think based on both the clear contractual right and

25  regulatory right to this procedure, that we've easily satisfied

1   a likelihood of success on the merits of those claims.

2         As Your Honor knows, whether or not Your Honor is

3   going to reach the merits or now has indicated that the

4   arbitrator will decide his own jurisdiction, the Court has the

5   right to impose certain restraints that protect the parties

6   here.

7         If the open-enrollment period comes and patients are

8   not told that these doctors are still in the plan, they're

9   going to find other -- try to find other physicians if they're

10  able.  Many of them likely will not be able to find other

11  physicians.

12        Just to follow up on what counsel said, I think

13  Ms. McIver is a Medicare patient.  She's over 65.  But even

14  though she did switch and follow Dr. Salerno to WellCare, her

15  whole specialists who Dr. Salerno in the past would be

16  referring her to, he's not able to refer her to those

17  specialists anymore unless those specialists are also part of

18  the WellCare plan.

19        So unless Your Honor provides that the status quo is

20  going to be maintained and that they're treated the same as

21  everyone else under the plan, subject to whatever an arbitrator

22  may rule down the road, the patients are going to scatter like

23  the wind here.

24        And we've indicated that the continuity issue --

25        THE COURT:  Hang on.  How many physicians are

1    affected in the short run, say, in the October period?

2              MR. ADLER:  There could be thousands.  We now have

3    the Medical Society in on behalf of all the doctors in

4    New Jersey.

5              I believe there was an indication in the short

6    certification that was submitted by UnitedHealthcare that we're

7    talking about thousands and thousands of patients.  And as

8    indicated in our papers, the physician directories for North

9    Jersey and South Jersey contain something like 40,000 doctors.

10             So just based on statistics, I would imagine at least

11   one-twelfth of those doctors have their contracts coming due in

12   the next month.

13             So this need to maintain the status quo and the

14   fact -- I know counsel mentioned discussions that we had prior

15   to today.  There was an indication they were willing to do

16   those things in discussions with us about correcting the

17   misrepresentations.  And there's nothing that says in any of

18   these regulations that they need to tell patients six months or

19   eight months before their contracts expire that they're coming

20   out of the plan.

21             THE COURT:  So what are you proposing?

22             MR. ADLER:  I'm proposing that the information that's

23   posted on their website and in the directories electronically

24   available to patients remove any indication for any doctors

25   that they're not accepting new patients and they take out the

1    indication there as well that says these doctors will be coming

2    out of the plan.

3            We can get to these issues as quickly as possible.

4    But in the meantime, my clients will suffer irreparably if --

5    and the patients will because, clearly, one element of

6    irreparable harm is interfering with a long-term

7    relationship --

8            THE COURT:  Sure.

9            MR. ADLER:  -- between a physician and his patient.

10           Secondly, because of UnitedHealthcare being such a

11   major provider and my clients, some of them 80 to 90 percent of

12   their patient base are in this plan, there's going to be

13   irreparable damage to my clients' business and their goodwill

14   unless some temporary restraints are imposed.

15           THE COURT:  Then how about that?  I think we're kind

16   of narrowing the relief that is being sought here.

17           How about just removing on the website whatever it

18   says to the effect that this doctor is not long for

19   UnitedHealth?

20           MR. BOONE:  So in our discussions before this hearing

21   today, we have offered, in fact, to do that if there is an

22   online provider directory.  We offered to, for the 30 days

23   under our proposed standstill, to remove from the online

24   directory any notation suggesting that the provider would be

25   non-renewed to allow the provider to then go seek emergency

```
1    relief from an individual arbitrator in an individual
2    arbitration.
3             So we certainly are open to doing that.
4             THE COURT:  Look, that seems fair to me.  Why don't
5    you do that.  Let's add that to the standstill order.  Again,
6    it's for the 30 days.  This is basically a bridge to get you to
7    the arbitrator.  And once --
8             MR. BOONE:  That's how we were contemplating it in
9    offering it.
10            THE COURT:  Yes.  That's the point of this relief,
11   this limited relief I am offering.  This is really for the
12   arbitrator ultimately to decide the issues here, assuming the
13   arbitrator has jurisdiction.  I'll be frank and say it kind of
14   looks like he does.
15            But I do want to -- I think it's only fair that we
16   have, as I say, a bridge to the arbitrator during which the
17   efficacy of relief that arbitrator could give is not
18   undermined.
19            So yes, let's add that.  Your online provider
20   directory or wherever that information would be will not be
21   indicating that so-and-so -- Dr. So-and-so is leaving the plan.
22            MR. BOONE:  Understood, Your Honor.  Just to be
23   clear, you're not ordering that we send new letters out?
24   Because we had never offered that.  And in --
25            THE COURT:  Yes.  I'm not going to order that.  I
```

1    think that's, number one, probably a little expensive.  But,

2    number two -- that doesn't bother me so much.  But number two

3    is I think that could be disruptive.  Just for a 30-day period

4    to get us to the arbitrator, it seems like just too much to

5    ask.  But I think the online one is fair, and so I will require

6    that.

7                MR. ADLER:  Just to be clear, Your Honor, that would

8    also include any representations about not accepting new

9    patients?  Because that is just false in terms of the doctors.

10               THE COURT:  Are there such representations?

11               MR. ADLER:  Yes.  Yes.  We submitted one or two

12   examples of letters --

13               THE COURT:  How about online?  No, no.  I mean

14   online.

15               MR. ADLER:  Yes.  Yes, it is there.

16               MR. BOONE:  I would need to look at the online

17   directory, Your Honor.

18               THE COURT:  Look, if it's in there, take it out.

19               But, yes.  Look, I haven't looked at the online

20   directory.  If it's like most kinds of directories, it's just a

21   list, right?  I mean, it doesn't say -- under orthopaedic

22   surgeons or something, it will say Dr. So-and-so, who are

23   within the plan.  And it wouldn't have a note after it saying,

24   "No longer accepting patients," or would it?

25               MR. BOONE:  So as I understand it, there would be a

1    notation perhaps in some cases saying there's a non-renewal

2    date coming due.

3            THE COURT:  Yes.  Well, that we want out.

4            MR. BOONE:  Right.  But outside of that, I think I

5    understand what you're saying.  I agree with your

6    understanding.

7            THE COURT:  Okay.  Do me a favor.  Between you, draft

8    up an order that I can sign.  Keep it minimal.  You know what

9    happens when we start negotiating complex orders.

10           MR. BOONE:  Sure.

11           THE COURT:  I think everybody understands what I've

12   ruled here, and so give me an order disposing of the motion and

13   providing for these temporary restraints for the 30-day period.

14   Okay?

15           MR. ADLER:  Your Honor, just so we're clear, it's

16   Exhibit G to the Ramos certification is the information I was

17   referring to.

18           THE COURT:  Which is in the letters?

19           MR. ADLER:  Sorry?

20           THE COURT:  Which is in a letter or online?

21           MR. ADLER:  No.  Exhibit G to her certification is a

22   copy of the listing for Miss Ramos in UnitedHealthcare

23   directory or published information.  It says she's not

24   accepting patients.

25           THE COURT:  Do me a favor.  I know I've got it, but

```
1    just hand me that one so I can look at it.

2              MR. ADLER:  It's on the top right, Your Honor.

3              THE COURT:  Okay.  I see what you're saying.

4              Yes, in addition to the other information, there's

5    like a little X and it says, "Not accepting patients."

6              Yes.  I think that's within the scope of what I've

7    asked in terms of deletion of --

8              MR. BOONE:  Understood, Your Honor.

9              THE COURT:  -- of the information.

10             MR. ADLER:  Thank you, Your Honor.

11             MR. BOONE:  Just for 30 days.

12             THE COURT:  Yes.  That's what I'm talking about.

13             By then we ought to have, if everybody moves with

14   dispatch, then we ought have an arbitrator lined up.  In my

15   experience, AAA moves pretty fast if you indicate some

16   urgency --

17             MR. BOONE:  That's my experience as well, Your Honor.

18             One other thing.  I think in making some comments

19   just a minute ago, Mr. Adler suggested that in our pre-hearing

20   conversations that we had suggested this offer because we were

21   wanting to correct some misrepresentations.

22             Well, that's not true.  There is no

23   misrepresentation.  We sent a letter saying we're not

24   non-renewing.

25             THE COURT:  Let's not get -- it's hard enough dealing
```

```
 1   with the literal.  Let's not get into the implications.

 2            MR. BOONE:  I just wanted for the record to clear

 3   that up.

 4            THE COURT:  I understand.  Anything else?

 5            I think we've done what we can do today.  So you'll

 6   get me an order by -- when can you get it to me?  By Monday?

 7            MR. ADLER:  Yes.  That's fine.

 8            THE COURT:  Do me a favor.  Before you put it in,

 9   call chambers, because I will ask you to email it in, in a word

10   processing format, just in case there's anything I need to

11   monkey with.  So call chambers, and they will give you an email

12   address that you can send it to.

13            MR. ADLER:  Thank you.

14            THE COURT:  Thanks, everybody, for a very

15   well-presented case on a tight schedule.

16            MR. ADLER:  Thank you.

17            MR. BOONE:  Thank you, Your Honor.

18            (Proceedings conclude 3:05 p.m.)

19   -------------------------------------------------

20        I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   /S/Rhéa C. Villanti, CCR, CRCR            10/6/19

25   Court Reporter/Transcriber
```

United States District Court
Newark, New Jersey

# INTRODUCTION

Our agreement consists of this contract, the appendices, and the additional materials we reference in the attached Appendix 1.

**Guiding principles**

We strive to operate in accordance with the following principles:

• *We want to work together with America's best physicians to improve the health care experience of our customers.*

• *We respect and support the physician/patient relationship while adhering fairly to the contract for benefits we provide our customers.*

• *Whether a particular treatment is covered under a benefit contract should not determine if the treatment is provided. Physicians and health care professionals should provide the care they believe is necessary regardless of coverage.*

• *You should discuss treatment options with patients regardless of coverage. We encourage that communication.*

• *Physicians should describe any factors that could affect their ability to render appropriate care. Matters such as professional training, financial incentives, availability constraints, religious or philosophical beliefs, and similar matters are all things that a physician should consider discussing with a patient. We encourage these communications. We urge full disclosure.*

• *Fairness and efficiency will govern the ways in which we administer our products. We will make our determinations promptly. Our commitments to our customers will be clear. We will honor our agreements. When it comes to coverage determinations, the language of the benefit contract will take precedence.*

**Next steps**

Please read this agreement. If you have questions, write to or call:

**Oxford Health Plans**
**A UnitedHealthcare Company**
**Network Contract Support**
1311 W. President George Bush Highway, Suite 100
Mail Route: TX023-1000
Richardson, TX  75080-9870

(732) 623-1144

You can visit our website at www.unitedhealthcareonline.com (UnitedHealthcare Online®) for additional details on items described in the agreement. If the agreement is acceptable to you, please sign both of the enclosed copies of the contract, and send both copies to the address above.

## PHYSICIAN CONTRACT

United HealthCare Insurance Company is entering into this agreement with you.  It is doing so on behalf of itself, Oxford Health Plans (NJ), Inc., and its other affiliates for certain products and services we offer our customers, all of which we describe in the attached Appendix 2. This agreement applies to you and the services you provide in all of your practice arrangements and for all of your tax identification numbers, except that if your services are covered under an agreement between us and a medical group that you are part of, services that you provide through that medical group will be subject to that other agreement and not this agreement.

### <u>What you will do</u>

You need to be credentialed in accordance with our Credentialing Plan, as referenced in Appendix 1, for the duration of this agreement.

You must notify us in a timely manner about certain services you provide in accordance with our Administrative Guide so that we can provide our customers with the services we have committed to provide.  If you do not so notify us about these services, you will not be reimbursed for the services, and you may not charge our customer.

Within one year of the effective date of this agreement, you must conduct business with us entirely on an electronic basis to the extent that we are able to conduct business electronically (described in the Administrative Guide), including but not limited to determining whether your patient is currently a customer, verifying the customer's benefit, and submitting your claim.  We will communicate enhancements in UnitedHealthcare Online® functionality as they become available and will make information available to you as to which products are supported by UnitedHealthcare Online.

You must submit your claims within 90 days of the date of service.  After we receive your claim, if we request additional information in order to process your claim, you must submit this additional information within 90 days of our request.  If your claim or the additional information is not submitted within these timeframes, you will not be reimbursed for the services, and you may not charge our customer.

You will submit claims only for services performed by you or your staff.  Pass through billing is not payable under this agreement and may not be billed to our customer.  For laboratory services, you will only be reimbursed for the services that you are certified through the Clinical Laboratory Improvement Amendments (CLIA) to perform, and you must not bill our customers for laboratory services for which you are not certified.

You will submit claims that supply all applicable information.   These claims are complete claims. Further information about complete claims is provided in our Administrative Guide.

If you disagree with our payment determination on a claim, you may submit an appeal as described in our Administrative Guide.

You will not charge our customers anything for the services you provide, if those services are covered services under their benefit contract, but the applicable co-pay, coinsurance or deductible amount.  If the services you provide are denied or otherwise not paid due to your failure to notify us, to file a timely claim, to submit a complete claim, to respond to our request for information, or based on our reimbursement policies and methodologies, you may not charge our customer.  If the services you provide are not covered under our customer's benefit contract, you may, of course, bill our customer directly. You will not require a customer to pay a "membership fee" or other fee in order to access you for covered

services (except for co-payments, coinsurance and/or deductibles provided for under the customer's benefit contract) and will not discriminate against any customer based on the failure to pay such a fee.

You will cooperate with our reasonable requests to provide information that we need.  We may need this information to perform our obligations under this agreement, under our programs and agreements with our customers, or as required by regulatory or accreditation agencies.

You will refer customers only to other network physicians and providers, except as permitted under our customer's benefit contract, or as otherwise authorized by us or the participating entity.

### What we will do

We or the other applicable participating entity will promptly adjudicate and pay your complete claim for services covered by our customer's benefit contract. If you submit claims that are not complete,

- You may be asked for additional information so that your claim may be adjudicated; or

- Your claim may be denied and you will be notified of the denial and the reason for it; or

- We may in our discretion attempt to complete the claim and have it paid by us or the other applicable participating entity based on the information that you gave in addition to the information we have.

If governing law requires us to pay interest or another penalty for a failure to pay your complete claim for covered services within a certain time frame, we will follow those requirements. The interest or other penalty required by law will be the only additional obligation for not satisfying in a timely manner a payment obligation to you. In addition, if we completed a claim of yours that was not complete, there shall be no interest or other late payment obligation to you even if we subsequently adjust the payment amount based on additional information that you provide.

The applicable participating entity will reimburse you for the services you deliver that our customer's benefit contract covers. The amount you receive will be based on the lesser of your billed charges or our fee schedule, which is described at Appendix 1 and is subject to the reimbursement (coding) policies and methodologies of us and the participating entities. Our reimbursement policies and methodologies are updated periodically and will be made available to you online or upon request.  To request a copy of our reimbursement policies and methodologies, write to Oxford Health Plans, a UnitedHealthcare Company, Network Contract Support, 1311 W. President George Bush Highway, Suite 100, Mail Route: TX023-1000, Richardson, TX  75080-9870.  Your reimbursement is also subject to our rules concerning retroactive eligibility, subrogation and coordination of benefits (as described in the Administrative Guide). We recognize CPT reporting guidelines as developed by the American Medical Association, as well as ICD diagnostic codes and hospital-based revenue codes. Following these guidelines does not imply a right to reimbursement for all services as coded or reported.

Ordinarily, fee amounts listed in Appendix 3 are based upon primary fee sources. We reserve the right to use gap-fill fee sources where primary fee sources are not available.

We routinely update our fee schedule in response to additions, deletions and changes to CPT codes by the American Medical Association, price changes for immunizations and injectable medications, and in response to similar changes (additions and revisions) to other service coding and reporting conventions that are widely used in the health care industry, such as those maintained by the Centers for Medicaid and Medicare Services (for example HCPCS, etc.). Ordinarily, our fee schedule is updated using similar methodologies for similar services. We will not generally attempt to communicate routine maintenance of this nature and will generally implement updates within 90 days from the date of publication.

We will give you 90 days written or electronic notice of non-routine fee schedule changes which will substantially alter the overall methodology or reimbursement level of the fee schedule. In the event such changes will reduce your overall reimbursement under this Agreement, you may terminate this Agreement by giving 60 days written notice to us, provided that the notice is given by you within 30 days after the notice of the fee schedule change.

If either of us believes that a claim has not been paid correctly, either of us may seek correction of the payment within a 12-month period following the date the claim was paid, except that overpayments as a result of abusive or fraudulent billing practices may be pursued by us beyond the 12-month time frame mentioned above. In the event of an overpayment, we will correct these errors by adjusting future claim payment and/or by billing you for the amount of the overpayment.

**How long our agreement lasts; how it gets amended; and how it can end**

Assuming you are credentialed by us, and we execute this agreement, you will receive a copy from us with the effective date noted below the signature block. It continues until one of us terminates it.

We can amend this agreement or any of the appendices on 90 days written or electronic notice by sending you a copy of the amendment. Your signature is not required to make the amendment effective. However, if you do not wish to continue your participation with our network as changed by an amendment that is not required by law or regulation but that includes a material adverse change to this agreement, then you may terminate this agreement on 60 days written notice to us so long as you send this termination notice within 30 days of your receipt of the amendment.

In addition, either you or we can terminate this agreement, effective on an anniversary of the date this agreement begins, by providing at least 90 days prior written notice. Either you or we can terminate this agreement at any time if the other party has materially breached this agreement, by providing 60 days written notice, except that if the breach is cured before our agreement ends, the agreement will continue.

Either of us can immediately terminate this agreement if the other becomes insolvent or has bankruptcy proceedings initiated.

Finally, we can immediately terminate this agreement if any governmental agency or authority (including Medicare or Medicaid) sanctions you, if you no longer have your license to practice medicine, if you no longer have hospital admitting privileges in any participating hospital, or in accordance with the terms of our Credentialing Plan.

We both agree that termination notices under this agreement must be sent by certified mail, return receipt requested, to Oxford Health Plans, a UnitedHealthcare Company, Network Contract Support, 1311 W. President George Bush Highway, Suite 100, Mail Route: TX023-1000, Richardson, TX  75080-9870 or to the post office address you provided us. We both will treat termination notices as "received" on the third business day after they are sent through regular mail.

**About data and confidentiality**

We agree that your medical records do not belong to us. You agree the information contained in the claims you submit is ours. We both will protect the confidentiality of our customers' information in accordance with applicable state and federal laws, rules, and regulations.

We are both prohibited from disclosing to third parties any fee schedule or rate information. There are three exceptions:

- You can disclose to our customer information relating to our payment methodology for a service the customer is considering (e.g., global fee, fee for service), but not specific rates (unless for purposes of benefit administration).

- We and the participating entities may use this information to administer our customers' benefit contracts and to pay your claims. We also may permit access to information by auditors and other consultants who need the information to perform their duties, subject to a confidentiality agreement.

- We both may produce this information in response to a court order, subpoena or regulatory requirement to do so, provided that we use reasonable efforts to seek to maintain confidential treatment for the information.

### What if we do not agree

We will resolve all disputes between us by following the dispute procedures set out in our Administrative Guide. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association (see http://www.adr.org) within one year.

We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute. We both agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling. The arbitrator will not vary the terms of this agreement and will be bound by governing law. We both acknowledge that this agreement involves interstate commerce, and is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The arbitrator will not have the authority to award punitive or exemplary damages against either of us, except in connection with a statutory claim that explicitly provides for such relief. Arbitration will be conducted in Essex County, NJ.

If a court allows any litigation of a dispute to go forward, we both waive rights to a trial by jury with respect to that litigation, and the judge will be the finder of fact. Any provision of this agreement that is invalid or unenforceable shall not affect the validity or enforceability of the remaining provisions of this agreement or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. This section of the agreement governs any dispute between us arising before or after execution of this agreement and this section shall survive and govern any termination of this agreement.

### What is our relationship to one another

You are an independent contractor. This means we do not have an employer-employee, principal-agent, partnership, joint venture, or similar arrangement. It also means that you make independent health care treatment decisions. We do not. We do not reserve any right to control those treatment decisions. It further means that each of us is responsible for the costs, damages, claims, and liabilities that result from our own acts.

You will look to the applicable participating entity for reimbursement for the products and services under our agreement. This means that we are not financially responsible for claims payment for groups that are self-funded or that are not affiliated with us.

We may assign this agreement to any entity that is an affiliate of United HealthCare Insurance Company at the time of the assignment.


**This is it**

This contract, the appendices and the items referenced in the attached Appendix 1, constitute our entire understanding. It replaces any other agreements or understandings with regard to the same subject matter – oral or written – that you have with us or any of our affiliates.

Federal law and the applicable law of the jurisdiction where you provide health care services govern our agreement. Such laws and the rules and regulations promulgated under them, when they are applicable, control and supersede our agreement. The Regulatory Appendix referenced in Appendix 1, and any attachment to it, is expressly incorporated to govern our agreement and is binding on both of us. In the event of any inconsistent or contrary language between the Regulatory Appendix (when it applies) and any other part of our agreement, including but not limited to appendices, amendments and exhibits, the Regulatory Appendix will control.

**Conclusion**

If you agree with these terms, please execute both copies of the agreement below and return them to us. With your signature, you confirm you understand the contract, including the dispute resolution procedures described in the section of this agreement entitled "What if we do not agree," the appendices and the items referenced in the attached Appendix 1.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.**

**AGREED BY:**

| **Physician** | **Address to be used for giving notice under the agreement:** |
|---|---|
| Signature | Street      443 NORTHFIELD AVE STE 301 |
| Print Name    FADI A EL-ATAT | City        WEST ORANGE |
| DBA (if applicable) | State      NJ |
| Date              02/25/2010 | Zip Code   07052-3022 |
| E-Mail | TIN  223766956 |
| National Provider Identification (NPI) Number | |

| **United HealthCare Insurance Company, on behalf of itself, Oxford Health Plans (NJ), Inc., and its other affiliates, as signed by its authorized representative:** |
|---|
| Signature |
| Print Name    Angie Kumler |
| Date              03/02/2010 |
| For office use only:    NCST_NE_0029523_20100111a_002795557 |
| Month and year in which agreement is first effective:   03/12/2010 |

**Appendix 1**

We include as part of our agreement the following additional materials that bind you and us:

| | |
|---|---|
| **Appendix 2** | **Definitions, Products and Services**<br><br>This appendix sets forth definitions for our "customer" and "participating entities" as well as lists the type of benefit contracts offered to our customers. |
| **Appendix 3** | **Fee Schedule Sample.** This document includes a portion of our fee schedule for the most frequent procedures you perform, or for those procedures you have requested.   Additional portions of the fee schedule can be requested by writing to Oxford Health Plans, A UnitedHealthcare Company, Network Contract Support, 1311 W. President George Bush Highway, Suite 100, Mail Route: TX023-1000, Richardson, TX  75080-9870.  You will be paid in accordance with the United fee schedule. |
| **State Regulatory Requirements Appendix** | In some instances, states add requirements to our agreement that are set forth in this appendix. |
| **Medicare Regulatory Requirements Appendix** | (This appendix applies only if you are in our Medicare network)<br>Your participation in our network for customers with Medicare benefit contracts is subject to additional Medicare requirements set forth in this appendix |
| **Medicare Fee Schedule** | This appendix applies only if you are in our Medicare network. |
| **Administrative Guide** | The Administrative Guide sets forth the policies and procedures of United, and includes the similar documents issued by affiliated companies such as Oxford Health Plans.  We have enclosed a copy of the Administrative Guide.  This guide governs the mechanics of our relationship.  Our Administrative Guide may be viewed by going to www.unitedhealthcareonline.com.<br><br>We may make changes to the Administrative Guide upon 30 days' electronic or written notice to you. |
| **Credentialing Plan** | To review our credentialing plan, visit www.unitedhealthcareonline.com.<br>This plan requires you to carry malpractice insurance in amounts with carriers and on terms and conditions that are customary for physicians like you in your community.  To request access to, or a copy of, our credentialing plan, write to Oxford Health Plans, A UnitedHealthcare Company, Network Contract Support, 1311 W. President George Bush Highway, Suite 100, Mail Route: TX023-1000, Richardson, TX  75080-9870. |

## Appendix 2
## Definitions, Products and Services

1.      **Customer.**  Individuals who are enrolled in benefit contracts insured or administered by us or any participating entity are included in our use of the phrase "customer" in this agreement.

2.      **Participating entities.**  The following entities have access to our agreement::

- United HealthCare Insurance Company and its affiliates

- Groups receiving administrative services from United HealthCare Insurance Company or its affiliates or that have arranged for network access through an entity that has contracted with United HealthCare Insurance Company or one of its affiliates.

3.      **Products and services.**  You will participate in networks where your patients are enrolled in benefit contracts of the types generally described below:

- Benefit contracts where individuals are offered a network of participating physicians and other health care professionals and must select a primary care physician, who in some cases must approve any care provided by other health care providers.  An option for this benefit contract allows individuals to receive health services from non-participating physicians.

- Benefit contracts where individuals are offered a network of participating physicians and other health care providers but are not required to select a primary care physician. An option for this benefit contract allows individuals to receive health services from non-participating physicians.

- Benefit contracts where individuals are not offered a network of participating physicians and other health care providers.

- Medicare benefit contracts that (A) are sponsored, issued or administered by us or another applicable participating entity and (B) replace, either partially or in its entirety, the original Medicare coverage (Medicare Part A and Medicare Part B) issued to beneficiaries by the Centers for Medicare and Medicaid Services ("CMS"), other than the following benefit contracts:  (i) Medicare Advantage Private Fee-For-Service Plans; and (ii) Medicare benefit contracts administered by our business unit Americhoice.

- 

You will **not** participate in networks where your patients are enrolled in benefit contracts of the types generally described below:

- Benefit contracts for Medicaid customers.  Note:  Excluding Medicaid from this agreement does not preclude the parties or their affiliates from having a separate agreement pertaining to participation in a Medicaid network.

- Medicare benefit contracts that (A) are administered by our business unit AmeriChoice and (B) replace, either partially or in its entirety, the original Medicare coverage (Medicare Part A and Medicare Part B) issued to beneficiaries by CMS.  Although Medicare benefit contracts (A) are administered by AmeriChoice and (B) replace, either partially or in its entirety, the original Medicare coverage (Medicare Part A and Medicare Part B) issued to beneficiaries by CMS are excluded from this Agreement, there can be a separate agreement between us or one of our

affiliates and you providing for your participation in a network for those Medicare benefit contracts.

- Medicare Advantage Private Fee-For-Service Plans.

- Benefit contracts for Medicare Select.

- 

-

**Appendix 3- Options PPO**

**Representative Options PPO Fee Schedule Sample for**: NJ 73118/73119

The provisions of this fee schedule apply to covered services rendered by you to customers covered by benefit contracts marketed under the name "Options PPO" and benefit contracts where customers are not offered a network of participating physicians and other health care professionals from which they may receive covered services.

Unless specifically indicated otherwise, amounts listed in the fee schedule represent global fees and may be subject to reductions based on appropriate modifier (for example, professional and technical modifiers). Any co-payment, deductible or coinsurance that the customer is responsible to pay under the customer's benefit contract will be subtracted from the listed amount in determining the amount to be paid by the payer. The actual payment amount is also subject to matters described in this agreement, such as the reimbursement policies. Please remember that this information is subject to the confidentiality provisions of this agreement.

## Appendix 3- Products other than Options PPO

**Representative All-Payer Fee Schedule Sample for:** NJ 73114/73115

Unless another fee schedule to this agreement applies specifically to a particular benefit contract as it covers a particular customer, the provisions of this appendix apply to covered services rendered by you to customers covered by benefit contracts sponsored, issued or administered by all participating entities.

Unless specifically indicated otherwise, amounts listed in the fee schedule represent global fees and may be subject to reductions based on appropriate modifier (for example, professional and technical modifiers). Any co-payment, deductible or coinsurance that the customer is responsible to pay under the customer's benefit contract will be subtracted from the listed amount in determining the amount to be paid by the payer. The actual payment amount is also subject to matters described in this agreement, such as the reimbursement policies. Please remember that this information is subject to the confidentiality provisions of this agreement.

**Appendix 3- Liberty Plan®**

**Representative All-Payer Fee Schedule Sample for:**  42ALL

Unless another fee schedule to this agreement applies specifically to a particular benefit contract as it covers a particular customer, the provisions of this appendix apply to covered services rendered by you to customers covered by Liberty Plan benefit contracts sponsored, issued or administered by "Oxford" identified by a reference to Oxford Liberty Plan on the valid ID card of any customer eligible for and enrolled in such benefit contracts.

Unless specifically indicated otherwise, amounts listed in the fee schedule represent global fees and may be subject to reductions based on appropriate modifier (for example, professional and technical modifiers).  Any co-payment, deductible or coinsurance that the customer is responsible to pay under the customer's benefit contract will be subtracted from the listed amount in determining the amount to be paid by the payer.  The actual payment amount is also subject to matters described in this agreement, such as the reimbursement policies.  Please remember that this information is subject to the confidentiality provisions of this agreement.

**Appendix 4 – LOCATIONS**

NOTE: Please attach additional copies of this page if you need to list additional locations.
Please remember that, as described on page 2, this agreement applies to all of your locations even if you
do not list all of your current locations or if you add a location in the future.

| Provider: FADI A EL-ATAT |
|---|

| Primary Service Location Address: | Address: 443 NORTHFIELD AVE STE 301 | | |
|---|---|---|---|
| | City: WEST ORANGE | State: NJ | Zip: 07052-3022 |
| | Tel #: | Fax #: | |
| Billing Address: | Address: | | |
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |

| Secondary Service Location Address: | Address: | | |
|---|---|---|---|
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |
| Billing Address:<br><br>   Same as above | Address: | | |
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |

| Mailing Address: | Address: | | |
|---|---|---|---|
| | City: | State: | Zip: |
| | Tel #: | Fax #: | |

**Insert MSPS Here**
Section Intentionally Left Blank

**For reference purposes, the following fee schedules will be used to pay claims under this agreement:**

| PRODUCTS: | FEE SCHEDULES: |
|---|---|
| Commercial - Options PPO | NJ 73118/73119 |
| Commercial - All Other | NJ 73114/73115 |
| Medicare | NJ NZ4/NZ5 |
| EMPIRE | NJ 73118 |
| LIBERTY | 42ALL |

# AMENDMENT TO PARTICIPATION AGREEMENT FOR VETERANS AFFAIRS COMMUNITY CARE PROGRAM

UnitedHealthcare Insurance Company, contracting on behalf of itself, Oxford Health Plans (NJ), Inc. and other entities that are United's Affiliates (collectively, "United") and FADI A ELATAT MD ("Provider") are parties to a Participation Agreement (the "**Agreement**") under which Provider participates in United's network of participating providers.

This amendment to the Agreement (the  "**Amendment**") is effective the first day of the first calendar month that begins at least 90 days after the day United sent Provider this Amendment (the "**Amendment Effective Date**"), subject to Section 5.5 of this Amendment.

## RECITALS

A.      Optum Public Sector Solutions, Inc. ("Optum") is a United Affiliate.

B.      Optum Public Sector Solutions, Inc., in response to solicitation number VA791-16-R-0086, submitted a bid to the United States Government to provide a Community Care Network ("**VA CCN**") for the Department of Veterans Affairs ("**VA**") on a self-funded basis for the provision of health and administrative services to its Enrolled Eligible Veterans (as defined below). In response to Optum's bid, Optum was awarded a Prime Contract by the Department of Veterans Affairs for VA CCN Region 1 (the "Prime Contract").

C.      United wants to make Provider's services available to the Enrolled Eligible Veterans, and Provider wishes to provide those services, under the terms and conditions set forth in this Amendment.

The parties to this Amendment agree to the following:

## ARTICLE I.  DEFINITIONS

The following terms when used in this Amendment have the meanings set forth below. Capitalized terms in this Amendment but not defined in this Amendment will have the meaning set forth in the Agreement. If there is a conflict between the terms of the Agreement and this Amendment concerning the VA CCN, the term set forth in this Amendment will govern for the VA CCN.

1.1      **Approved Referral.**  An Approved Referral constitutes an authorized service under the VA CCN Requirements (as defined below).  Approved Referrals will support a specific plan of care as it relates to a specified number or visits and/or services approved for the individual Enrolled Eligible Veteran over a specified period of time not to exceed one year.

1.2      **Enrolled Eligible Veteran.**  A person who is enrolled in VA's patient enrollment system established and operated under 38 U.S.C. Section 1705, and is eligible to receive care in the community due to either time-eligibility or distance-eligibility at the time services are rendered.

1.3      **Clean Claim.**  A Clean Claim means a claim for payment for Contracted Services that contains all the required data elements necessary for adjudication, without requesting supplemental information from the submitter, as required by VA CCN Requirements.

1.4 **Contracted Services.** Covered Services that are within Provider's scope of practice and provided to an Enrolled Eligible Veteran pursuant to VA CCN Requirements in effect at the time services are rendered and compensated in accordance with this Amendment and VA CCN Requirements.

1.5 **Covered Services.** The health care services and supplies that are covered under the VA CCN as described in 38 CFR 17.38 and for which Provider has received an Approved Referral or Prior Authorization.

1.6 **Distance Eligible Veterans.** Distance-Eligible and Special-Circumstances Veterans (hereinafter referred to as "Distance-Eligible Veterans") are Veterans who meet specific requirements as determined by VA to be eligible for community care because of geographic reasons including unusual and/or excessive burden or any other special circumstance VA determines to be valid for providing care in the community.

1.7 **Emergent Care.** Medical care required within twenty-four hours or less essential to evaluate and stabilize conditions of an emergent need that if not provided may result in unacceptable morbidity/pain if there is significant delay in the evaluation or treatment. Emergent and emergency are used interchangeably in this Amendment.

1.8 **Emergent Healthcare Need.** Conditions of one's health that may result in the loss of life, limb, vision, or result in unacceptable morbidity/pain when there is significant delay in evaluation or treatment.

1.9 **Standardized Episode of Care.** A set of clinically related healthcare services for a specific unique illness or medical condition (diagnosis and/or procedure) provided by an authorized provider during a defined authorized period of time not to exceed one year.

1.10 **Provider.** A facility, ancillary provider, physician, physician organization, other health care professional, supplier, or other entity engaged in the delivery of health care services which is licensed and/or certified as required under applicable law, and which has been duly credentialed by United or its designee and is subject to an effective written Amendment directly with United, or indirectly through another entity (such as another provider), to provide Covered Services to Eligible Veterans.

1.11 **Provider Manual.** The VA Community Care Network Provider Manual is added to Table 1 in the Additional Manuals Appendix of the Agreement, and will be an "Additional Manual," as that term is defined in the Additional Manuals Appendix. It will include manuals and handbooks provided by the VA or United for use by Providers. The Provider Manual will be updated from time to time through revisions, modifications or amendments, which will be communicated to Providers through amendments, provider newsletters, bulletins or supplemental manuals or handbooks.

1.12 **Prior Authorization.** A required process through which VA reviews and approves certain medical services to ensure the medical necessity and appropriateness of care, according to VA CCN Requirements, prior to services being rendered within a specified timeframe from a non-VA provider or additional resources in the community. This type of process requires Prior Authorization be obtained "prior to" the specified service.

1.13 **Provider Professional.** The physicians, practitioners, allied health professionals who have been accepted by United to provide Contracted Services to Enrolled Eligible Veteran.

1.14 **Reimbursement Rate.**  The payment made to Provider for Covered Services provided to an Enrolled Eligible Veteran as set forth in the Payment Appendix to this Amendment.  The Reimbursement Rate is calculated in accordance with the VA CCN Requirements.  In no event will the Reimbursement Rate exceed the maximum allowed by the VA CCN Requirements.

1.15 **Service Connected Care.**  Medical care and services provided for a Veteran who has an illness or injury incurred in or aggravated by military service as determined by VA.

1.16 **State.**  The state or states in which Provider is to provide Covered Services under this Amendment.

1.17 **Time-Eligible Veterans.**  Veterans who are unable to schedule an appointment for hospital care, medical services or dental services with the VA within the wait-time goals of the Veterans Health Administration (VHA) for such care or services or the period determined by a VA provider to be clinically necessary for such care or services, whichever is shorter.  This includes when such care or services are not provided within a medical facility of VA that is accessible to the Veteran. This also includes when there is a compelling reason that the Veteran needs to receive the care or service outside of a medical facility of VA.

1.18 **United VA CCN Policies.**  The policies, procedures and programs utilized by United for VA CCN and applicable to Providers in effect at the time services are rendered to an Enrolled Eligible Veteran, including, without limitation, the Provider Manual, credentialing and quality management and improvement programs, fraud detection and recovery procedures, eligibility verification, payment and coding guidelines, anti-discrimination requirements, utilization management, case management and disease management plans and programs, grievance and appeal procedures, consultation report policy and procedure, and provider dispute and/or administrative review processes.  The United VA CCN Policies are documented and may be modified from time to time through revisions, supplements, modifications or amendments, and Providers may be made aware of those modifications through modification notices, amendments, provider newsletters, bulletins or supplemental releases.

1.19 **VA CCN Requirements.**  VA CCN Requirements shall mean laws, regulations, and requirements applicable to VA CCN, including but not limited to Title 38, United States Code, Chapter 81, Title 38 Code of Federal Regulations, Chapter 1, Part 17, the Prime Contract, and the United VA CCN Policies as may be amended.

1.20 **Veteran's Administration Benefit Plan.**  Benefit Plans sponsored, issued, or administered by the Veteran's Administration for veterans enrolled in the patient enrollment system established and operated by the Veteran's Administration under 38 U.S.C. Section 1705.

## ARTICLE II.  PROVIDER OBLIGATIONS

2.1 **Provision of Services.**  Provider will render Contracted Services to Enrolled and Eligible Veterans, in accordance with the terms and conditions of this Amendment, including all VA CCN Requirements.  Provider shall be solely responsible for the quality of Contracted Services rendered by Provider to Enrolled Eligible Veterans. In the event Provider or Provider Professional is uncertain as to whether a service is a Covered Service, the Provider or Provider Professional shall contact the VA, as directed in the Provider Manual and vacommunitycare.com, to obtain a coverage determination prior to rendering services, except in an Emergent Healthcare Need.

2.2 **Provider Education.**  Provider shall participate in VA CCN education efforts, and shall require all Provider Professionals and staff members to participate in VA CCN education efforts

described in the Provider Manual so that Provider, Provider Professionals and Provider's staff members understand the applicable VA CCN Requirements to enable them to carry out the requirements of this Amendment in an efficient and effective manner which promotes Enrolled Eligible Veteran satisfaction.

2.3    **Credentialing of Provider Professionals.**  Provider shall ensure that each Provider Professional submits to United, or its designee, a credentialing application which meets the requirements of United, to the extent they are subject to credentialing.  The credentialing application must be approved by United or its designee prior to any performance taking place by such Provider or Provider Professional under this Amendment.

2.4    **Office Availability/Access.**  Provider shall maintain such offices, equipment, patient service personnel and allied health personnel as may be necessary to provide Contracted Services.  Provider shall provide Contracted Services under this Amendment at Provider's offices during normal business hours, and shall be available, or obtain coverage referenced in Section 2.5, to Enrolled Eligible Veterans by telephone twenty-four (24) hours a day, seven (7) days a week for consultation on medical concerns.  Further, Provider shall be available, or obtain coverage referenced in Section 2.5, to provide Contracted Services on a Medical Emergency basis twenty-four (24) hours a day, seven (7) days a week.

2.5    **Coverage.**  Provider shall arrange for coverage, in the event of Provider Professional's illness, vacation or other absence from his or her practice, and shall ensure that such coverage is by a Provider.  Provider shall ensure that the covering professional abides by the terms of this Amendment.

2.6    **Notice of Adverse Action.**  Provider shall notify United within five (5) calendar days of the occurrence of any of the following:

a)     Any action taken to restrict, suspend or revoke Provider's or a Provider Professional's license or authorization to provide Contracted Services;

b)     Any suit or arbitration action brought by a patient against Provider or a Provider Professional for malpractice.  In addition, Provider shall send United a summary of the final disposition of such action;

c)     Any misdemeanor conviction or felony information or indictment naming Provider or a Provider Professional.  In addition, Provider shall send United a summary of the final disposition thereof;

d)     Any disciplinary proceeding or action naming Provider or a Provider Professional before an administrative agency in any state.  In addition, Provider shall send United a summary of the final disposition thereof;

e)     Any cancellation or material modification of the professional liability insurance required to be carried by Provider or a Provider Professional under the terms of this Amendment;

f)     Any action taken to restrict, suspend or revoke Provider's or a Provider Professional's participation in Medicare, Medicaid or CHAMPUS, VA CCN or any succeeding program.  In addition, Provider shall send United a summary of the final disposition thereof;

g)      Any action which results in the filing of a report on Provider or a Provider Professional under applicable laws and/or regulations relating to the provision of, or the billing and payment for, Covered Services.  In addition, Provider shall send United a summary of the final disposition thereof;

h)      Any material Enrolled Eligible Veteran complaints against Provider or a Provider Professional; or

i)      Any other event or situation that could materially affect Provider's ability to carry out Provider's duties and obligations under this Amendment.

**2.7**   **Non-Discrimination.**  Provider shall not discriminate against any Enrolled Eligible Veteran in the provision of Contracted Services hereunder, whether on the basis of the Enrolled Eligible Veteran's coverage under the VA CCN age, sex, marital status, sexual orientation, race, color, religion, ancestry, national origin, disability, handicap, health status, source of payment, utilization of medical or mental health services, equipment, pharmaceuticals or supplies, or other unlawful basis including, without limitation, the filing by such Enrolled Eligible Veteran of any complaint, grievance or legal action against Provider or United.  Provider will make reasonable accommodations for Enrolled Eligible Veteran with disabilities or handicaps, in accordance with all applicable law, including but not limited to, providing such auxiliary aides and services to Enrolled Eligible Veteran at the Provider's expense as are reasonable, necessary and appropriate for the proper rendering of Contracted Services.

**2.8**   **Clinical Quality Monitoring Plan.**  Provider will comply with all provisions of the clinical quality management plan, including the provision of medical records and other documentation, and those provisions of VA CCN Requirements that state Provider will cooperate fully with a designated utilization and clinical quality management organization, will agree to follow all quality assurance, utilization management, and patient referral procedures established under VA CCN Requirements, will make available medical records or other pertinent records to designated Veteran's Administration utilization management or quality monitoring contractors, and will authorize the release of information as required by United for such quality assurance and utilization management activities.  Provider further authorizes United to release all review data obtained through medical record and other document audits required by VA or any peer reviewer.

**2.9**   **Prior Authorization.**  All services other than Emergent Care require a prior authorization from the VA.  If a Prior Authorization from the VA is not obtained, in accordance with VA CCN Requirements, Provider's payment will not be reimbursed and Provider will not bill the Enrolled Eligible Veteran.  Prior Authorization is not a guarantee of payment; payment determinations are made after the claim is submitted for payment, based on a variety of factors, including the eligibility of the patient and whether the service is a Covered Service.

The preferred method of submitting Prior Authorization requests is in electronic format.  If Provider has the capability to submit EDI 278 transactions, Provider will submit Prior Authorization requests via Direct Messaging, eHealth Exchange secure online file exchange, secure email, secure fax, or telephone.

**2.10**   **Referrals.**  All services require an Approved Referral from the VA.  The provision of services must be limited to what is set forth in the Approved Referral, which is only valid for the services, and time and treatment period specified.  Services not included in the Approved Referral and any applicable extension of time and treatment period must be requested by the Provider as a new Approved Referral request.

Where a Veteran self-presents for Emergent Care to an in-network emergency department or Provider without an Approved Referral, Provider must both notify the VA and request retroactive approval of referral from the VA within the time-frame and manner specified in the VA CCN Requirements.

2.11    **Medical Documentation.**  The Provider must deliver, directly to VA or the referring Provider, medical documentation in a secure electronic format or otherwise as defined in the Provider Manual, and include, at a minimum, the data elements described in the Provider Manual.

2.12    **Quality Management and Improvement Program.**  The quality of Covered Services rendered by Provider to Enrolled Eligible Veteran is subject to the quality management and improvement program described in the VA CCN Requirements. Provider will participate in, cooperate with and comply with all quality management and improvement program requirements and all decisions rendered by United in connection with the quality management and improvement program. Provider also will provide, within ten (10) days of receipt of written notice, all medical records, review data and other information as may be required or requested under the quality management and improvement program.

2.13    **Indemnification and Liability Insurance**

a.    This a non- personal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, under which the professional services rendered by the Provider are rendered in its capacity as an independent contractor.  The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspects of the services rendered, including by example, a Provider's professional medical judgment, diagnosis, or specific medical treatments. Each Provider shall be liable for his or her liability-producing acts or omissions.  The Provider shall maintain during the term of this Amendment, professional liability insurance issued by a responsible insurance carrier of not less than the following amount(s) per specialty per occurrence: $1,000,000 per occurrence; $3,000,000 aggregate.  However, if the Provider is an entity or a subdivision of a State that either provides for self-insurance or limits the liability or the amount of insurance purchased by State entities, then the insurance requirement of this contract shall be fulfilled by incorporating the provisions of the applicable State law.

b.    Provider's liability insurance shall be of the types and in the amounts set forth in paragraph (a), and may be of the types and amounts as specified by applicable state law. In lieu of purchasing the required insurance coverage, Provider may self-insure its medical malpractice and/or professional liability, as well as its commercial general liability coverage.

c.    Unskilled or non-clinical Providers, e.g. Tai Chi instructors, massage therapists, etc. are only required to maintain insurance coverage consistent with the types and limits commonly necessary for their scope of practice, as determined by the prime contractor and the VA.

d.    Provider will, upon request, furnish evidence to United of its insurability, as required in this section, or the provisions of State law as to self-insurance, or limitations on liability or insurance.  Provider shall also provide Certificates of Insurance or insurance policies evidencing the required insurance coverage and an endorsement stating that any cancellation or material change adversely affecting the Government's interest shall not be effective until 30 days after the insurer or the Provider gives written notice to United.

e.      The Provider will notify United if it changes insurance providers during the term this Amendment.  The notification shall provide evidence that the Provider will meet all the requirements of this section, including those concerning liability insurance and endorsements.  These requirements may be met either under the new policy, or a combination of old and new policies, if applicable.

f.      If Provider uses the self-insurance option described in this Section, Provider will provide to United, prior to Effective Date, a statement verified by an independent auditor or actuary that its reserve funding levels and process of funding appears to be adequate to meet the requirements of this section and fairly represents the financial condition of the fund.  Provider will provide a similar statement during the term of this Amendment upon United's request, which will be made no more frequently than annually or as otherwise specified by the VA.  Provider will ensure that its self-insurance fund complies with applicable laws and regulations.

2.14   **Listing of Provider.**  United and its designees may list the name, address, telephone number and other factual information of Provider, in United's provider directory and/or informational materials provided to the VA.  In no event shall Provider market or advertise the VA CCN Program without the prior written consent of United, except that Provider may make known the fact that it is a participating provider with United for the VA CCN Program.

2.15   **Identification Number/Payment of Taxes.**  Provider shall notify United in writing, thirty (30) days in advance, of any changes to Provider's federal tax identification numbers or national provider identification numbers.

2.16   **Electronic Connectivity.**  When made available by United, Provider will make reasonable commercial efforts to do business with United electronically.  This includes, but is not limited to, checking eligibility status, claims status, and submitting requests for claims adjustments, referrals, prior authorizations, and claims submission, as well as for additional functionalities after United informs Provider that such functionalities have become available.  Providers who do not do business with United electronically may be moved to the end of referral and provider directory search lists.

### ARTICLE III.  SUBMISSION, PROCESSING AND PAYMENT OF CLAIMS

3.1    **Submission of Claims.**  Provider shall, when possible, submit all claims electronically to United.  Claims shall be submitted as complete, accurate Clean Claims in a format approved by United for Contracted Services rendered to Enrolled Eligible Veteran.

Claims must be submitted within one hundred eighty (180) days after the date of service.  Claims received by United beyond the timely filing periods specified in this section may be denied.  Provider shall not seek or accept payment from the Enrolled Eligible Veteran in the event United, as a third party administrator for the VA, does not pay Provider for a claim not submitted in a timely manner.  Additionally, electronic claims must comply with standardized electronic transactions and code sets as required pursuant to the Health Insurance Portability and Accountability Act ("HIPAA").

Provider will comply with VA CCN Requirements when billing and collecting and/or seeking administrative review of payment for Contracted Services rendered pursuant to this Amendment.

3.2    **Reimbursement.**  United, as a third party administrator for the VA, will pay claims for Covered/Contracted Services as further described in the applicable Payment Appendix to this Amendment, and in accordance with the VA CCN Requirements, Provider will accept the Reimbursement Rates as payment in full for Covered Services.  In no event will reimbursement for Covered Services exceed the maximum allowed by the VA CCN Program.

3.3    **No Surcharges.**  Provider shall not charge the Enrolled Eligible Veteran any fees or surcharges for Covered Services rendered pursuant to this Amendment, or any membership fee or other fee as a prerequisite for accepting a Enrolled Eligible Veteran as a patient.  In addition, Provider shall not collect sales or use tax from Enrolled Eligible Veteran for the sale or delivery of Covered Services.  If United receives notice of any additional charge, Provider shall fully cooperate with United to investigate such allegations, and shall promptly refund any payment deemed improper by United to the party who made the payment.

3.4    **Enrolled Eligible Veteran Hold Harmless.**  Provider acknowledges that Enrolled Eligible Veterans do not have financial responsibility for any Approved Referral or Prior Authorization. Provider agrees that in no event, including, but not limited to, non-payment by United, as a third party administrator for the VA, the insolvency of United, or breach of this Amendment, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against Enrolled Eligible Veteran or persons other than VA or United, as a third party administrator for the VA, for Covered Services.  This provision shall survive termination of this Amendment, regardless of the cause giving rise to termination.  This provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Enrolled Eligible Veteran or persons acting on their behalf.

3.5    **Charges.**  Provider shall not charge Enrolled Eligible Veteran for the following services: services for which Provider is entitled to payment from United, as a third party administrator for the VA, services for which the Enrolled Eligible Veteran would be entitled to have payment made by United, as a third party administrator for the VA, had Provider complied with VA CCN Requirements; services not medically necessary and appropriate for the clinical management of the presenting illness, injury, disorder or maternity; services for which a Enrolled Eligible Veteran would be entitled to have payment made by United, as a third party administrator for the VA, but for a reduction or denial in payment as a result of quality review; and services rendered during a period in which Provider was not in compliance with one or more conditions of authorization pursuant to the VA CCN Requirements.

3.6    **Other Health Insurance.**  Provider shall adhere to the Other Health Insurance policies and procedures set forth in the VA CCN Requirements.

3.7    **Third Party Recoveries.**  If United, as a third party administrator for the VA, has compensated Provider for Covered Services, United retains the right to recover from applicable third parties responsible for payment for services rendered to an Enrolled Eligible Veteran and to retain all such recoveries.  Provider will provide United with such information as United may require in order to pursue recoveries from such third party sources, and to promptly remit to United any monies Provider may receive from or with respect to such sources of recovery.

3.8    **Correction of Claims Payments.**  United, as a third party administrator for the VA, may recover from Provider amounts owed to United pursuant to VA CCN Requirements , including payments that were made beyond or outside what is provided for under this Amendment.

Where a claim is denied partially or in its entirety, Provider must file a written reconsideration request in accordance with the VA CCN Requirements within 90 calendar days form the date of

denial.  Where a claim has not been denied partially or in its entirety, but the Provider believes the claim has been incorrectly paid, the Provider must seek correction of a given claim payment by giving written notice to United within 12 months after the claim was initially processed. Provider's failure to comply with the foregoing will waive any right by Provider to subsequently seek such payment or correction of payment under this Amendment, or through dispute resolution or in any other forum.

Subject to the VA CCN Requirements, United shall have the right to offset overpayments and other amounts Provider owes United against future payments otherwise due to Provider.

**3.9**     **VA CCN Contract Phase-Out.**  Provider will use reasonable commercial efforts to submit all VA CCN claims within thirty (30) days from date of service or discharge during the phase-out period of United's VA CCN contract with the United States Government.

## ARTICLE IV.  TERM AND TERMINATION

**4.1**     This Amendment shall take effect on the Amendment Effective Date and shall continue until one of the following occurs:

a)     The parties mutually agree in writing to terminate this Amendment;

b)     Either party terminates the Amendment by providing 180 days prior written notice to the other party;

c)     The Prime Contract expires or is terminated;

d)     A material breach of this Amendment by either party upon 60 days written notice; except that such termination will not take effect if the breach is cured within 45 days after notice of breach.

**4.2**     **Reimbursement of Services after Termination.**  United will not reimburse the Provider for any Covered Services provided to the Enrolled Eligible Veteran after this Amendment terminates.

**4.3**     **Enrolled Eligible Veteran Notification.**  Provider shall notify any Enrolled Eligible Veteran seeking professional services after the date of termination that the Provider is no longer a Provider.  The parties agree to cooperate in good faith and without disparagement in connection with information supplied to Enrolled Eligible Veteran in connection with any termination of this Amendment.

## ARTICLE V.  MISCELLANEOUS PROVISIONS

**5.1**     **Governing Law.**  This Amendment will be governed by and construed in accordance with VA CCN Requirements and the laws of the state(s) in which Provider renders Contracted Services (except where preempted by Federal law), and any other applicable law. Any provision required to be in this Amendment pursuant to the VA CCN Requirements shall bind Provider and United, whether or not set forth herein.  The parties agree to comply with all applicable laws, rules and regulations regarding the performance of their obligations under this Agreement.  In the case of Indian Health Care providers, no term or condition of the Amendment or any addendum thereto shall be construed to subject the Provider to state law to any greater extent than state law is already applicable.  United reserves the right to unilaterally amend, revise, or supplement this

Amendment with written notice to Provider where necessary to maintain compliance with the VA CCN Requirements and/or any applicable laws, rules, or regulations.

5.2     **Supplemental Terms and Conditions.**  This Amendment is subject to the supplemental terms and conditions specified in Exhibit A.

5.3     **Appendix 2 of the Agreement.**  With this Amendment, the Veteran's Administration Benefit Plan is added to Section 1 of Appendix 2 of the Agreement.

5.4     **Conflict of Provisions.**  The Provider Manual controls if it conflicts with this Amendment. Applicable statues or regulations will control if any conflict with the terms of this Amendment or the Provider Manual.

5.5     **Opt-out**.  The Agreement allows us to amend it by sending you a copy of the Amendment 90 days prior to the Amendment Effective Date. Your signature is not required to make this Amendment effective.  However, if you do not wish to accept this Amendment, please provide written notice to us within 30 days of your receipt of this Amendment at the following address:

UnitedHealthcare
780 Shiloh Road
MS-1.700
Plano, TX  75074

If we receive such notice from you during such time period, this Amendment will not take effect.

**All other provisions of the Agreement shall remain in full force and effect.**

UnitedHealthcare Insurance Company, on behalf of itself, Oxford Health Plans (NJ), Inc. and its other affiliates, as signed by its authorized representative:

| Signature:  Abraham Berman |
| --- |
| Print Name:  Abraham Berman |
| Title:  Network President, Northeast Region |
| Date:  08/30/2019 |

**List of Exhibits:**

**<u>Exhibit A</u>:**  Payment Appendix

<u>**Exhibit A:**</u>

**Payment Appendix**
**Veterans Affairs**

**Applicability**

This Payment Appendix applies to Covered Services rendered to Customers enrolled in a Veterans Affairs Benefit Program.

**Section 1**
**Definitions**

Unless otherwise defined in this section 1, capitalized terms used in this Payment Appendix have the meanings assigned to them in this Agreement.

**CMS:**  Centers for Medicare and Medicaid Services.

**CMS Fee Amount:**  The fee amount specified in the current year Medicare fee schedule published by the Centers for Medicare and Medicaid Services for the Carrier Locality in which services were provided.

**Customary Charge:**  The fee for health care services or supplies charged by Provider that does not exceed the fee Provider would ordinarily charge another person regardless of whether the person is a Customer.

**Provider:**  The person or practice that is the contracted party to the participation agreement to which this appendix is attached.

**VA Fee Schedule:**  The fee schedule published by the United States Department of Veterans Affairs.

**Section 2**
**Contract Rates for Covered Services**

2.1    **Contract Rates.**  The contract rates for Covered Services are the lesser of Customary Charges and the applicable contract rate as follows:

   i)      Except as otherwise provided in this Section, the contract rate for Covered Services is 100% of the CMS Fee Amount;

   ii)     Urgent or emergent durable medical equipment, medical devices, orthotics, and prosthetic items are not separately payable when included in the contract rate for other healthcare services (for example, a medical device implanted during surgery and included in the contract rate for the surgery).  Otherwise for urgent or emergent durable medical equipment, medical devices, orthotics, and prosthetic items, the contract rate is 100% of the CMS Fee Amount.

   iii)    For the seasonal influenza vaccines, the contract rate for the vaccine is 100% of the CMS Fee Amount.  The contract rate for the administration and dispensing of the vaccine is $20.50.

iv)    For Covered Services that are not covered by the Medicare program or for which the Medicare program does not have local pricing, the contract rate is 100% of the maximum allowable under the VA Fee Schedule.

v)    For Covered Services that are not covered by the Medicare program or for which the Medicare program does not have local pricing and for which the VA Fee Schedule does not have pricing, the contract rate is 100% of your Customary Charges for Covered Services.

vi)    For Covered Services which are marked as approved under Mill Bill, the Veterans Millennial Health Care Act, the contract rate is the lesser of the amount for which the Customer is responsible or 70% of the CMS Fee Schedule.

**Section 3**
**Miscellaneous**

3.1    **Billing and Filing of Claims.**  Provider will submit claims using a CMS 1500, its successor form or its electronic equivalent.  All claims submitted under this Payment Appendix must use CPT Codes, HCPCS Codes, ICD-10-CM Codes or its successor and other codes in compliance with HIPAA standard data set requirements.  Claims submitted without HIPAA standard data set requirements may be denied.

3.2    **Routine Maintenance.**  United routinely updates the fee schedule in response to changes published by the Fee Source, such as fee amount changes.  United will use reasonable commercial efforts to implement the fee schedule changes in its systems within 90 days after final publication.  These changes will be effective in our system on the effective date of the change provided by the Fee Source.  Routine coding changes are typically completed within 30 days from when CMS places information regarding a modification in the public domain or the effective date of the modification, whichever is later.  However, claims already processed prior to the change being implemented by United will not be reprocessed unless otherwise required by the U.S. Department of Veterans Affairs.

United also routinely updates the fee schedule in response to coding changes as described in this Agreement.  When implementing coding updates, United will apply the same percentage(s) as set forth above in section 1 and the then current value of the published code to determine the contract rate.  United will use reasonable commercial efforts to implement such changes within 90 days from the date of publication.  Claims already processed prior to the change being implemented by United will not be reprocessed unless otherwise required by the U.S. Department of Veterans Affairs.

3.3    **Payment Code Updates.**  United will update CPT codes, HCPCS codes, ICD codes or successor version and/or revenue codes according to Health Insurance Portability and Accountability Act requirements based on (a) the latest edition of the Current Procedural Terminology (CPT) manual which is revised by the American Medical Association, (b) the latest edition of the HCPCS manual which is revised by the Centers for Medicare and Medicaid Services (CMS), (c) the latest edition of the ICD manual which is issued by the U.S. Department of Health and Human Services and (d) the latest revenue code guidelines from the National Uniform Billing Committee.  Unless specified elsewhere in this Payment Appendix, the contract rate for a new, replacement, or modified code(s) will be at the existing contract rate for the appropriate code(s) it replaced or modified.  United will not generally notify Provider of these code updates.